UNITED STATES DISTRICT COURT   JUDGE BRODERICK
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                                                    :
TREEHOUSE FOODS, INC., BAY VALLEY          :
FOODS, LLC, and STURM FOODS, INC.,         :
                                                    :     Civil Action No. _____
                                                    :
                    Plaintiffs,                     :
                                                    :
v.                                                  :     COMPLAINT AND DEMAND
                                                    :     FOR JURY TRIAL
                                                    :
GREEN MOUNTAIN COFFEE ROASTERS,            :
INC. and KEURIG, INCORPORATED,             :
                                                    :
                    Defendants.                     :
———————————————————— x

RECEIVED
FEB 11 2014
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC, and Sturm Foods, Inc.,

(collectively, "TreeHouse" or "Plaintiffs"), bring this action for damages and permanent

injunctive relief against Defendants Green Mountain Coffee Roasters, Inc. ("GMCR"), and

Keurig, Incorporated ("Keurig"), GMCR's wholly-owned subsidiary (collectively, "Green

Mountain" or "Defendants").  Plaintiffs allege as follows:

1.      This is an action for damages and permanent injunctive relief against Green

Mountain for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; Section 3 of

the Clayton Act, 15 U.S.C. § 14; and state antitrust and unfair competition statutes and common

law of the states of New York, Wisconsin, and Illinois.

2.      Green Mountain has monopolized the market for the sale of single-serve brewers,

as well as the market for the sale of single servings or "portion packs" of coffees or other

beverages that are used in those brewers.  Green Mountain previously owned certain patents that

allowed it to exclude competition for the sale of the most popular format of those "portion

packs" — the "K-Cup" format — but those patents expired in 2012. However, rather than compete for market share on the merits or fulfill its statutory obligation to enable competitors to practice its invention after its patents expired, Green Mountain has abused its dominance in the brewer market by coercing business partners at every level of the K-Cup distribution system to enter into anticompetitive agreements intended to unlawfully maintain Green Mountain's monopoly over the markets in which K-Cups are sold. Even in the face of these exclusionary agreements that have unreasonably restrained competition, some companies, such as TreeHouse, have fought hard to win market share away from Green Mountain on the merits by offering innovative, quality products at substantially lower prices. In response, Green Mountain has announced a new anticompetitive plan to maintain its monopoly by redesigning its brewers to lock out competitors' products. Such lock-out technology cannot be justified based on any purported consumer benefit, and Green Mountain itself has admitted that the lock-out technology is not essential for the new brewers' function. Like its exclusionary agreements, this lock-out technology is intended to serve anticompetitive and unlawful ends. Indeed, such an anticompetitive product redesign would force consumers to pay at least 15% to 25% more for K-Cups, would block consumers from their preferred beverages, and would restrain competition on the merits.

3.     Green Mountain's market dominance is clear. To this day, Green Mountain controls at least approximately 89% of the market for the sale of single-serve brewers and at least approximately 73% of the market for the sale of all portion packs used in single-serve brewers. Green Mountain's portion pack market share is even higher if considering only the market for the K-Cup and equivalent cup formats, which is the market Green Mountain analyzes for competitive purposes. As Green Mountain's President and Chief Executive Officer, Brian

Kelley, admitted during an investor call on February 5, 2014, Green Mountain controls approximately 86% of the market for cups that are compatible with brewers that use K-Cups.

4.     As Mr. Kelley acknowledged, for many years, Green Mountain controlled 100% of the market for the sale of these cups, which are used in brewers to prepare a single serving of coffee, tea, hot chocolate, cider, or other beverages. Although competitors have entered the market, Green Mountain continues to sell K-Cups at supracompetitive prices for use with single-serve brewers manufactured or licensed for manufacture by Keurig to be compatible with K-Cups ("K-Cup Brewers").

## NATURE OF THE ACTION

5.     GMCR first partnered with Keurig in the late 1990s to manufacture and sell K-Cups, which, at that time, were covered by patents relating to the coffee filters in those cups ("K-Cup Filter Patents").

6.     Threatened by the inevitable expiration of the K-Cup Filter Patents that would occur in 2012, GMCR embarked on an aggressive plan to eliminate and restrain competition for the manufacture and sale of competitive portion packs that, just like K-Cups, would be compatible with K-Cup Brewers, but that would be engineered, manufactured, and sold by unaffiliated competitors seeking to introduce new products to consumers at lower prices ("Competitive Cups" or, collectively with K-Cups, "Compatible Cups").

7.     After acquiring Keurig and its patents in 2006, Green Mountain aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. (Van Houtte), all before the end of 2010. But Green Mountain did not stop there.

8.     To monopolize through the foreclosure of potential competition, Green Mountain proceeded to systematically tie up vertical distribution channels for Competitive Cups by

3

entering into unduly restrictive exclusive dealing agreements with companies at every level of the Compatible Cup distribution system — from sellers of machinery used to make Compatible Cups; to sellers of Compatible Cup components; to competitor coffee roasters and coffee brands whose coffee is used in Compatible Cups; and to the distributors and retailers that sell and market Compatible Cups to end user consumers, businesses, and institutions.

9.     The terms and number of these anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.

10.    For example, as suppliers subjected to Green Mountain's exclusionary terms have admitted — Green Mountain does not restrict the ability to sell these same products for other purposes — *just so long as those products are not sold to a Green Mountain competitor who intends to use them to make cups for use in K-Cup Brewers*. Thus, these unduly restrictive and unreasonably lengthy, exclusive dealing agreements directly and effectively serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

11.    Moreover, upon information and belief, Green Mountain's exclusionary agreements with coffee brands also contain restrictions dictating where and how licensed K-Cups can be sold, thereby allowing Green Mountain to maintain supracompetitive prices across licensed brands by controlling output. This creates a further incentive for licensed coffee brands to conspire to exclude Competitive Cup makers from the market unless those competitors agree to take a license or become "authorized" by Green Mountain, thereby likewise subjecting the Competitive Cup makers to Green Mountain's territorial control and allocation.

4

12.     Green Mountain distributors, which according to Green Mountain exceed 500 in number, are also prohibited from dealing with Competitive Cup makers under the express terms of Green Mountain's Keurig Authorized Distributor, or "KAD," Agreement.

13.     Having grown into a billion dollar publicly traded company by restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, it did just that — raising its K-Cup prices 10% to 15% in the fourth quarter of 2010.

14.     The web of exclusive dealing agreements Green Mountain had created allowed it to leverage its monopoly over K-Cup Brewers in order to maintain its monopoly over the portion pack market, and indeed, this was the intended result of Green Mountain's business model — the profitability of which depends upon Green Mountain's ability to maintain supracompetitive K-Cup prices and to restrain competition from lower-priced Competitive Cups.

15.     Green Mountain sells K-Cup Brewers at cost or even at a loss for use by consumers and provides K-Cup Brewers to businesses for free, so long as those businesses agree to purchase K-Cups exclusively from Green Mountain.

16.     While Green Mountain sacrifices brewer profits to drive K-Cup sales, it recoups profits by charging a 50% margin on K-Cups.  Green Mountain admits, for instance, that it "sell[s] [] at home ("AH") brewers at attractive price points which are … sometimes at a loss … in order to drive the sales of profitable packs."

17.     Without anticompetitive agreements foreclosing meaningful price competition from Competitive Cups, Green Mountain would not have been able to maintain such a substantial K-Cup profit margin for as long as it has following the entry of Competitive Cup makers.

5

18.     Although Green Mountain was able to stave off virtually all competition until late 2010, it could not prevent TreeHouse from converting production lines it had previously used to produce a different product in order to bring the first Competitive Cups to the market in 2010 so that consumers could enjoy new brands of beverages without the monopoly mark-up in price.

19.     These Competitive Cups did not infringe any of Defendants' patents because they did not contain a filter.  But that did not stop Defendants from pursuing a baseless lawsuit to try to keep Competitive Cups off the market.  Within a matter of weeks after Competitive Cups hit the shelves, Keurig sued TreeHouse Foods, Inc.'s subsidiary, Sturm Foods, Inc. ("Sturm"), alleging that the sale of these Competitive Cups to consumers infringed and induced infringement of Keurig's *brewer* method patents — not even asserting any patents covering K-Cups themselves.

20.     After Sturm incurred three years of litigation costs, the United States Court of Appeals for the Federal Circuit affirmed the district court's ruling, holding on appeal that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

21.     This lawsuit was not filed for any valid purpose of protecting patent rights, but was an objectively and subjectively baseless sham intended to squelch competition from Competitive Cups.  As the Federal Circuit expressly concluded, "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law."  *Id.*  Instead of any proper purpose, the lawsuit was filed to intimidate market entrants and to raise a rival's costs, thereby depriving TreeHouse of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.

6

22.    While the litigation over Sturm's non-filtered Competitive Cups was pending, Green Mountain's K-Cup Filter Patents expired, and TreeHouse and others began selling Competitive Cups, now with and without filters, in competition with Green Mountain.  Although TreeHouse and others were able to enter the market, TreeHouse's ability to increase capacity and to bring Competitive Cups to consumers and businesses has been restrained by anticompetitive exclusive dealing agreements that have restricted access to cup-making machinery, cup components, coffee brands, and virtually entire categories of potential TreeHouse customers, like the highly profitable Office Coffee Services business.  These exclusive dealing agreements are anticompetitive because, among other reasons, they have facilitated Green Mountain's exercise of market power by impairing rivals' abilities to achieve the scale necessary to become competitively efficient and by depriving TreeHouse of efficient access to both upstream and downstream markets.

23.    Consumers who purchase Compatible Cups are highly price-sensitive.  Not surprisingly, demand has been growing for Competitive Cups, which are typically sold at prices that are at least 15% to 25% lower than prices for K-Cups.

24.    Rather than lowering K-Cup prices and their 50% K-Cup profit margins to a competitive level to compete on the merits, Defendants have instead announced a new anticompetitive plan to further exclude competition.  In yet another attempted "end-run" around the patent and competition laws, Defendants have announced that Keurig will stop selling existing K-Cup Brewers and will replace them with a new K-Cup Brewer called the Keurig 2.0 ("2.0 K-Cup Brewer") containing "interactive technology."  Defendants have announced that the new 2.0 K-Cup Brewers will be able to identify whether an inserted Compatible Cup is either a new generation Defendant-supplied or licensed K-Cup ("2.0 K-Cups") or a Competitive Cup, in

order to prevent the brewer from working with Competitive Cups. Defendants' technology is therefore intended to block Competitive Cups from working with 2.0 K-Cup Brewers, even though the shape of the Competitive Cups will be the same as the 2.0 K-Cups and Defendants do not currently have any patent protections extending to 2.0 K-Cups.

25.     To date, Green Mountain has failed to articulate any material and demonstrable consumer benefit that will be achieved by locking Competitive Cups out from 2.0 K-Cup Brewers, nor could it, as many consumers prefer the price, taste, and/or quality of Competitive Cups to K-Cups. Green Mountain's anticompetitive product redesign is thus not legitimately intended to benefit consumers, but is rather its latest of many anticompetitive acts designed to maintain its monopoly over the markets for the sale of portion packs and Compatible Cups by excluding competition and the lower-priced Competitive Cups that consumers demand. Indeed, Mr. Kelley has admitted that the proposed lock-out technology could be programmed by Green Mountain to be switched on or off after a certain number of uses, thus demonstrating that this technology cannot plausibly be considered to be integral or key to any consumer benefit offered by the new product.

26.     End user businesses, institutions, and consumers should be free to decide whether this pretextual and purported product "improvement" is worth the substantially higher price of 2.0 K-Cups over Competitive Cups, but Green Mountain is threatening to eliminate the freedom of consumer choice and the free and fair interplay of the market. End users of K-Cup Brewers should not be forced by Green Mountain to buy only 2.0 K-Cups when they would prefer to buy Competitive Cups, but this is precisely the goal and result of this anticompetitive and exclusionary scheme.

27.    Defendants have also been interfering with TreeHouse's business relations by systematically confronting TreeHouse's retail customers with their plan to lock out Competitive Cups in order to dissuade retail customers from purchasing Competitive Cups from TreeHouse, and then, on information and belief, foreclosing future competition by entering into unduly restrictive, long-term exclusive agreements with those customers.  Even if Competitive Cups ultimately can be made to work in 2.0 K-Cup Brewers, competition will have already been unlawfully restrained by these agreements prohibiting retailers from doing business with TreeHouse unless Defendants' anticompetitive exclusive dealing agreements are invalidated.

28.    In short, Green Mountain has committed numerous anticompetitive acts to unlawfully maintain its monopoly over the portion pack and Compatible Cup markets, including:

- Coercing machine manufacturers and component suppliers to enter into unduly restrictive, anticompetitive, and unjustifiable exclusionary agreements restraining or eliminating access to equipment and materials needed to make Compatible Cups;

- Conspiring with competitor roasters and coffee brands to allocate markets, reduce output, and to restrain competition from substantially lower-priced Competitive Cups, thereby maintaining supracompetitive prices and inducing would-be competitors to enter into an agreement with Green Mountain despite the expiration of its K-Cup Filter Patents;

- Coercing distributors and retailers to enter into unduly restrictive, anticompetitive, and unjustifiable exclusionary agreements restraining or eliminating access to retail customers and distribution channels;

- Filing sham litigation and continuing on appeal to pursue a "tactic" that had previously been "expressly admonished" by the Supreme Court in order to "impermissibly restrict" consumers from using Competitive Cups;

9

- Threatening to eliminate competitive access to 2.0 K-Cup Brewers, as well as retail customer and consumer choice, by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups, even though K-Cup Brewers and Compatible Cups are distinct products that consumers demand to purchase separately and that have been purchased separately for years; and

- Interfering with TreeHouse's business relations by confronting retail customers with Green Mountain's plan to lock out Competitive Cups in order to dissuade such customers from doing further business with TreeHouse.

29.     Because these anticompetitive acts were performed both to unlawfully maintain Green Mountain's monopoly over portion packs and Compatible Cups and by employing anticompetitive agreements with unaffiliated entities to unreasonably restrain trade without adequate justification or procompetitive benefits, Green Mountain's conduct violates both Sections 1 and 2 of the Sherman Act, as well as Section 3 of the Clayton Act, state antitrust and unfair competition statutes, and the common law of the states of New York, Wisconsin, and Illinois.

30.     These efforts, individually and collectively, were intended to, and have had the effect of, substantially foreclosing competition, restricting entry, constraining output, maintaining supracompetitive prices, restraining the free and fair interplay of the market, and curtailing consumer choices.

## THE PARTIES

31.     Plaintiff TreeHouse Foods, Inc. ("TreeHouse Foods"), is a corporation organized under the laws of the State of Delaware with a principal place of business in Oak Brook, Illinois.

TreeHouse Foods is a food manufacturer that operates its business in the United States as Bay Valley Foods, LLC, and Sturm Foods, Inc.

32.     Plaintiff Bay Valley Foods, LLC ("Bay Valley"), is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Oak Brook, Illinois.  Bay Valley is a wholly-owned subsidiary of TreeHouse Foods.  Bay Valley enters into supply arrangements with retailers for portion packs used in single-serve brewers.

33.     Plaintiff Sturm Foods, Inc., is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Manawa, Wisconsin.  Sturm is a wholly-owned subsidiary of Bay Valley that manufactures dry groceries, under private label brands as well as its own "Grove Square" and "Caza Trail" brand single-serve beverage cups, among other things.  Sturm enters into contracts with suppliers of the machinery and components required to manufacture Compatible Cups.

34.     Defendant Green Mountain Coffee Roasters, Inc., is a corporation organized under the laws of the State of Delaware with a principal place of business in Waterbury, Vermont.

35.     Defendant Keurig, Incorporated, is a corporation organized under the laws of the State of Delaware with a principal place of business in Reading, Massachusetts.  Keurig is a wholly-owned subsidiary of GMCR.

### AGENTS AND CO-CONSPIRATORS

36.     Various persons that are not named as Defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  These other entities have facilitated, adhered to, participated in, and/or communicated with others regarding the alleged conspiracy to monopolize the markets for the

sale of portion packs and Compatible Cups and the anticompetitive and unduly restrictive exclusive dealing agreements addressed in this lawsuit.  Plaintiffs reserve the right to name some or all of these entities as Defendants at a later date.

37.    On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiffs, are co-conspirators with Defendants in their unlawful restraints of trade.

## JURISDICTION AND VENUE

38.    This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiffs for their damages.  This Court has jurisdiction over the federal antitrust law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

39.    This action arises, in part, under the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.* This Court has supplemental jurisdiction over Plaintiffs' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and New York law.

40.    This action arises, in part, under the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/1, *et seq.,* the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 Ill. Comp. Stat. § 510/1, *et seq.,* and Illinois common law pertaining to unfair competition.  This Court has supplemental jurisdiction over Plaintiffs' claims under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and Illinois law.

41.    This action arises, in part, under the Wisconsin Antitrust Act, Wis. Stat. § 133.03, *et seq.,* and Wisconsin common law pertaining to unfair competition.   This Court has

supplemental jurisdiction over Plaintiffs' claims under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and Wisconsin law.

42. This Court has personal jurisdiction over Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

43. This Court also has personal jurisdiction over GMCR because GMCR regularly does and solicits substantial business in New York, either directly or through intermediaries, is continuously and systematically present in New York, and has established minimum contacts with New York, in particular by registering to do business in the state of New York in 2003, maintaining a registered agent for service of process in New York, doing substantial business with third parties in New York, maintaining a distribution center in New York, and conducting banking with financial institutions in New York. In light of GMCR's substantial contacts with New York, the exercise of jurisdiction over GMCR would not offend traditional notions of fair play and substantial justice. Furthermore, GMCR's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Plaintiffs, companies with a presence in this District. The effects of the unlawful conduct alleged below were felt by Plaintiffs, as well as by consumers, in this District.

44. This Court also has personal jurisdiction over Keurig because Keurig regularly does and solicits substantial business in New York, either directly or through intermediaries, is continuously and systematically present in New York, and has established minimum contacts with New York, in particular by registering to do business in the state of New York in 2006, maintaining a registered agent for service of process in New York, and doing substantial business with third parties in New York. In light of Keurig's substantial contacts with New York, the exercise of jurisdiction over Keurig would not offend traditional notions of fair play

13

and substantial justice.  Furthermore, Keurig's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Plaintiffs, companies with a presence in this District.  The effects of the unlawful conduct alleged below were felt by Plaintiffs, as well as by consumers, in this District.

45.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

## RELEVANT MARKETS

### A.     Relevant Product Markets

46.     There are at least three relevant product markets in which to evaluate Defendants' anticompetitive conduct: (1) the market for the design, manufacture, and sale of single-serve brewers ("Single-Serve Brewer Market"); (2) the market for the design, manufacture, and sale of "portion packs" or single-serve containers of coffee, tea, or other beverages ("Portion Packs") that are used in single-serve brewers ("Portion Pack Market"); and (3) the market for the design, manufacture, and sale of Compatible Cups (the "Compatible Cup Market"), which is a sub-market of the Portion Pack Market.  Green Mountain tracks market shares in the Compatible Cup Market to analyze its K-Cup market share for competitive purposes.  *See* Green Mountain FQ1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014).

### 1.     Single-Serve Brewer Market

47.     The Single-Serve Brewer Market encompasses the design, manufacture, and sale of single-serve brewers.  The single-serve brewer is a quick, convenient, and simple way for

consumers to brew a single cup of coffee, cocoa, cappuccino, cider, or other beverages ("Single-Server Brewer"). Single-Serve Brewers brew coffee in less than a minute without requiring the consumer to grind beans, measure coffee, handle used filters, or clean up after the coffee is prepared.

48.     In part because of the unique convenience offered by Single-Serve Brewers, the price of traditional drip coffee makers typically does not fully constrain prices for Single-Serve Brewers.

49.     Consumers pay a premium for Single-Serve Brewers over the price of traditional drip coffee makers. While traditional drip coffee makers are frequently sold around a price point of $20 to $30, Single-Serve Brewers typically cost anywhere from $80 to several hundred dollars.

### a.     Keurig Single-Serve Brewers

50.     Green Mountain designs, manufactures, and sells a variety of Single-Serve Brewers under the brand name Keurig, including K-Cup Brewers, Vue Brewers, and Rivo Brewers, each of which uses a different type of Portion Pack that is incompatible with the other types of brewers.

51.     Keurig offers a variety of Single-Serve K-Cup Brewers that, for the most part, are marketed for use in the home, office, or hospitality sector (*e.g.*, hotels).

52.     K-Cup Brewers are sold for a range of prices. For example, the Mr. Coffee KG2 brewer for home use has been priced at $89.95, while the Breville brewer for home use has been priced at $249.95. Keurig's website lists the prices of only two of its commercial brewers, which are either $129.95 or $249.95.

53.     While K-Cups and K-Cup Brewers are sold as separate products in many stores and online, Keurig typically sells K-Cup Brewers bundled with K-Cups, which makes it difficult for consumers to determine the price of the K-Cups when they purchase K-Cup Brewers.

54.     As a 2012 New York Times article explained, "it's hard to tell how much coffee costs, even if you know what you spent[,] ... [which is] the case with many of the single-serve brewing machines."

55.     Many of Keurig's commercial K-Cup Brewers do not even have their price listed anywhere on the Keurig website.  An interested consumer must specifically "request a price" from a distributor.

56.     Businesses can request a "free trial" at the click of a button on the Keurig website, without being shown the price of the commercial K-Cup Brewers for which they are requesting a free trial.

57.     Green Mountain restricts the ability of distributors to advertise or display the prices of K-Cups that are used in office K-Cup Brewers.  For example, contractual provisions provide that distributors are not allowed to "list, display or broadcast pricing for any Keurig Product or Keurig Pack [ ] through or at any store operated by or for Distributor."  KAD Agreement § 2.1.

58.     In addition to the Single-Serve Brewers manufactured by Green Mountain, Green Mountain also licenses K-Cup Brewer technology to such brands as Mr. Coffee, Cuisinart, and Breville, among others.

59.     Keurig also sells Vue Brewers, which, like K-Cup Brewers, are marketed for home or office use.  Vue Brewers, however, use a different type of Portion Pack, known as "Vue

Cups," which are shaped differently than K-Cups. The Vue Brewer is not compatible with K-Cups, and Vue Cups cannot be used in K-Cup Brewers or Rivo Brewers.

60.     Keurig also offers the Rivo cappuccino and latte brewer. This brewer "exclusively uses Rivo Packs," which, again, are shaped differently than K-Cups and are not compatible with K-Cup Brewers. K-Cups thus cannot be used in Rivo brewers.

61.     More than half of the Keurig K-Cup Brewers, in both the home and commercial sectors, already offer consumers more than one brew size and a digital display.

### b.     Single-Serve Brewers Manufactured By Other Companies

62.     Additional Single-Serve Brewers besides Green Mountain's Keurig brewers include Mars, Inc.'s "Flavia;" Bosch's "Tassimo;" Philips Electronics N.V.'s "Senseo;" Nestlé's "Nespresso;" and Starbucks' "Verismo."

63.     Prices across these Single-Serve Brewers can vary by as much as several hundred dollars.

64.     These Single-Serve Brewers are fragmented and collectively represent a small share of the Single-Serve Brewer Market.

### c.     Green Mountain Has Monopoly Power In The Single-Serve Brewer Market

65.     Green Mountain controls the dominant share of the Single-Serve Brewer Market. As brokerage and investment firm Stifel has noted, Green Mountain's brewer market share is so "dominant" that it is "unlikely any new entrant could gain meaningful share." A 2011 Morgan Stanley consumer survey report similarly observed, "Green Mountain and its Keurig system dominates [the single-serve brewer market]."

66.     Green Mountain reported in September 2013 that it had sold over 30 million Keurig Single-Serve Brewers, which are used in at least approximately 15 million U.S.

households. In fiscal year 2013 alone, Green Mountain sold approximately 10.6 million Keurig Single-Serve Brewers.

67.    As of September 2013, Keurig Single-Serve Brewers represented the top four best-selling coffeemakers in the United States by dollar volume.

68.    From July 2012 to July 2013, Green Mountain sold approximately 4.8 million Single-Serve Brewers, which accounted for 89% of all Single-Serve Brewer sales by units and 93% by dollar value. According to a 2013 market report, Green Mountain controls at least 88% of the Single-Serve Brewer Market of brewers used in the home, and on information and belief, Green Mountain controls nearly 100% of the share of K-Cup Brewers supplied to offices.

69.    In the first quarter of 2014, Green Mountain sold a record 5.1 million Keurig Single-Serve Brewers.

70.    Green Mountain has the power to exclude competition in the Single-Serve Brewer Market. Green Mountain has exercised its power to exclude competition in the Single-Serve Brewer Market by coercing distributors and retail customers to enter into exclusive agreements, which require that only Keurig Single-Serve Brewers be sold or used by these entities.

71.    Barriers to entry are high and imposing for any potential entrant into the Single-Serve Brewer Market. For example, Green Mountain still holds patents that cover its K-Cup Brewers. Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment. Moreover, because retailers are reluctant to stock brewers unless the Portion Packs they use are readily and widely available, and Portion Packs that are compatible with any particular brewer are not widely available unless the corresponding brewers are popular, potential market entrants face a substantial competitive disadvantage vis-à-vis established brewer suppliers.

### 2.    The Portion Pack Market

72.    The second relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for the design, manufacture, and sale of Portion Packs that are used in Single-Serve Brewers.

73.    Compatible Cups (both K-Cups and Competitive Cups) are Portion Packs that are generally only used in Single-Serve Brewers that are K-Cup Brewers.

74.    Some Single-Serve Brewers besides K-Cup Brewers instead use Portion Packs that are packaged as "pods," which look like flat cookies, or "T-Discs," which are a type of sealed pod.

75.    Manufacturers of Single-Serve Brewers that use "pod" Portion Packs include Hamilton Beach, Gevalia, and Philips Electronics N.V.'s "Senseo."

76.    Bosch's "Tassimo" brewer uses "T-Disc" Portion Packs.

77.    The ability to increase Portion Pack prices above their competitive levels has not been reasonably constrained by the price of ground coffee sold to consumers.  The price-per-pound of Portion Pack coffee is nearly five times greater than that of ground coffee.  This has been the case because consumers who utilize Single-Serve Brewers and compatible Portion Packs generally find such packs to be substantially more convenient and desirable in their quality as compared with the brewed coffee from multiple-serve formats.  Thus, were single-serve Portion Packs competitively priced, consumers who own a Single-Serve Brewer would generally not substitute away from its use in favor of multi-serve formats in reaction to a small but significant rise in the price for the corresponding single Portion Packs.

78.    Although there are different types of Portion Packs, such as K-Cups, T-Discs, and pods, each of these Portion Packs is generally only compatible with a corresponding type of

Single-Serve Brewer.  For example, Compatible Cups generally only work in K-Cup Brewers and T-Discs generally only work in the Tassimo brand of Single-Serve Brewers.

79.     Once a consumer purchases a K-Cup Brewer, that consumer cannot use other types of Portion Packs, such as T-Discs or pods, in the K-Cup Brewer, and thus consumers do not view T-Discs or pods as reasonably interchangeable with Compatible Cups for use in K-Cup Brewers.  Indeed, these other Portion Packs are generally incompatible with K-Cup Brewers.

80.     Green Mountain possesses and exercises monopoly power over the Portion Pack market.  Green Mountain controls approximately 73% of the Portion Pack Market.  Green Mountain touts its K-Cups as the "#1 single cup brand."

81.     Barriers to entry are high and challenging for potential entrants into the Portion Pack Market.  Potential manufacturers must either develop and manufacture their own brewers to be compatible with their own Portion Packs, or alternatively make Portion Packs that are compatible with Green Mountain's K-Cup Brewers or another existing Single-Serve Brewer (e.g., pods or T-Discs).

82.     In the first instance, potential entrants to the market cannot easily manufacture their own brewers to accommodate their own Portion Packs because Green Mountain has a number of patents covering brewer technology.  Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

83.     In the second instance, there is substantial technological know-how, research and design, and capital investment required to design, manufacture, and sell a Portion Pack that is compatible with a particular Single-Serve Brewer format.

84.    Potential entrants are further restrained from entering the Portion Pack Market because Green Mountain has entered into exclusionary agreements with suppliers of the machinery and components used to make Portion Packs.  These agreements have restricted the ability of TreeHouse and other competitors to purchase machinery and inputs needed to compete on a level playing field with Green Mountain in the Portion Pack Market.

85.    Because of Green Mountain's restrictive practices, TreeHouse has been forced to work with more expensive and less experienced suppliers, thereby raising TreeHouse's costs associated with entering the Portion Pack Market.  These restrictions also delayed entry by TreeHouse into the Portion Pack Market because TreeHouse had to encourage suppliers that had not previously manufactured Portion Pack components to manufacture and supply these components for the first time.  These new suppliers faced a significant learning curve and start-up costs when manufacturing Portion Packs for the first time.

86.    Green Mountain intends to further increase its monopoly power by launching the 2.0 K-Cup Brewer, which will reportedly contain "interactive technology" preventing 2.0 K-Cup Brewers from functioning with Competitive Cups, and by replacing all existing K-Cup Brewers sold by Green Mountain with the 2.0 K-Cup Brewer.

### 3.    The Compatible Cup Market

87.    The third relevant product market in which to evaluate Defendants' anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups that are either: (1) compatible with K-Cup Brewers; or (2) would be compatible with K-Cup Brewers, but for the proposed "interactive technology" designed to prevent Competitive Cups from working in 2.0 K-Cup Brewers.  The Compatible Cup Market is a sub-market of the Portion Pack Market.

88.     Green Mountain has itself acknowledged, in statements to the public and investors, that the Compatible Cup Market is distinct from the Portion Pack Market, inasmuch as Portion Packs that are incompatible with the K-Cup format do not offer much significant competition to compatible ones.

89.     Indeed, the Compatible Cup Market, as opposed to the Portion Pack Market, is the market in which Green Mountain tracks market shares of K-Cups for competitive purposes. *See* Green Mountain FQ1 2014 Earnings Call Tr. at 15.

90.     As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high.  The New York Times has noted that "Folgers [K-Cups], with 8 grams per capsule, work[] out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."

91.     Yet, as Time Magazine pointed out, "[t]he [cup] numbers are highly variable based on where one shops, what kind of coffee you're buying, and whether you purchase in small packages or enormous quantities."

92.     Competitive Cup companies, exercising their right to produce Competitive Cups, offer prices that are substantially lower than Keurig-branded K-Cups, and, hence, appeal to large numbers of price-conscious consumers.

93.     Competitive Cups, such as those produced by TreeHouse, are typically priced at least 15% to 25% less than the K-Cups produced or licensed by Green Mountain. *See, e.g.,* Green Mountain FQ1 2014 Earnings Call Tr. at 15 (Green Mountain admitting that Competitive Cups "came in … at mostly 15 to 25% lower prices").  Specifically, on average, the price per K-Cup is approximately $0.60 as opposed to Competitive Cups, which are sold at about $0.45. *See* Rabobank, NCA 2013 Coffee Summit Presentation at 28 (October 4, 2013).

94.     Green Mountain owns several businesses that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., and LJVH Holdings, Inc. (Van Houtte).

95.     Green Mountain also licenses the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of various major players in the coffee industry, such as Starbucks, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks. Green Mountain either owns or licenses some forty-nine brands.

96.     In total, Green Mountain controls approximately 86% of the Compatible Cup Market, as Green Mountain's President and Chief Executive Officer, Brian Kelley, recently admitted during a conference call with financial analysts on February 5, 2014. *See* Green Mountain FQ1 2014 Earnings Call Tr. at 15 ("We had 100% of the system … and all of a sudden we have 86% ...."); *see also* Citi Report, DD's K-Cup Corner v8.13 at 2 (July 18, 2013) (noting Green Mountain controlled 92% of the K-Cup market in 2013).

97.     The remaining 14% of the Compatible Cup Market is composed of sellers, like TreeHouse, of unlicensed and private label Competitive Cups that are compatible with K-Cup Brewers. *See* Green Mountain FQ1 2014 Earnings Call Tr. at 6 (Green Mountain "estimate[s] that unlicensed packs represented a 14% share of the Keurig system as of the end of [their] first quarter" of 2014.).

98.     In fiscal year 2012, Green Mountain's net sales were $3.9 billion. 90% of these consolidated net sales resulted from the combined sales of K-Cup Brewers (which comprised 22%, or $760 million) and K-Cups (which comprised 78%, or $2.7 billion). This is consistent with Green Mountain's strategy of selling its K-Cup Brewers at cost or at a loss.

99.     In fiscal year 2013, Green Mountain's net sales included approximately $3.187 billion for K-Cups and approximately $828 million for K-Cup Brewers.

100.    As discussed further above, Compatible Cups designed for use in K-Cup Brewers are not reasonably interchangeable with other Portion Pack formats, such as T-Discs, pods, or capsules, and consumers who purchase K-Cup Brewers do not view other types of Portion Packs as being reasonably interchangeable with Compatible Cups. *See supra* ¶ 79.

101.    Because Compatible Cups are not reasonably interchangeable with other Portion Packs, Green Mountain locks consumers in to use the Compatible Cup format by selling its K-Cup Brewers at cost or at a loss and is able to recoup and greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% margin or more on its K-Cups. *See* Green Mountain Investor Day Presentation at 164 (September 10, 2013).

102.    Indeed, Green Mountain has been able to exercise its monopoly power by profitably raising K-Cup prices by at least 10% to 15% above competitive levels for extended periods of time without losing significant market share or increasing demand for Portion Packs other than Compatible Cups or Single-Serve Brewers other than K-Cup Brewers.

103.    Green Mountain has also exercised, sustained, and magnified its monopoly power over the Compatible Cup Market by excluding competitors from accessing machinery, inputs, distributors, and retailers that are needed to compete on a level playing field with Green Mountain.

104.    For example, Green Mountain has succeeded in substantially foreclosing TreeHouse's access to the market for the sale of Compatible Cups to offices and has substantially restrained competition for Compatible Cup sales to consumers for home use.

24

105.   Barriers to entry for the Compatible Cup Market are high and difficult to surmount for the same reasons discussed above with respect to the Portion Pack Market. *See supra* ¶ 81.

106.   Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, pods, or other types of Portion Packs that are not compatible with a K-Cup Brewer. The reason is that most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer, and are sufficiently locked-in to its use to find it impractical to substitute to Portion Packs that are incompatible. The prices of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers do not reasonably constrain the price of Compatible Cups. TreeHouse, for example, bases the price for Competitive Cups on the price of K-Cups, but not on the price of T-Discs, pods, or other Portion Packs that are incompatible with K-Cup Brewers. In general, TreeHouse seeks to price its Competitive Cups at least 15% to 25% lower than K-Cups.

### a.   The At-Home Market Segment

107.   The Compatible Cup Market includes at least two large market segments, including one covering Compatible Cups purchased by consumers for use at home in their K-Cup Brewers ("At-Home Market Segment") and one covering Compatible Cups purchased for use outside the home (the "Away-From-Home Market Segment").

108.   The At-Home Market Segment is a billion dollar market.

109.   At least approximately 15 million U.S. households have a K-Cup Brewer for use at home.

110.   Green Mountain controls approximately 92% of the At-Home Market Segment for Compatible Cups. Competitive Cup manufacturers hold the remaining 8% of that market segment. *See* Green Mountain Investor Day Presentation at 98-99 (September 10, 2013).

25

>        b.     The Away-From-Home And Office Coffee Services Market
>               Segments

111.    K-Cups are also consumed outside of consumers' homes at, among other places, food service, workplace, higher education, and hospitality locations.

112.    The Away-From-Home Market Segment is a $600 million to billion dollar market.

113.    Since at least 2009, Green Mountain has been the Portion Pack leader in the Away-From-Home Market Segment.

114.    On information and belief, Green Mountain currently provides all or nearly all of the office K-Cup Brewers to "Office Coffee Services" customers (the "Office Coffee Services Market Segment"), which is part of the Away-From-Home Market Segment.

115.    The Office Coffee Services Market Segment for Green Mountain is estimated to account for $175 million to $250 million worth of Green Mountain's sales.

116.    Green Mountain's distributors are prohibited from selling Competitive Cups to the Office Coffee Services Market Segment because doing so would violate the Keurig Authorized Distributor (KAD) Agreement.

117.    Green Mountain has substantially foreclosed TreeHouse from selling to the Office Coffee Services Market Segment through the use of anticompetitive conduct including Green Mountain's extensive web of agreements, such as the KAD Agreements.

118.    Green Mountain also enters into exclusionary agreements with office specialty stores, such as Staples. TreeHouse sought to supply Compatible Cups to Staples, but Staples had an agreement with Green Mountain and was thus unable to enter into a supply arrangement with TreeHouse.

119.   Green Mountain has admitted that it has more than 500 KADs, which are contractually obligated to buy directly from Green Mountain and to only sell products that are "authorized" by Green Mountain.

120.   Green Mountain maintains its monopoly power in the Away-From-Home and Office Coffee Services Market Segments by leveraging its monopoly over the Single-Serve Brewer Market in order to exclude competition from Competitive Cups. Specifically, Green Mountain and its distributors agree to provide K-Cup Brewers to commercial or office customers at little or no cost, provided those customers agree to exclude Competitive Cup suppliers from this market segment by purchasing Compatible Cups exclusively from Green Mountain.

**B.      Geographic Market**

121.   The relevant geographic market is the United States. To compete effectively within the United States, Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States. Compatible Cup manufacturers and sellers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Compatible Cup manufacturers and sellers that have such domestic assets and relationships.

**C.      Interstate Commerce**

122.   Defendants manufactured and/or sold Single-Serve Brewers, Portion Packs, and/or Compatible Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

123.   Defendants' business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

124.   Green Mountain had net sales of $4.358 billion for its 2013 fiscal year, which ended on September 28, 2013. This number includes $3.187 billion in Portion Pack net sales and

$827.6 million in Keurig Single-Serve Brewer and accessories net sales. Green Mountain had the top four best-selling coffeemakers by dollar volume in the United States at the end of its 2013 fiscal year.

### ADDITIONAL FACTUAL ALLEGATIONS

A.  **Green Mountain's Business Model Depends Upon Its Ability To Leverage Its Single-Serve Brewer Monopoly In Order To Restrain Competition And Extract Monopoly Profits From Its Monopoly Power In The Portion Pack And Compatible Cup Markets**

125.  Green Mountain's business model depends upon its ability to leverage its monopoly power in the Single-Serve Brewer Market in order to extract monopoly profits from the K-Cups it sells in the Portion Pack and Compatible Cup Markets. Specifically, this model relies on Green Mountain's ability to: (1) drive sales of Green Mountain's highly profitable K-Cups by excluding competition for sales of Single-Serve Brewers; (2) restrain price competition from Competitive Cups; and (3) maintain supracompetitive K-Cup prices for extended periods of time.

126.  As it admits in its own statements to the public and investors, Green Mountain sells K-Cup Brewers at cost or even a loss in order to saturate the market with brewers that are only compatible with the K-Cup format, thereby locking consumers in to using the cup format instead of other types of portion packs.

127.  K-Cups account for the bulk of Green Mountain's profit margin, and Green Mountain's earnings come primarily from its direct or licensed sales of K-Cups, not from its sales of Single-Serve Brewers.

128.  While Green Mountain sacrifices its brewer profits to drive K-Cup sales, it recoups and exceeds its losses on brewer sales by charging a 50% margin on K-Cups.

129.   Green Mountain's monopoly leveraging strategy has created an enormous installed base of consumers for Green Mountain, which currently supplies at least 88% of the Single-Serve Brewers purchased by consumers for use at home, and on information and belief, 100% or close to 100% of K-Cup Brewers supplied to offices.

130.   Green Mountain likewise controls at least 86% of the Compatible Cup Market, based on Green Mountain estimates, which corresponds closely with its share of Single-Serve Brewers sold to consumers for home use.

131.   About 2.5 million cups are brewed in K-Cup Brewers every day in offices and homes in North America, and billions of cups have been brewed with K-Cup Brewers since K-Cups were created in 1998.

132.   As discussed further below, Green Mountain has protected its monopoly K-Cup profits and has exercised its power to exclude competition by coercing companies that would like to do business with TreeHouse or other Compatible Cup makers — but whose business depends upon access to K-Cup Brewers — to sign anticompetitive agreements that prevent them from doing so.

133.   Without anticompetitive agreements foreclosing meaningful price competition from Competitive Cups, Green Mountain would not have been able to maintain K-Cup profit margins as substantial as it has since TreeHouse entered the market.

**B.     Green Mountain Eliminates Competition And Exercises Its Monopoly Power By Raising Prices 10% To 15%**

134.   Keurig developed K-Cup Brewers and K-Cups in the late 1990s and obtained patents on those brewers as well as on the filters in K-Cups.  For years thereafter, Keurig licensed various coffee company competitors, including GMCR, to manufacture and sell filtered K-Cups.

135.    GMCR first partnered with Keurig in the late 1990s to manufacture and sell Keurig's filtered K-Cups under a license to the K-Cup Filter Patents.

136.    Threatened by the inevitable expiration of the K-Cup Filter Patents that would occur in 2012, GMCR embarked on an aggressive plan to eliminate and restrain competition for the manufacture and sale of Competitive Cups.

137.    After acquiring Keurig and its patents in June 2006, Green Mountain aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation (in 2009), Timothy's Coffees of the World, Inc. (in 2009), Diedrich Coffee, Inc. (in 2010), and LJVH Holdings, Inc. (Van Houtte) (in 2010).

138.    According to one analyst's presentation, "GMCR eliminated the licensees by buying them. … GMCR paid high prices to avoid having to compete with the licensees post patent expiration."

139.    By August 2010, Green Mountain was ranked number 2 on Fortune's List of Global 100 Fastest-Growing Companies.  When reporting the ranking, Green Mountain touted on August 19, 2010, that for "the first nine months of fiscal 2010, the company [had] produced net sales growth of 70% over the prior year and … earnings per share growth of 89% over the same period for fiscal year 2009."

140.    Having grown into a billion dollar publicly traded company by eliminating and restraining competition, Green Mountain was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, it did just that.  On September 7, 2010, Green Mountain announced "a price increase" of "approximately 10 to 15 percent" on "all K-Cup portion packs for its Keurig Single Cup brewing system sold in North America" that would "occur across all sales channels."

C.     TreeHouse Enters The Compatible Cup Market

141.    Prior to 2010, TreeHouse did not engineer, manufacture, or sell Competitive Cups. In or about 2010, TreeHouse decided to undertake a substantial investment in order to enter the Compatible Cup Market.

142.    TreeHouse was well positioned to enter the Compatible Cup Market because it already possessed relevant technical expertise and know-how in light of its experience engineering, manufacturing, and selling similar types of cups used for other products.

143.    TreeHouse already owned production lines worth millions of dollars, which had previously been used to produce another product, that TreeHouse was able to convert into production lines capable of manufacturing Competitive Cups.

144.    Although Green Mountain controlled 100% or close to 100% of the Compatible Cup Market at that time, TreeHouse believed consumers would switch to its Competitive Cups because of the new brand offerings, substantially lower pricing, and/or the quality of the new products, and indeed, consumers in the Compatible Cup Market have proven to "have a high degree of price sensitivity" and to be willing to try a new brand "if it [is] less expensive." As one 2013 market study concluded, "91.3% of Keurig users [stated] that they would try a new [Compatible Cup] brand if it were less expensive."

145.    Before beginning to sell Competitive Cups, TreeHouse hired counsel to analyze whether there would be any potential intellectual property issues that might arise from the manufacture and sale of its Competitive Cups.

146.    Because Green Mountain owned K-Cup Filter Patents covering the use of filters in single-serve cups that had not yet expired as of 2010, TreeHouse decided to manufacture and sell Competitive Cups that did not contain filters.

147.    Thus, in August 2010, TreeHouse subsidiary Sturm introduced the first Competitive Cups for use in K-Cup Brewers that were not sold by Green Mountain or under a Green Mountain license.

148.    As the expiration date of Green Mountain's K-Cup Filter Patents approached, retailers and distributors were eager to offer consumers additional lower-priced alternatives to the filtered K-Cup.   As retailers and distributors know, competition among Compatible Cup vendors allows such resellers to reduce prices, increase sales, and win business from competitors with higher prices.

149.    For example, Kroger Co., whose network of stores includes Ralphs, King Soopers, and Fred Meyer, announced plans on June 8, 2012 to offer store-branded, filtered Competitive Cups for use in Keurig brewers.   Likewise, Safeway, Inc., announced on June 15, 2012 that it would introduce its own branded, filtered Competitive Cups for use in K-Cup Brewers, but at prices below Green Mountain's K-Cups.

150.    Green Mountain's K-Cup Filter Patents expired in September 2012.

151.    In response, in part, to requests from grocery retailers and foodservice distributors, TreeHouse launched its first filtered Competitive Cups in the Fall of 2012 in order to supply a lower-priced alternative to Green Mountain's filtered K-Cup's.

152.    Between September 2012 and December 2013, TreeHouse subsidiary Bay Valley entered into supply arrangements with dozens of retailers for filtered Competitive Cups.

153.    Since TreeHouse entered the Compatible Cup Market, demand has been growing for Competitive Cups.

154.    TreeHouse's sales have grown as the result of new retail customers and consumers seeking competitive alternatives to Green Mountain's K-Cups.

155.    Although it still has only a small share of the Compatible Cup Market, TreeHouse has become the largest seller of Competitive Cups that compete with Green Mountain's K-Cups.

156.    After Competitive Cups like TreeHouse's hit the shelves, the market suddenly "shifted." Brian Kelley explained, during the Green Mountain 2014 first quarter earnings call, that "we had a 100% of the system, and all of a sudden we have 86% of the system, [or] something like that."

### D.    Green Mountain Retaliates Against TreeHouse By Filing A Sham Litigation And Appeal To Restrain Competition, Raise A Rival's Costs, And Intimidate Market Entrants

157.    As discussed above, prior to September 2012, Green Mountain enjoyed patent protection on certain aspects of its K-Cups. Green Mountain claimed that these patents, for example, prevented competitors from offering single-serve cups of coffee with filters.

158.    The Competitive Cups introduced by TreeHouse in 2010 did not infringe any Green Mountain patents because these cups did not contain any filters.

159.    But that did not stop Defendants from filing a baseless litigation (asserting various infringement, trademark, and false advertising claims) and appeal harming competition.

160.    Within just a matter of weeks after Competitive Cups hit the shelves, Keurig sued TreeHouse subsidiary Sturm, alleging in bad faith that Sturm's Competitive Cups infringed Keurig's patents directed at *brewers* and methods of using *brewers* — *not even asserting any patents covering K-Cups themselves*. Keurig also alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup *brewers* by using Sturm's unlicensed Competitive *Cups*, and that Sturm was thus also liable for "inducing" infringement by these consumers.

161.    Keurig's non-patent claims were likewise baseless. Keurig alleged, for example, that it was trademark infringement and false advertising for Sturm to say on its packaging that

the Compatible Cups were "[f]or use by owners of Keurig coffee makers."  Second Am. Compl. ¶¶ 35, 104.

162.    No reasonable litigant could have realistically expected to succeed on the merits of such claims, and thus Keurig's complaint was objectively baseless.

163.    The litigation was also subjectively baseless.  This is indeed demonstrated, for example, by other allegations in the Complaint itself.  For example, while Keurig claimed that Sturm "falsely advertised" that its Competitive Cups were "for use by owners of Keurig coffee makers," other allegations in the Complaint demonstrated Keurig's knowledge that this statement was, in fact, true.

164.    Paragraph 50 of the Second Amended Complaint, for example, alleged that "Sturm is advertising such [Competitive Cups] for use in Keurig's brewers.  Sturm's cartridges have no other use except in Keurig's brewers."  Second Am. Compl. ¶ 50; *see also id.* ¶ 23 ("[T]he packaging for Sturm's [Competitive Cups] states they are 'For use by owners of Keurig coffee makers.'  In fact, Sturm's [Competitive Cups] have no other use.").

165.    Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of noninfringement.

166.    In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit, thereby further requiring TreeHouse to expend additional resources that could have otherwise been spent competing against Green Mountain.

167.    After Sturm incurred three years of litigation costs based on Keurig's frivolous argument that Sturm's Competitive Cups infringed Defendants' K-Cup Brewer patents, the

Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

168.    The court noted that the result sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'" *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 630 (2008) (quoting *Adams v. Burke*, 84 U.S. 453, 457 (1873))).

169.    On information and belief, and as supported by the allegations in the Complaint and the meritless legal claims, Keurig instituted this lawsuit in an attempt to interfere with TreeHouse's ability to compete in the Compatible Cup Market, to intimidate market entrants, to raise a rival's costs, to harm TreeHouse's reputation, and to deprive TreeHouse of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.

170.    Indeed, Keurig also sued another early Compatible Cup Market entrant, Rogers Family Co., making similar claims.  In Keurig's litigation against Rogers Family Co., a different federal district court likewise held on summary judgment that the Competitive Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.

171.    As the Federal Circuit expressly concluded in Keurig's appeal against Sturm, rather than pursuing any legitimate purpose, "Keurig is attempting to *impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law.*" *Id.* (emphasis added).

E.    **Green Mountain Restrains Competition With Anticompetitive Exclusive Agreements, Cuts Rivals Off From Inputs Needed To Compete, And Raises Rivals' Costs**

172.    Green Mountain has entered into unduly restrictive, anticompetitive, and exclusionary agreements with companies at every level of the Compatible Cup distribution system — from sellers of machinery used to make K-Cups; to sellers of K-Cup components; to coffee roasters and coffee brands whose coffee and/or trademarks are used in K-Cups; all the way down to the distributors and retailers that sell K-Cups to end-user consumers, businesses, and institutions.

173.    This web of anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups. As parties to these agreements have admitted — Green Mountain does not restrict the ability to sell these same products for other purposes — just so long as those products are not sold to a Green Mountain competitor who intends to use them to make Competitive Cups for use in K-Cup Brewers.    Thus, these exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with Green Mountain.

174.    Indeed, the web of exclusive dealing agreements Green Mountain has created allowed it to leverage its monopoly over the Single-Serve Brewer Market in order to maintain its monopoly over the Portion Pack and Compatible Cup Markets.

36

1.   **Green Mountain Unreasonably Restrains Access To Machines Needed To Make Compatible Cups In Competition With Green Mountain**

a.   **Direct Evidence Confirms That Green Mountain Exercises, Sustains, And Magnifies Its Monopoly Power By Coercing Suppliers To Exclude Competition**

175.   Before TreeHouse entered the Compatible Cup Market in 2010, it owned Spee-Dee Holmatic machines that it had purchased from R.A. Jones & Co. ("R.A. Jones") to manufacture a commercial product that was not related to any type of brewer or Compatible Cup.

176.   At the time TreeHouse purchased the Spee-Dee Holmatic machines to produce this other product, R.A. Jones placed no restrictions on TreeHouse's ability to purchase such machinery.

177.   In order to enter the Compatible Cup Market TreeHouse retrofitted the Spee-Dee Holmatic machines it had previously purchased from R.A. Jones in order to convert these production lines into machines that were capable of manufacturing non-filtered Compatible Cups.

178.   In 2013, in response to positive consumer feedback and increased demand for TreeHouse's non-filtered Competitive Cups following its entry into the Compatible Cup Market, TreeHouse sought to increase its capacity to produce a higher output of non-filtered Compatible Cups by purchasing another Spee-Dee Holmatic machine from R.A. Jones.

179.   TreeHouse requested a price quote for a new machine, but on December 19, 2013, a Sales Manager from R.A. Jones responded in an email, stating: "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product."

180.    Under "the rules," as described by the representative, "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it."  However, R.A. Jones can still "build equipment for all types of packages, just not k-cups or anything that goes into a Keurig brewer."

181.    The Sales Manager expressed hope that the Green Mountain "*agreement* will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup machinery] business" with TreeHouse. (emphasis added.)

182.    The December 19, 2013 R.A. Jones email, explaining that the "agreement" with Green Mountain prohibits R.A. Jones from quoting any equipment that could be used to make "anything that goes into a Keurig brewer," provides direct evidence that Green Mountain coerces suppliers into entering exclusionary agreements intended to restrain competition between Competitive Cup makers and Green Mountain.  Because R.A. Jones is free to supply the same equipment for the purpose of making other non-competitive products, the restriction placed on supplying machinery used to make Competitive Cups cannot be justified on the basis that it ensures a reliable supply when Green Mountain needs equipment.  Instead, it is merely intended to cut off Competitive Cup makers' access to machinery that is necessary to compete with Green Mountain on a level playing field.  This agreement, in and of itself, constitutes an unlawful conspiracy in restraint of trade and provides direct evidence that Green Mountain has exercised its monopoly power by excluding competitors from resources needed to compete with Green Mountain.

     **b.**  **Green Mountain Has Substantially Foreclosed Access To Machinery Used To Make Compatible Cups**

183.    In the December 19, 2013 R.A. Jones email, the Sales Manager further noted that "[f]rom my own personal perspective, it's very frustrating because I feel that I'm alienating a great customer in Sturm Foods."  He sympathized further, stating: "I can imagine this causes

problems for Sturm, because you now have to start over with another OEM.  I can only offer my sincere apology."

184.    Indeed, R.A. Jones's refusal did cause problems for TreeHouse.  TreeHouse searched for, but was unable to find, a single other supplier in the United States that was willing to sell it machinery used to make non-filtered Compatible Cups.

185.    Thus, on information and belief, by coercing R.A. Jones to enter into this anticompetitive and exclusionary agreement, Green Mountain substantially foreclosed competitors from the United States market for machinery used to make Compatible Cups.

### 2.    Green Mountain Unreasonably Restrains Access To Inputs Necessary To Make Compatible Cups In Competition With Green Mountain

186.    Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter.  There are few suppliers for each of these components because Compatible Cup components must generally be custom engineered for use in K-Cup Brewers and therefore cannot be purchased from suppliers "off the shelf."

187.    As set forth below, upon information and belief, Green Mountain entered into exclusive dealing agreements with suppliers of each K-Cup component to prevent competitors from purchasing these necessary inputs.  Such agreements have restrained TreeHouse's ability to purchase Compatible Cup components and to compete with Green Mountain.  As a direct result of Green Mountain's exclusionary agreements with suppliers, TreeHouse has been forced to work with less experienced suppliers at higher cost to TreeHouse.

### a.    Green Mountain Has Substantially Foreclosed Access To Domestic Suppliers Of Plastic Cups Used To Make Compatible Cups

188.    Before TreeHouse entered the Compatible Cup market, the three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups, and

Curwood, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce K-Cups.

189.    TreeHouse approached all three of these companies to find a supplier for components to make Competitive Cups.

190.    At that time, Winpak was already supplying Sturm with different types of cups and lids to make products that were not used in K-Cup Brewers.  TreeHouse contacted Winpak to see if Winpak could also supply cups and lids to make Competitive Cups.  After TreeHouse informed Winpak that the cups and lids it sought to purchase were intended for use in K-Cup Brewers, Winpak refused to supply the components to TreeHouse.  Winpak still supplies Sturm with lids for products that are not used in K-Cup Brewers.

191.    Upon information and belief, Winpak was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.  Also, on information and belief, such agreement has since been renewed and/or continues to this day.

192.    Because Winpak would have been free to supply the same cups and lids for use in products not intended for K-Cup Brewers, any Green Mountain restriction prohibiting Winpak from supplying cups and lids to TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of such cups and lids.

193.    TreeHouse also met with Phoenix Cups to see if Phoenix could supply the cup component to make Competitive Cups.  Phoenix initially agreed to supply TreeHouse and even began customizing the cups per TreeHouse's requirements.  However, shortly thereafter, Phoenix Cups informed TreeHouse that it could not supply TreeHouse with cups for use in K-Cup

Brewers due to concerns that TreeHouse was not an "authorized manufacturer" for Green Mountain.

194.    Upon information and belief, Phoenix Cups was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.  Also, on information and belief, such agreement has since been renewed and/or continues to this day.

195.    Because Phoenix Cups was free to supply cups for use in products not intended for K-Cup Brewers, any restriction prohibiting Phoenix Cups from dealing with TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of cups for Green Mountain.

196.    TreeHouse then contacted Curwood, the only remaining domestic supplier of cup components used to make Compatible Cups known at that time.  Shortly after the initial meeting, during which the parties discussed the possibility of Curwood supplying TreeHouse with cups for use in K-Cup Brewers, Curwood informed TreeHouse that Curwood could not work with TreeHouse due to Curwood's other "obligations."

197.    Upon information and belief, Curwood was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.  Also, on information and belief, such agreement has since been renewed and/or continues to this day.

198.    As a direct result of these suppliers' refusals to supply TreeHouse with materials needed to make Competitive Cups, TreeHouse's remaining option was to develop new cups with a company that was not at that time in the business of manufacturing Compatible Cup components.  Developing a new cup component was a more costly and lengthy process as

41

compared to purchasing cup components from a company that already produced such components.

199. Because Green Mountain cut TreeHouse off from the experienced domestic cup suppliers, TreeHouse was forced to incur additional, unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture cups for use in K-Cup Brewers. TreeHouse's start-up costs were substantially higher than they would have been if TreeHouse had been free to purchase cups from one of the experienced cup manufacturers.

### b. Green Mountain Has Substantially Foreclosed Access To Domestic Suppliers Of Lids Used To Make Compatible Cups

200. The domestic suppliers of foil lids used to make Compatible Cups are Winpak and LMI Packaging Solutions ("LMI"). On information and belief, at or about the time TreeHouse entered the Compatible Cup market Winpak and LMI collectively accounted for all or nearly all of the share of the market for the sale of foil lids components used to make K-Cups.

201. As detailed above, Winpak refused to supply TreeHouse with lids after learning that TreeHouse's intended to use the lids in Competitive Cups.

202. LMI, then a supplier to Sturm of other cups and lids, also refused to supply TreeHouse with foil lids to make Competitive Cups, citing other business commitments. Upon information and belief, LMI refused to supply TreeHouse because of an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.

203. Indeed, subsequent to their initial refusal, LMI later informed TreeHouse that they no longer had a relationship with Green Mountain, and were therefore now free to do business with TreeHouse.

204. Because Green Mountain cut TreeHouse off from almost all of the experienced domestic lid suppliers, TreeHouse was forced to incur additional, unnecessary costs by dealing

with a company that lacked the know-how and expertise required to manufacture lids for use in K-Cup Brewers.  TreeHouse's start-up costs were substantially higher than they would have been if TreeHouse had been free to purchase lids from one of the experienced lid manufacturers.

**c.   Green Mountain Has Substantially Foreclosed Access To Domestic Suppliers Of Filters Used To Make Compatible Cups**

205.   TreeHouse contacted many suppliers of filter components for K-Cups.  Several filter suppliers declined to supply TreeHouse because they were already supplying Green Mountain with the same product.  Upon information and belief, these companies refused to supply TreeHouse because of an unduly restrictive, anticompetitive, and exclusionary agreement with Green Mountain.

206.   Because Green Mountain cut TreeHouse off from experienced filter suppliers, TreeHouse was forced to find a new supplier and then adapt TreeHouse's production process in order to use the new product.  TreeHouse had to incur additional costs than it would have if it was able to work with a company that already supplied filters used in Compatible Cups because TreeHouse had to work with the new supplier to improve the filter for use in Compatible Cups.

**3.   Green Mountain Unreasonably Restrains Access To Roasters And Coffee Brands And Conspires To Allocate Markets, Exclude Competition, And Induce Competitive Cup Makers To Take An Anticompetitive License**

**a.   Green Mountain Enlists Competitor Co-Conspirators To Restrain Price Competition By Excluding Competitive Cup Makers**

207.   Over the years, Green Mountain has obtained trademark license and manufacturing agreements from numerous third parties to use their brand names on K-Cups. These companies include: Starbucks, Dunkin' Donuts, Caribou Coffee, Wolfgang Puck, and Newman's Own.  Green Mountain currently owns or licenses some forty-nine coffee brands.

43

208.   Upon information and belief, many, if not all, of these agreements have multi-year terms and are exclusive, which prevents these brands from also licensing trademarks or entering into manufacturing agreements with Green Mountain's competitors, such as TreeHouse, in the Compatible Cup Market.

209.   Starbucks, Wolfgang Puck, and other coffee brands discussed entering into potential business relationships with TreeHouse, but declined to do so after entering into contracts with Green Mountain.

210.   Upon information and belief, Green Mountain's agreements with coffee brands also contain restrictions dictating where and how the licensed K-Cups can be sold, thereby allowing Green Mountain to maintain supracompetitive prices across licensed brands by controlling output.  This creates a further incentive for licensed coffee brands to renew their agreements with Green Mountain and to refuse to deal with any Compatible Cup maker that refuses to take a license or become "authorized" by Green Mountain, as demanded by Green Mountain as a precondition for selling Compatible Cups.

211.   Upon information and belief, Green Mountain has entered into this web of anticompetitive and unduly restrictive exclusionary agreements with coffee roasters and/or coffee brands as part of its expansive campaign to maintain its monopoly position in the Compatible Cup Market by excluding competitors who refuse to allow Green Mountain to dictate the geographical territory, market segments, and/or channels of distribution in which Compatible Cups may be sold.

212.   This expansive system of exclusionary agreements is orchestrated by Green Mountain, and coffee brands that enter into a license or manufacturing agreement with Green Mountain do so with the express knowledge of Green Mountain's anticompetitive exclusionary