distribution agreements. This is demonstrated, for example, by the Amended and Restated Purchase and License Agreement entered into between Green Mountain and Caribou Coffee Company, Inc. ("Caribou"), on December 20, 2011. *See* Exhibit A at 2 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou Coffee Company, Inc. (December 20, 2011)). The Caribou agreement expressly recites the fact that "Keurig Authorized Distributors" and "Keurig Authorized Re-Distributors" enter into "distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase … of [both bulk and non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale."

213. As agreed to between Green Mountain and coffee brands, such as Caribou, Keurig Authorized Distributor (KAD) Agreements contain a corresponding restriction prohibiting distributors from selling K-Cups outside of the "Authorized Location" determined by Green Mountain. *See* Exhibit B at 2.1 (attaching KAD Agreement).

214. On information and belief, Keurig Authorized Re-Distributor or "KARD" Agreements similarly prohibit bulk wholesalers from selling K-Cups outside of locations or stores specified by Green Mountain.

215. Coffee brands further agree: (1) "not to sell coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System;" and (2) not to license any trademarks for use by third parties in connection with products "intended for use with the Keurig Brewing System." *See* Exhibit A at 7 (attaching Am. and Restated Purchase and License Agreement between Green Mountain and Caribou).

45

216.    This massive hub-and-spoke conspiracy has the anticompetitive effect of allowing Green Mountain to allocate markets, restrain output, restrain price competition, and to exclude competitors.  Indeed, the coffee brands' agreements not to deal with Competitive Cup makers that could otherwise increase their product output and sales revenue do not make economic sense, but for a conspiracy to sustain supracompetitive K-Cup prices by restraining price competition with Competitive Cup makers.

217.    Moreover, as Green Mountain's K-Cup Filter Patents have expired, there is no legitimate justification for this division of markets across competitors or the restraints placed on dealing with Competitive Cup makers that could plausibly be grounded in any valid patent rights.  Nor is there any basis for Green Mountain to demand that Competitive Cup makers take a purported "license" or become "authorized" to sell Competitive Cups.  Green Mountain's lawful right to exclude Competitive Cup makers from the Compatible Cup Market has expired and it cannot extend this right beyond the term it was granted by the U.S. Patent Office simply because it was the first to make K-Cup Brewers or K-Cups.  Indeed, as a quid pro quo for its initial, now expired, right to exclude competition, it was statutorily required to enable competitors to practice its invention upon the expiration of its patent.  *See* 35 U.S.C. § 112.

    b.    **Green Mountain Has Substantially Foreclosed Competition Through A Series Of Agreements Allocating The Compatible Cup Market Across Coffee Brands**

218.    According to one analyst report, the "only meaningful coffee brands that [Green Mountain] does not have in its portfolio are Maxwell House (*i.e.*, Kraft) and Peet's."

219.    In December 2006, Green Mountain entered into a multi-year agreement with Caribou under which Caribou branded coffee would be packaged and sold in K-Cups.  The parties renewed and amended their agreement in December 2011.  Under this five-year agreement, Caribou sells Green Mountain its coffee, which Green Mountain packages into K-

46

Cups, and grants Green Mountain a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups. The contract provides that Caribou may only sell the K-Cups at Caribou coffee stores and Caribou's website for "At Home" use only.

220.    In February 2010, Green Mountain entered into a multi-year agreement with J.M. Smucker Company ("Smucker"), a leader in the domestic retail coffee market, under which Green Mountain is the exclusive manufacturer of Compatible Cups under Smucker's Folgers and Millstone coffee brands. Under the agreement, Smucker sells the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on the Smucker retail website.

221.    In February 2011, Green Mountain entered into an agreement with Dunkin' Donuts, a market leader in the traditional and iced coffee markets in the United States, under which Green Mountain became the exclusive manufacturer of Dunkin' Donuts Compatible Cups. Green Mountain and Dunkin' Donuts agreed that Dunkin' Donuts K-Cups would be sold exclusively at Dunkin' Donuts restaurants — not at grocery stores, where Dunkin' Donuts sells its bagged coffee — and that some Dunkin' Donuts restaurants would also sell Keurig Brewers.

222.    In May 2011, Green Mountain entered into a multi-year agreement with Starbucks, the world's largest coffee retailer, to manufacture, market, distribute, and sell Starbucks K-Cups in grocery stores. The companies renewed and expanded their agreement in May 2013 with a "minimum five-year agreement," under which Starbucks is the "exclusive licensed super premium coffee brand on the Keurig platform" and the Keurig brewer is "the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee." Under this agreement, Green Mountain began manufacturing additional varieties of Starbucks coffee and products from Starbucks' other brands, such as Seattle's Best. Green Mountain sells

Starbucks K-Cups at grocery stores, and Starbucks sells its K-Cups at Starbucks' cafes and on its website.

223.    In May 2013, Green Mountain entered into a multi-year agreement with The Coffee Bean & Tea Leaf, "the largest privately held specialty coffee and tea retailer in the United States," under which Coffee Bean K-Cups will be sold "in a variety of channels" beginning in the spring of 2014.

224.    In July 2013, Green Mountain entered into a multi-year agreement with Cinnabon under which Green Mountain will manufacture Cinnabon K-Cups.  Under the terms of this agreement, Cinnabon K-Cups will be sold in the retail and Away-From-Home Market Segment, as well as in Cinnabon restaurants.

225.    Green Mountain has also entered into similar agreements with Newman's Own Organics Coffee, Gloria Jean's Coffee, and Wolfgang Puck, as well as agreements to manufacture and distribute non-coffee products with companies, such as Bigelow, Twinings, Swiss Miss, Snapple, Celestial Seasonings, Campbell's, and most recently, Coca-Cola.

### c. Green Mountain Enters Into Contracts With Coffee Roasters That Unduly Restrict Competition From Competitive Cup Makers

226.    Green Mountain also enters into contracts with coffee roasters and tea packers to manufacture, package, inventory, and sell K-Cups using Green Mountain's own coffee as well as the coffee and tea that Green Mountain purchases from coffee brands.

227.    In at least one such contract, Green Mountain subjected the roaster's ability to contract separately with Competitive Cup makers to Green Mountain's veto rights.  Specifically, the contract provided that "Keurig shall have the right to approve or disapprove any such contract [for the manufacture and sale of private-label K-Cups by third parties] based on such

contract's compliance with the terms and conditions of this Agreement. Keurig shall review and either approve or disapprove such contracts ... ."

228. Upon information and belief, Green Mountain has entered into additional, anticompetitive agreements similarly restricting the ability to contract separately with Competitive Cup makers and impermissibly subjecting any such proposed contract to Green Mountain's veto rights.

### d.  Green Mountain Ties Up Distributors And Retailers With Unduly Restrictive And Anticompetitive Exclusive Agreements

229. Green Mountain distributes commercial K-Cup Brewers and accompanying K-Cups to the Away-From-Home Market Segment through over 500 Keurig Authorized Distributors (KADs), including Office Coffee Service operators, office suppliers such as WB Mason and United Stationers, hospitality service providers, and food-service management companies, such as Vistar and Aramark.

230. Green Mountain requires distributors to enter into a multi-year KAD Agreement, which prevents them from purchasing any and all Competitive Cups, thereby substantially foreclosing access to the Office Coffee Services Market Segment. Specifically, Green Mountain KAD Agreements contain a "Keurig Loyalty" requirement that provides:

> 3.2. Keurig Loyalty. Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs, or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs.

*See* Exhibit B (attaching KAD Agreement).

231. These KAD Agreements are unduly restrictive not only because they substantially exclude competition, but also because they do so for a multi-year period.

49

232.    Although TreeHouse has sought to supply Competitive Cups to the Office Coffee Services Market Segment, it has been repeatedly turned away on the basis that distributors, such as Vistar, Aramark, and United Stationers, have "several years left" on their KAD Agreements with Green Mountain.   On information and belief, Vistar, Aramark, and United Stationers collectively supply the majority share of K-Cups to the Office Coffee Services Market Segment.

233.    Without competition for distribution services from multiple Compatible Cup suppliers, many distributors have experienced margin erosion under the KAD distribution system and have expressed a preference to do business with multiple Compatible Cup manufacturers, but are prohibited from doing so.   Market research indicates that distributors feel "generally unhappy" with and "restricted" by the terms of Green Mountain's multi-year KAD Agreements. Distributors have also expressed dissatisfaction with Green Mountain's "arrogance" and lack of partnership in what they describe as a "contentious" relationship.

234.    Despite widespread displeasure with the KAD distribution system, it persists because Green Mountain has leveraged its monopoly over the Single-Serve Brewer Market to coerce distributors into unfavorable and exclusionary agreements, which protect Green Mountain's monopoly profits in the Compatible Cup Market.

235.    Notably, the standard KAD Agreement also has the effect of locking in office and commercial customers that might otherwise switch if they were made better aware of Green Mountain's supracompetitive K-Cup prices because KAD Agreements restrict distributors' ability to display prices for K-Cups, further insulating Green Mountain from competitive pricing. *See* Exhibit B at 2.1, 2.3 (attaching KAD Agreement).

236.    Upon information and belief, Green Mountain also enters into anticompetitive, unjustified, and exclusionary agreements with distributors and retailers of K-Cups and Single-

Serve Brewers that ultimately are purchased by consumers in the At-Home Market. *See, e.g.*, *supra* ¶ 214 (discussing KARD Agreement).

    **F.**    **Green Mountain Plans To Eliminate Competition By Technologically Tying K-Cup Purchases To K-Cup Brewer Purchases To Lock Out Competitive Cups**

    237.    Faced with the expiration of its K-Cup Filter Patents, its brewer patents lawsuit rejected as overreaching, retailers seeking low-priced alternatives to the Green Mountain K-Cup, and TreeHouse and other market entrants overcoming the substantial hurdles to produce those alternatives, Green Mountain now seeks to impose an exclusionary technological barrier to prevent consumers and commercial customers that use a K-Cup Brewer from using Competitive Cups and to coerce retailers into replacing low-priced Competitive Cups with K-Cups.

    238.    As explained by Green Mountain's CEO, Brian Kelley, "the [2.0 K-Cup Brewer] will not brew unlicensed packs" because of a new "interactive technology" intended to "ensure the system delivers on the promise of excellent quality beverages, produced simply and consistently every brew." Brian Kelley, Green Mountain Q4 2013 Earnings Call, Transcript at 4-5 (Nov. 20, 2013).

    239.    Thus, as one analyst explained, "GMCR has decided to 'close' the system with its new reader technology, meaning that the new brewers will not brew unlicensed packs."

    240.    Rather than a true technological innovation, Green Mountain's announced "new" technology threatens to eliminate competitive access to 2.0 K-Cup Brewers as well as consumer and retail customer choice by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups. By tying 2.0 K-Cup purchases to the purchases of the 2.0 K-Cup Brewers, Green Mountain intends to leverage its monopoly over the Single-Serve Brewer Market in order to exclude competition in the Compatible Cup Market.

241.    This is yet another attempted "end-run" around the patent and competition laws. While Green Mountain could lower K-Cup prices and their 50% K-Cup profit margins to compete on the merits, Green Mountain instead announced a new anticompetitive plan to lock out what it describes as "the many strong [Competitive Cup] brands that are unlicensed" from 2.0 K-Cup Brewers.

### 1.    Green Mountain Has Announced That 2.0 K-Cup Brewers Will Lock Out Competitive Cups

242.    In November 2013, in the wake of increased competition from TreeHouse and other Competitive Cups following the expiration of Green Mountain's K-Cup Filter Patents, Green Mountain announced that it would "launch a new lineup" of 2.0 K-Cup Brewers over the next twelve months with an anticipated release date in Fall 2014.

243.    The 2.0 K-Cup Brewer will reportedly work with a special taggant ink built into the lid of Green Mountain-owned or licensed 2.0 K-Cups, which will be read by "interactive technology" in the 2.0 K-Cup Brewer in order to identify whether the user has inserted a 2.0 K-Cup that is owned or licensed by Green Mountain or a Competitive Cup.

244.    As Brian Kelley stated during a conference call with financial analysts on November 20, 2013, 2.0 K-Cup Brewers "will not brew unlicensed [Competitive Cup] packs." Green Mountain Q4 2013 Earnings Call, Transcript at 4-5 (Nov. 20, 2013).

245.    2.0 K-Cup Brewers will reportedly only work if a Green Mountain-owned or licensed 2.0 K-Cup is inserted and will prevent consumers from using Competitive Cups they wish to brew that lack the special taggant ink.

### 2.    Green Mountain Has Announced That It Will Eliminate K-Cup Brewers That Work With Competitive Cups

246.    During the November 2013 financial analyst call, Mr. Kelley stated that Green Mountain "will replace [its] current lineup of both K-Cup and Vue brewers" with 2.0 K-Cup

52

Brewers and "will be transitioning [its] lineup of Keurig brewers over fiscal 2014 and early 2015."

247.    Mr. Kelley reiterated Green Mountain's plan to eliminate alternative K-Cup Brewers during the investor call on February 5, 2014.  When asked if the 2.0 K-Cup Brewers would "have a more narrow retail footprint," as "retailers [ ] might not carry it [2.0 K-Cup Brewers], because it might not support their private label brand," Mr. Kelley responded in part that "[t]his [2.0 K-Cup Brewer] will be the Keurig system and so it's replacing the current Keurig system that's out there.  And so this [2.0 K-Cup Brewer] is the Keurig system that all retailers would carry."

248.    By eliminating the K-Cup Brewers that work with Competitive Cups and replacing them with brewers that lock out Competitive Cups, Green Mountain seeks to exercise its monopoly power to exclude competition and to maintain supracompetitive K-Cup prices by forcing consumers to give up the Competitive Cups they prefer to use.

249.    Brokerage and investment firm Stifel agrees that Green Mountain's "re-closing ... is primarily driven by share gains from unlicensed brands ... since patent expiration," rather than an interest in benefitting consumers.

250.    Bank of America has similarly observed that "the new Keurig platform [] not brew[ing] unlicensed portion packs ... is the strongest action management has taken to strengthen the moat around its profit pool," noting further that their "impression was that management felt a sense of urgency to [] protect its market share (and profits) from the incursion of unlicensed portion pack competitors ... ."

251.    As industry news editor, Keith Nunes, explains, "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share."

252.    Accordingly, Mr. Kelley "expect[s] [the] unlicensed [Competitive Cup] share of the system to … begin to decline in the second half [of fiscal 2014] and thereafter," as prior generations of K-Cup Brewers are replaced, corresponding roughly with the introduction of the 2.0 K-Cup Brewer.

**3.    Green Mountain's Lock-Out Strategy Is Intended To Coerce Competitive Cup Makers To Enter Agreements Restricting Competition**

253.    Brian Kelley stated during the November 20, 2013 investor call that Green Mountain "will continue to convert current unlicensed players into licensed Keurig system partners," noting that "obviously [its] goal" is to "convert … as many [Competitive Cup makers] as [it] can."

254.    Stifel has explained that Green Mountain views its "introduction of Keurig 2.0 … as an opportunity to convert unlicensed [Competitive Cup makers] to licensed partners."  It further observed that "Green Mountain is pushing retailers on the need to become a licensed partner before the system closes to prevent losing consumer relevance."

255.    In order to become an "authorized" or "licensed" "Keurig system partner," however, on information and belief, Green Mountain demands that its purported "licensees" cede their independent decision-making authority to Green Mountain as to where and how many Competitive Cups can be sold by the "licensee."  Such agreements have the effect of allocating markets, restraining output, and allowing Green Mountain to maintain supracompetitive prices.

256.    On information and belief, Green Mountain additionally demands a royalty payment or other consideration under the purported "license," despite the fact that its K-Cup Filter Patents expired over a year ago.  Such monopoly rents have the effect of raising rivals' costs, increasing prices, and restraining free and fair competition on the merits.

257.    Indeed, Green Mountain's Investor Day slides, dated September 10, 2013, state that even Green Mountain's new "interactive" brewer technology that will be used to "recognize licensed portion packs" and to exclude Competitive Packs is "proprietary and exclusive" — not patented.

258.    Green Mountain has been further using the upcoming 2.0 K-Cup Brewer launch to coerce Competitive Cup makers to enter into anticompetitive agreements with Green Mountain by enlisting the help of Competitive Cup makers' retail customers.   Specifically, Green Mountain has been contacting retailers to inform them that the Competitive Cups they have been purchasing will not work in 2.0 K-Cup Brewers and then inducing those retailers to urge their supplier of Competitive Cups to contact Green Mountain to become an "authorized" or "licensed" partner.

### 4.    The 2.0 K-Cup Brewer's Lock-Out Feature Has No Legitimate Consumer Benefit and Actually Harms Consumers

259.    To date, Green Mountain has failed plausibly to substantiate its claim that locking Competitive Cups out of 2.0 K-Cup Brewers would benefit consumers.   Not only is there no consumer benefit to be gained by locking Competitive Cups out of the market, but the lock-out would actually harm consumers.

260.    Green Mountain asserts in its 2013 Investor Day slides that its "interactive technology" recognizing only "licensed portion packs" will allow 2.0 K-Cup Brewers to "deliver the perfect beverage."   Mr. Kelley claims that this function will provide "game-changing performance," allowing the brewers to "provide consumers with the perfect brew settings for each beverage by recognizing the 'recipes' of licensed portion packs."

261.    However, these vague claims lack any real substance, are without merit, and are pretextual sham justifications for Green Mountain's anticompetitive and exclusionary conduct.

As Mr. Kelley admits, even with the 2.0 K-Cup Brewers, "a K-Cup will be a K-Cup." As Green Mountain has openly acknowledged, "very much of the [2.0 K-Cup Brewer] technology … is technology [it is] very familiar with."

262. As analysts at Stifel recently noted, what has been announced to date concerning Keurig 2.0 at best represents an "underwhelming innovation."

263. The so-called "breakthrough innovation" is in fact old news. For example, Bosch has for some time been selling its Tassimo brewer with "Intellibrew™" barcode technology that is advertised as allowing the bar code on each T-disc to tell the brewer the exact temperature, cup size, and brewing time in order to purportedly make the "perfect cup." Despite this "interactive technology," consumers remained unconvinced and, as of January 2014, Tassimo had only captured a 2.9% share of the market of consumers who own a brewer at home (as opposed to 88% for Keurig).

264. Green Mountain's claim that its lock-out technology benefits consumers by providing "game-changing" performance by recognizing the "recipes" on K-Cups is also belied by Green Mountain's own experience with its Vue Brewer, which also touted the same feature, but was largely rejected by consumers.

265. As the Vue V1200 product brochure states, "[e]ach commercial Vue pack contains an identification tag that is read by the Vue Brewer so it can apply the optimum recipe for your beverage." Just as Green Mountain now claims with respect to 2.0 K-Cup Brewers, this identification tag on Vue portion packs was touted by Green Mountain as promising the "perfect brew."

266. Nonetheless, Vue's lock-out technology was recognized as a failure. One analyst notes the "Vue platform was a poorly planned, researched and designed platform."

56

267.   A recent market report shows that the overwhelming majority of Keurig users do not own a Vue and are either unlikely or very unlikely to purchase a Vue.

268.   Even Mr. Kelley has acknowledged that the Vue Brewer lock-out technology was poorly received by consumers, noting in a May 2013 call with investors that Vue portion packs offer only about 25% of the variety of K-Cups.  Referring to the Vue Brewer's limited success, Mr. Kelley admitted that consumers "want the ability to have more choice.  They want to have all of the brands available to them.  And a lot of consumers who have [the] Keurig today, they don't want to give up the K-Cup.  They love the K-Cup … And the most important thing they tell us about Vue is, give us more choice."

269.   Mr. Kelley further stated in a November 2013 investor call that Green Mountain "learned from prior product introductions, in particular the Vue, and we'll do things differently with our new Keurig 2.0."

270.   Green Mountain says it "learned" from its prior Vue introduction, and indeed it did learn that consumers wanted more choice across Compatible Cup brands.  But instead of responding to consumer demand, Green Mountain has decided it simply did not go far enough in order to force consumers and commercial customers to use K-Cups exclusively, and thus has decided "to replace" all existing K-Cup Brewers that can be used with Competitive Cups to ensure that Green Mountain can fully realize its monopoly power by excluding competitors and maintaining supracompetitive prices.  Thus, the purported consumer benefit of a "perfect brew" delivered by interactive technology is a pretextual sham intended to conceal Green Mountain's true intention of excluding competition that threatens its ability to extract monopoly profits from the Compatible Cup Market.

271.    Even if Green Mountain were able to articulate a consumer benefit for the lock-out strategy, any such purported benefit would not, in any event, outweigh the anticompetitive effects.  Consumers often prefer the price, taste, and/or quality of Competitive Cups to K-Cups.

272.    Additionally, consumers generally prefer having the ability to choose from a greater variety of Compatible Cups.  As of early 2012, there were already more than 200 K-Cup varieties on the market, allowing consumers the luxury of buying different flavors at drastically different price points.

273.    However, as one research analyst noted, "if you buy Keurig 2.0, you're actually limiting the amount of coffee that you can make."  As the analyst asked, "[d]ue to the fact that the original K-Cup is still growing, who is going to be eager to 'upgrade' their coffee maker and simply chuck the one they have now, that makes all brands accessible?"  But ultimately consumers will be forced to make the switch as prior generations of K-Cup Brewers need to be replaced.

274.    Green Mountain's anticompetitive product redesign is not legitimately intended to benefit consumers; it is just Green Mountain's latest of many anticompetitive acts designed to maintain its monopoly over the Compatible Cup Market by excluding competition and the lower-priced Competitive Cups that consumers demand.

275.    End user businesses, institutions, and consumers should be free to decide whether this pretextual and purported product "improvement" is worth the substantially higher price of K-Cups.  End users of the 2.0 K-Cup Brewer should not be forced by Green Mountain to buy only K-Cups, when they would prefer to buy Competitive Cups, but this is precisely the goal and result of this anticompetitive and exclusionary scheme that eliminates consumer and commercial customer choice.

276.     As one financial analyst recently observed, "the introduction of a new closed system, dubbed Keurig 2.0, which will only use licensed K-Cups ... will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup) hostage to higher prices. With the new machines, Green Mountain is effectively cutting off competition. I know, I know — a monopoly is good, but marketplace/consumer confusion isn't."

<strong>5.     Green Mountain Cannot Justify Tying K-Cup Purchases To Brewer Purchases On The Basis That They Create A "System"</strong>

277.     Green Mountain deceptively claims that its K-Cup Brewers and K-Cups together create one purportedly unified "system," but this is false.  Indeed, Green Mountain has admitted that it could turn on or off this lock-out technology after a certain number of uses, such that any purported claim that the K-Cup Brewers and the K-Cups necessarily constitute a system is pretextual.

278.     As of October 2013, Mr. Kelley, admitted it was "fair to say [Green Mountain] [was] still deciding on exactly how [it would] handle the unlicensed pod" in that "it could range from not brewing them at all to brewing them a few times before they no longer work," as reported by USA Today.  *See* Dan D'Ambrosio, With K-Cup Patent Expired, Others Try To Cash In, USA Today (October 29, 2013).  Green Mountain therefore cannot plausibly assert that this lock-out technology, which could be programmed to be switched on or off or to work only a limited number of times, is in any way integral to any purported consumer benefit or a necessary aspect of any unified "system."

279.     Moreover, K-Cup Brewers and Compatible Cups have been sold as separate products for many years, and consumers have purchased and demand to purchase Compatible Cups and their K-Cup Brewer separately, from different types of suppliers, from different stores or internet retailers, in different locations, at different times, and under different promotions.

280. While Keurig may choose to bundle K-Cups with K-Cup Brewers at the time the brewer is sold, the vast majority of K-Cups are sold without a K-Cup Brewer.

281. Consumers frequently buy a mix of both Competitive Cups and K-Cups from a wide variety of sources at a wide variety of price points, such as high-end stores like Starbucks, bulk warehouses like BJs, budget mass retailers like Wal-Mart, or online meccas like Amazon.com — all typically at separate times from the time at which they purchase a K-Cup Brewer.

282. Some retailers only sell K-Cups or Competitive Cups but not the corresponding K-Cup Brewers.

283. As such, a diverse group of entities typically sell K-Cups and/or K-Cup Brewers alone and/or separately.

284. Further, Green Mountain has successfully raised K-Cup prices above supracompetitive levels for extended periods of time without losing market share of its K-Cup Brewers, thereby demonstrating that the K-Cup Brewer and the K-Cup do not constitute a system.

285. Indeed, Green Mountain's sales of K-Cup Brewers have experienced a high rate of growth, year after year, every year since Green Mountain increased its prices in 2010.

### 6. Green Mountain Has Interfered With TreeHouse's Business Relations By Confronting Retailers With Its Plan To Lock Out Competitive Cups

286. Green Mountain has been systematically confronting retailers with statements of its purported Keurig 2.0 product design and present intent and plan to lock out Competitive Cups, attempting to dissuade those retailers from doing business with TreeHouse, and then, on information and belief, seeking to foreclose future competition by entering into unduly restrictive, long-term exclusionary agreements with such retail customers. In the alternative,

60

even if it turns out that 2.0 K-Cup Brewers are not ultimately able to lock out new Competitive Cups that may be created through reverse engineering, Green Mountain has been falsely or recklessly interfering with TreeHouse's business relations by suggesting otherwise.

### G.   Green Mountain Has Harmed Competition, Competitive Cup Makers, Suppliers, Retailers, Distributors, Commercial Customers, And Consumers

287.   Green Mountain's anticompetitive acts, including requiring its K-Cup machinery and component suppliers, coffee brands and roasters, and K-Cup distributors and retailers to enter into exclusive agreements, have had serious anticompetitive effects on TreeHouse and on competition in the Compatible Cup Market overall, including on other Competitive Cup manufacturers, potential market entrants, distributors, retailers, commercial customers, and consumers.

### 1.   Restraints On Price Competition Have Caused Supracompetitive Prices Harming Consumers, Commercial Customers, Retailers, And Distributors

288.   With little to no competition, depending on the line of business, Green Mountain and its owned or licensed coffee brands have been able to charge supracompetitive prices for K-Cups. As a result, consumers and commercial customers in both the Away-From-Home and At-Home Market Segments have been forced to pay at least 15% to 25% more for Green Mountain-owned and licensed K-Cups than they would have for Competitive Cups. Indeed, a consumer or commercial customer pays on average $0.60 for a Green Mountain K-Cup, as opposed to $0.45 for a Competitive Cup. *See* Rabobank, NCA 2013 Coffee Summit Presentation at 28.

289.   The average K-Cup Brewer owner, moreover, uses more than 1,000 K-Cups per year, according to estimates. At an estimated 60 cents per K-Cup, that translates into an expense of over $600 per year for the average K-Cup user.

290.    Competitive Cups are substantially less expensive, which can save consumers over $150 a year (assuming the same 1,000-cup per year consumption rate).

291.    Consumers and commercial customers do not willingly choose to pay supracompetitive prices for Green Mountain-owned and licensed K-Cups. On the contrary, market studies show that "Keurig users remain highly price sensitive and willing to try new K-Cup brands if they are less expensive." In fact, "90.9% of Keurig users replied that they would try a new K-Cup brand if it were less expensive. This is more supportive evidence that K-Cup users would not necessarily be loyal to a particular brand if they found a more inexpensive option."

292.    By restraining price competition and the availability of Competitive Cups, Green Mountain has also harmed retailers, grocers, and distributors, which seek to reduce prices in order to increase sales and win business away from competitors with higher prices or less brands.

2.      **Restraints On Competition Have Reduced Output And Availability Of Preferred Brands, Thereby Harming Suppliers, Competitive Cup Makers, Retailers, Distributors, Commercial Customers, And Consumers**

293.    Green Mountain's conduct has also limited the number and variety of Compatible Cup beverages available to consumers and commercial customers. By foreclosing access to markets, inputs, suppliers, distributors, and brands, Green Mountain has limited the output, distribution, and availability of Competitive Cups. As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by Competitive Cup manufacturers.

294.    Restricted access to Competitive Cups has been especially harmful to consumers who prefer the taste, flavor, and/or quality of Competitive Cups over Green Mountain-owned or licensed K-Cups. Indeed, as one market study observed, "[w]hile there are more licensed K-

Cups in the top 100 on Amazon, unlicensed [Competitive Cups] actually had a better average ranking and had far more consumers who rated each flavor."

295.    Consumer choice has been further limited because competitors disadvantaged by Green Mountain's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Competitive Cups.

296.    Green Mountain has further constrained Competitive Cup output and diversity by foreclosing access to lucrative licensing and manufacturing arrangements with most well-known coffee brands, such as Starbucks and Dunkin' Donuts.

### 3.    Green Mountain Has Substantially Foreclosed Access To The Office Coffee Services Market Segment

297.    Because Green Mountain is currently, on information and belief, the only provider of K-Cup Brewers in the Office Coffee Services Market Segment and has prohibited distributors from selling Competitive Cups, competition in this market has been substantially foreclosed.  TreeHouse, other Competitive Cup manufacturers, and other potential entrants have been substantially foreclosed from competing for this business.

298.    Distributors serving the Office Coffee Services Market Segment have also been deprived of competition for their services and the opportunity to bargain for their preferred sales terms, despite their expressed interest in doing business with multiple Compatible Cup manufacturers.

299.    Instead, distributors have been forced to do business with Green Mountain alone on a take-it-or-leave-it basis, and distributors and commercial customers have had to accept Green Mountain's unfavorable delivery and packaging terms.

300.     By eliminating the freedom to do business with Competitive Cup manufacturers, distributors have also been harmed because they cannot compete based on the brands that they carry, which also harms consumers who are deprived of their preferred Compatible Cup selections.

301.     Green Mountain's Office Coffee Services customers have expressed that they would prefer to purchase Competitive Cups from TreeHouse, but are precluded from doing so because Green Mountain has locked in all distributors and has substantially foreclosed access to Competitive Cups.

### 4.     Harm Specific To The TreeHouse Companies

302.     As a direct and proximate result of Green Mountain's anticompetitive conduct, TreeHouse has lost profits due to higher costs of doing business and the fact that it has been substantially foreclosed from competing with Green Mountain in the Compatible Cup Market.

303.     As a direct and proximate result of Green Mountain's scheme to foreclose Plaintiffs from the Compatible Cup Market, Bay Valley has been financially injured by a decreased ability to compete for Competitive Cup supply arrangements.

304.     As a direct and proximate result of Green Mountain's scheme to restrain competition for Compatible Cups, Sturm's ability to manufacture Compatible Cups has been substantially restrained and therefore Sturm has been financially injured.  In addition, Sturm's reputation was substantially harmed as a result of Green Mountain's baseless litigation regarding Sturm's Grove Square Compatible Cups.

### 5.     Threat Of Future Harm

305.     Green Mountain's interference with various distributors and retail outlets with respect to its plans for the Keurig 2.0 brewer launch has already harmed competition, as Green Mountain has induced those entities to stop doing business with Competitive Cup sellers.

Moreover, the introduction of Green Mountain's 2.0 K-Cup Brewer threatens to further harm competition in the future.   Green Mountain already controls approximately 86% of the Compatible Cup Market, but is threatening to substantially foreclose Competitive Cup makers from the balance of the market by locking Competitive Cups out of new brewers and replacing prior generations of K-Cup Brewers.

306.   The elimination of Competitive Cup competition for Green Mountain's K-Cup Brewers will harm consumers by raising average Compatible Cup prices and by eliminating consumer choice.   It will also harm retailers, distributors, and unlicensed suppliers of Competitive Cups that seek to win business based on the price and availability of alternative brands.

307.   The Competitive Cup business is critical to the economic health of TreeHouse and its subsidiaries.   Unless permanently enjoined, Defendants' continued promotion, marketing, and introduction of 2.0 K-Cup Brewers that will reportedly not function with Competitive Cups may destroy the valuable reputation Plaintiffs have built in the Compatible Cup Market, may make it impossible for TreeHouse to compete in any meaningful way with Green Mountain, and may cause TreeHouse to lose its substantial investment in the Competitive Cup business.

CAUSES OF ACTION

### COUNT ONE
**Monopolization**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

308.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 307 as fully set forth herein.

309.    As detailed above, Green Mountain has monopoly power in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

310.    As alleged herein, Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

311.    Green Mountain has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Cup Markets by:

a.    coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements that restrain market entry, unreasonably restrain competition, exclude competitors, limit output, and raise competitors' costs;

b.    conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, unreasonably restrain competition, allocate markets, and limit output;

c.    coercing distributors and retailers to enter into anticompetitive agreements that restrain market entry, exclude competitors, unreasonably restrain competition, and limit output;

d.      filing an objectively and subjectively baseless litigation and appeal against TreeHouse subsidiary Sturm for the purpose of interfering with TreeHouse's ability to compete in the Compatible Cup market;

e.      interfering with TreeHouse's business relationships by attempting to dissuade retailers from working with TreeHouse on the basis that TreeHouse's Competitive Cups will not be compatible with 2.0 K-Cup Brewers;

f.      announcing an anticipated tie of the purchase of K-Cups to the purchase of K-Cup Brewers in order to unreasonably restrain competition from Competitive Cup makers;

g.      threatening to unreasonably restrain competition through the implementation of an anticompetitive product redesign with lock-out technology that cannot be justified based on any legitimate, non-pretextual consumer benefit, which is coupled with the elimination of K-Cup Brewers that are compatible with Competitive Cups; and

h.      raising rivals' costs above those that would exist under competitive conditions by coercing Competitive Cup makers to enter purported "licenses" that restrict output and raise rivals' costs by requiring the payment of improper "royalty" payments.

312.    While many of these anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

313.    As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, TreeHouse has been injured in its business, all with resultant damages in amounts to be proven at trial, in at least the following ways: (1) TreeHouse's costs of doing business have been increased as a direct result of Green Mountain tying up the inputs and machinery necessary to make Competitive Cups; (2) TreeHouse has been substantially foreclosed from competing in the Portion Pack and

Compatible Cup Markets; (3) TreeHouse has had to pay attorneys' fees and costs to defend against a baseless litigation and appeal; and (4) TreeHouse has lost business as a result of Green Mountain's interference with its relationships with retailers and its claims that Competitive Cups will be locked out of 2.0 K-Cup Brewers.

314.    As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, competition, suppliers, retailers, distributors, commercial customers, and consumers in the Portion Pack and Compatible Cup Markets have been harmed by, among other things: (1) Green Mountain's ability to charge supracompetitive prices for K-Cups; and (2) the reduced output and availability of consumers' preferred Compatible Cups.

## COUNT TWO
### Exclusive Dealing
### Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2
### and Section 3 Of The Clayton Act, 15 U.S.C. § 14
### Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(1)-(4)
### Wisconsin Antitrust Act, Wis. Stat. §§ 133.03(1)-(2)
### Donnelly Act, N.Y. Gen. Bus. Law § 340

315.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 314 as fully set forth herein.

316.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

317.    Green Mountain has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors, and retailers.

318.    These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

68

319.    This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Green Mountain does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers.  Thus, Green Mountain's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

320.    This conduct has substantially foreclosed competition in the Portion Pack and Compatible Cup Markets.

321.    This conduct has also substantially foreclosed access to machinery used to manufacture non-filtered Compatible Cups and competition for sales of Compatible Cups to the Office Coffee Services Market Segment.

322.    Because this conduct involves exclusionary agreements between two or more unaffiliated entities, this conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and similar state laws.  These exclusionary agreements also violate Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws because these agreements constitute anticompetitive acts intended to maintain Green Mountain's monopolies in the Portion Pack and Compatible Cup Markets.

### COUNT THREE
**Monopoly Leveraging**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

323.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 322 as fully set forth herein.

324.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

69

325.    Green Mountain has willfully and intentionally used its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets, specifically, by selling K-Cup Brewers at or below cost in order to lock consumers into the K-Cup format, then coercing companies, whose business depends on access to K-Cup Brewers, to sign anticompetitive agreements prohibiting them from dealing with Green Mountain's competitors in the Compatible Cup Market.

326.    Green Mountain further threatens to continue to leverage its monopoly power in the Single-Serve Brewer Market to gain or attempt to gain or maintain monopoly power in the Portion Pack and Compatible Cup Markets by tying 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers, which purportedly contain interactive, lock-out technology that cannot be justified on the basis of any legitimate consumer benefit.

327.    Green Mountain willfully acquired monopoly power by the exclusionary conduct detailed above, rather than through efficiency or innovation.

**COUNT FOUR**
**Sham Litigation**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

328.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 327 as fully set forth herein.

329.    Just weeks after TreeHouse subsidiary Sturm entered the Compatible Cup Market, Keurig willfully and intentionally sued Sturm, alleging in bad faith, with no objective or subjective basis, that Sturm's Competitive Cups infringed Keurig's patents directed at brewers and methods of using brewers and that Sturm induced consumers to infringe these brewer patents by using Competitive Cups.    Keurig's non-patent claims were likewise objectively and subjectively baseless.

70

330.    In September 2012, the United States District Court for District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit, thereby further requiring TreeHouse to expend additional resources that could have otherwise been spent competing against Green Mountain.

331.    After Sturm incurred three years of litigation costs based on Keurig's frivolous argument that Sturm's Competitive Cups infringed Defendants' K-Cup Brewer patents, the Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

332.    The Federal Circuit expressly concluded that rather than pursuing any legitimate purpose, "Keurig [was] attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law." *Id.*

333.    No reasonable litigant could have realistically expected to succeed on the merits of Keurig's claims, and thus Keurig's litigation and appeal were objectively baseless.

334.    On information and belief, and as supported by the allegations in the *Keurig v. Sturm* complaint and the meritless legal claims, Keurig's litigation and appeal were also subjectively baseless.

335.    On information and belief, Keurig instituted this lawsuit and appeal in an attempt to interfere with TreeHouse's ability to compete in the Compatible Cup Market, to intimidate market entrants, to raise a rival's costs, to harm TreeHouse's reputation and interfere with its

business relations, and to deprive TreeHouse and consumers of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.

336.    As a result of this sham litigation and appeal, Plaintiffs were forced to incur three years' worth of litigation fees and costs, rather than use those resources to compete against Green Mountain.  Competition in the market for Compatible Cups has thus been harmed.

**COUNT FIVE**
**Patent Misuse**

337.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 336 as fully set forth herein.

338.    The *Keurig v. Sturm* litigation alleged that Green Mountain's patents directed at brewers and methods of using brewers were infringed by Sturm and Green Mountain's consumers using Sturm's Competitive Cups in K-Cup Brewers.

339.    As noted above, the United States Court of Appeals for the Federal Circuit affirmed the district court's grant of summary judgment in Sturm's favor on Keurig's patent claims, holding that rather than seeking the proper enforcement of any patent rights, Keurig was rather trying to make an "end-run" around the patent laws. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).  This constituted patent misuse.

340.    Green Mountain has engaged in both types of unlawful patent misuse.  First, by having sought to "impermissibly restrict" purchasers of K-Cup Brewers from using Competitive Cups on the basis of its brewer and brewing method patents, (and similarly having sought to restrict suppliers of those Competitive Cups, like TreeHouse) Green Mountain has willfully, intentionally, and unlawfully broadened the scope of its patents and, moreover, has attempted to, and threatens to do so again in the future.  Second, by conditioning consumers' use of the patented K-Cup Brewers on the use of its unpatented K-Cups, Green Mountain engaged in, and

72

threatens to continue to engage in, an unlawful tying arrangement, constituting *per se* patent misuse.

341.     As a result of Green Mountain's patent misuse, competition has been harmed because, among other things, Green Mountain's patent misuse has substantially foreclosed its competitors from the Compatible Cup market, TreeHouse has been forced to pay attorneys' fees and costs that otherwise would have been spent bringing more Competitive Cups to the market, and consumers have had reduced access to Competitive Cups.

**COUNT SIX**
**Technological Tying**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**and Section 3 Of The Clayton Act, 15 U.S.C. § 14**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)-(4)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2)**

342.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 341 as fully set forth herein.

343.     With the introduction of the 2.0 K-Cup Brewers, which Green Mountain asserts will only be compatible with 2.0 K-Cups, Green Mountain threatens to tie 2.0 K-Cup purchases to the purchase of 2.0 K-Cup Brewers.  By willfully and intentionally imposing a technological tie between the 2.0 K-Cup Brewers and 2.0 K-Cups, Green Mountain will condition the use of the 2.0 K-Cup Brewers on a consumer's purchase of 2.0 K-Cups.  2.0 K-Cup Brewer consumers will be forced to forgo purchasing Competitive Cups, since those cups will purportedly be rendered incompatible with 2.0 K-Cup Brewers.

344.     Green Mountain's tying arrangement will affect a substantial volume of interstate commerce.

345.     Green Mountain's tying arrangement will have the effect of: (i) inhibiting or preventing the sale of Competitive Cups; (ii) decreasing research and investment by Competitive

Cup makers in the Portion Pack and Compatible Cup Markets; (iii) discouraging or preventing new entry into the Compatible Cup Market; (iv) maintaining supracompetitive K-Cup prices and increasing average prices of Compatible Cup prices overall to consumers; (v) exploiting purchasers of 2.0 K-Cup Brewers by blocking their use of Competitive Cups of their preference; (vi) allowing Green Mountain to coerce competitors and third parties to take licenses from, and pay royalties to, Green Mountain; and (vii) increasing Green Mountain's share and monopoly power over the Compatible Cup Market.

346.    The anticompetitive effects of Green Mountain's conduct outweigh any procompetitive benefits; indeed, there are little or no procompetitive benefits resulting from Green Mountain's threatened lock-out of Competitive Cups through means of a technological tie.

347.    Green Mountains' tying arrangement is intended to maintain and increase its monopoly power, or dangerous probability of acquiring monopoly power, in the Portion Pack and Compatible Cup Markets.

348.    Green Mountains' tying arrangement threatens to cause TreeHouse substantial damages as a direct and proximate cause of this unlawful conduct, and indeed has already caused TreeHouse damages because Green Mountain has used this impending lock-out as a basis to interfere with TreeHouse's business relationships, thereby diverting sales from TreeHouse to Green Mountain.

349.    Additionally, TreeHouse has been, and will be, irreparably harmed by this tying arrangement, for which there is no adequate remedy at law, and TreeHouse is entitled to a permanent injunction to prevent further harm to TreeHouse resulting from this conduct.

**COUNT SEVEN**
**Anticompetitive Product Redesign**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

350.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 349 as fully set forth herein.

351.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

352.    As alleged herein, Green Mountain has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

353.    Green Mountain has further threatened to willfully and intentionally exclude competition from the Portion Pack and Compatible Cup Markets through the use of anticompetitive and exclusionary interactive lock-out technology intended to render Competitive Cups incompatible with 2.0 K-Cup Brewers.

354.    Green Mountain has threatened to eliminate alternative brewers by replacing prior generations of K-Cup Brewers with 2.0 K-Cup Brewers, thereby locking in consumers and forcing them to use K-Cups exclusively.

355.    On information and belief, the "interactive technology" will not materially benefit consumers, and, in fact, will harm consumers by resulting in reduced availability of preferred brands.    Any purported consumer benefit asserted by Green Mountain for this lock-out technology is a pretextual sham, which, on information and belief, is intended to disguise Green

Mountain's anticompetitive intent to exclude competition and maintain and increase its monopoly over the Portion Pack and Compatible Cup Markets.

356.   Green Mountain seeks to force Competitive Cup makers to take a purported "license" from, and to pay illegitimate royalties to, Green Mountain in order to avoid the exclusionary effects of this "interactive technology."

357.   Green Mountain also seeks to leverage the threat of the exclusionary effects of "interactive technology" to cause entities to stop dealing with Green Mountain's competitors.

## COUNT EIGHT
### Attempted Monopolization In The Alternative
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)
### Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)

358.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 357 as fully set forth herein.

359.   As detailed above, Green Mountain has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

360.   Green Mountain has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

361.   Green Mountain's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Portion Pack and Compatible Cup Markets.  Green Mountain's anticompetitive conduct presents a dangerous probability that Green Mountain will succeed, to the extent it has not already, in its attempt to monopolize the Portion Pack and Compatible Cup Markets.

362.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, TreeHouse has been injured in its business, all with resultant damages in amounts to be proven at trial, in at least the following ways: (i) TreeHouse's costs of doing business have been increased as a direct result of Green Mountain tying up the inputs and machinery necessary to make Competitive Cups; (ii) TreeHouse has been substantially foreclosed from competing in the Portion Pack and Compatible Cup Markets; (iii) TreeHouse has had to pay attorneys' fees and costs to defend against a baseless litigation and appeal; and (iv) TreeHouse has lost business as a result of Green Mountain's interference with its relationships with retailers and its claims that Competitive Cups will be locked out of 2.0 K-Cup Brewers.

363.   As a direct, foreseeable, and proximate result of Green Mountain's anticompetitive and monopolistic conduct, competitors, suppliers, distributors, retailers, commercial customers, and consumers in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets have been harmed by, among other things: (i) Green Mountain's ability to restrain competition with Competitive Cup makers; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

### COUNT NINE
**Conspiracy to Monopolize**
**Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(1)-(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2)**
**Donnelly Act, N.Y. Gen. Bus. Law § 340**

364.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 363 as fully set forth herein.

365.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack Market, and Compatible Cup Market, including the power to control prices and exclude competition.

366.    Green Mountain willfully and intentionally conspired with competitor roasters and coffee brands to monopolize the Portion Pack and Compatible Cup Markets.

367.    Green Mountain and its licensees accomplished this by entering into multi-year, exclusionary agreements which prevent competitor roasters or coffee brands from licensing trademarks or entering into agreements with Green Mountain's competitors.

368.    Co-conspirators entered into these agreements with the knowledge and agreement that distributors and other resellers will be required to enter into, or already have entered into, agreements that limit their freedom to do business outside of specified authorized locations, thereby restraining the ability of Competitive Cup makers to enter into contracts with distributors or other resellers.

369.    These restrictions regarding where and how K-Cups can be sold also allow Green Mountain to maintain supracompetitive prices across licensed brands by controlling output, which reduces the competitor roaster or coffee brands' incentives to enter into deals with Competitive Cup makers and creates an economic incentive for these co-conspirators to restrain competition from Competitive Cup makers and to induce Competitive Cup makers to enter into "license" agreements with Green Mountain that would require the Competitive Cup maker to permit Green Mountain to allocate the markets for Competitive Cups and to raise rivals' costs through the payment of an illegitimate "royalty."

370.    Green Mountain and its licensees' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of restraining competition from

Competitive Cup makers in order to restrain price competition in the Portion Pack and Compatible Cup Markets.

## COUNT TEN
### Concerted Refusals to Deal & Group Boycott
### Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
### Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10(1)-(2)
### Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)
### Donnelly Act, N.Y. Gen. Bus. Law § 340

371.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 370 as fully set forth herein.

372.    As detailed above, Green Mountain has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

373.    Green Mountain has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified concerted refusal to deal agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors, and retailers.

374.    Specifically, Green Mountain has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Cup Markets by:

    a.    coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers;

    b.    conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers; and

    c.    coercing distributors and retailers to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers.

375.    These agreements constitute unlawful concerted refusals to deal because two or more unaffiliated companies have unreasonably agreed not to deal with Competitive Cup makers.  These agreements also constitute unlawful group boycotts because they are designed to induce Competitive Cup makers to become "licensed" or "authorized" by Green Mountain. Indeed, Green Mountain has repeatedly made public statements that its business objective is to "convert" unlicensed suppliers to licensed entities.

376.    This web of agreements refusing to deal with Competitive Cup makers cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because Green Mountain does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers.  Thus, Green Mountain's refusals to deal serve the anticompetitive purpose of cutting competitors off from resources they need to compete with Green Mountain.

377.    These concerted refusals to deal have unreasonably restrained trade and have permitted Green Mountain to maintain its monopoly power over the Portion Pack and Compatible Cup Markets.

### COUNT ELEVEN
### Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*

378.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 377 as fully set forth herein.

379.    The violations of Sections 1 and 2 of the Sherman Act set forth above also constitute violations of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340-47.

## COUNT TWELVE
### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, *et seq.*

380.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 379 as fully set forth herein.

381.    Green Mountain's conduct alleged herein has injured TreeHouse Foods and Bay Valley, companies with a principal place of business in Illinois.

382.    The anticompetitive conduct alleged herein also constitutes a violation of the IUDTPA, 815 Ill Comp. Stat. 510/1, *et seq.*, which makes it unlawful to engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

383.    Green Mountain's anticompetitive conduct was willful and intentional and has resulted in substantial injury to consumers and competition that is not outweighed by any benefit to consumers, and which could not have been reasonably avoided by consumers.

## COUNT THIRTEEN
### Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/1, *et seq.*

384.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 383 as fully set forth herein.

385.    Green Mountain's conduct alleged herein has injured TreeHouse Foods and Bay Valley, companies with a principal place of business in Illinois.

386.    The anticompetitive conduct alleged herein also constitutes a violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(1), which makes it unlawful for a person to "make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person;" 740 Ill. Comp. Stat. § 10/3(2), which prohibits unreasonable restraints of trade or commerce "[b]y contract,

81

combination or conspiracy;" 740 Ill. Comp. Stat § 10/3(3), which makes it unlawful to "[e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce;" and 740 Ill. Comp. Stat. § 10/3(4), which prohibits unlawful tying and exclusive dealing arrangements.

387.    Green Mountain has willfully and intentionally monopolized trade or commerce in Illinois by restraining competition with TreeHouse Foods and Bay Valley, which have their principal place of business in Illinois.

### COUNT FOURTEEN
### Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*

388.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 387 as fully set forth herein.

389.    Green Mountain intentionally entered into an agreement with R.A. Jones, a Wisconsin-based supplier of machinery necessary to make non-filtered Compatible Cups, to refuse to sell such machinery to Green Mountain's competitors, such as TreeHouse.

390.    The anticompetitive conduct alleged herein also constitutes a violation of the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1) which prohibits "contract[s], combination[s] in the form of trust or otherwise, or conspirac[ies], in restraint of trade or commerce" as well as Wis. Stat. § 133.03(2), which makes unlawful monopolization, attempts to monopolize, and combinations or conspiracies to monopolize trade or commerce.

391.    A portion of the conduct alleged herein occurred within the state of Wisconsin. Furthermore, the conduct alleged herein as a whole substantially affects consumers in the state of Wisconsin and Bay Valley's subsidiary, Strum, located in Wisconsin, as well as interstate commerce.

## COUNT FIFTEEN
### Wisconsin Common Law Unfair Competition

392.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 391 as fully set forth herein.

393.    Green Mountain entered into an agreement with R.A. Jones, a Wisconsin-based supplier of machinery necessary to make non-filtered Compatible Cups, to refuse to sell such machinery to Green Mountain's competitors, such as TreeHouse.

394.    The anticompetitive conduct alleged herein also constitutes a violation of the common law of Wisconsin, which prohibits unfair competition between competitors or would-be competitors.

## COUNT SIXTEEN
### Intentional Interference with Business Relations Under New York Law

395.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 394 as fully set forth herein.

396.    TreeHouse had, or has, a reasonable expectation of, economically advantageous business relations with its past, current, and prospective retail customers.

397.    A special relationship existed between Green Mountain and TreeHouse because Green Mountain intended to harm TreeHouse, such harm was foreseeable, TreeHouse's injury was directly linked to Green Mountain's conduct, and Green Mountain's conduct was morally blameworthy.

398.    Green Mountain knew of TreeHouse's business relations and was aware or should have been aware that if it did not act with due care, its actions would interfere with and cause injury, in whole or in part, to these relations.

399.    Green Mountain interfered with and continues to interfere with these relations by confronting TreeHouse's retail customers with its plan to lock out Competitive Cups through its

83

introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those retailers from doing business with TreeHouse.

400.    Green Mountain made and continues to make these statements intentionally, maliciously, without justification, and through the use of wrongful means as set forth above.

401.    But for Green Mountain's interference, TreeHouse would have received or would receive the expected economic advantage from its business relations with its retail customers.

402.    As a result of Green Mountain's interference, TreeHouse is likely to suffer, has suffered, and will continue to suffer damage to its relations with past, current, and/or prospective retail customers, as set forth above.

403.    By reason of the foregoing, Green Mountain has engaged in negligent and intentional interference with business relations in violation of New York law.

**COUNT SEVENTEEN**
**Tortious Interference with Contract Under Wisconsin Law**

404.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 403 as fully set forth herein.

405.    Green Mountain has interfered with TreeHouse's business relations by confronting retail customers with its plan to lock out Competitive Cups through its introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those retailers from doing business with TreeHouse.

406.    Green Mountain, aware of TreeHouse's reasonable expectation of entering into a valid business relationship with these retail customers, intentionally interfered without justification or privilege with that prospective business relationship by making the statements described above, causing injury to TreeHouse.

84

## COUNT EIGHTEEN
**Tortious Interference with Prospective Business Expectancy Under Illinois Law**

407.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 406 as fully set forth herein.

408.    Green Mountain has interfered with TreeHouse's business relations by confronting retail customers with its plan to lock out Competitive Cups through its introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those retailers from doing business with TreeHouse.

409.    Green Mountain, aware of TreeHouse's reasonable expectation of entering into a valid business relationship with these retail customers, intentionally interfered with that prospective business relationship by making the statements described above, causing injury to TreeHouse.

410.    Green Mountain's conduct also constitutes common law unfair competition under Illinois law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a trial by jury and hereby respectfully request:

A.    Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has monopolized, or in the alternative, attempted to monopolize, the Compatible Cup Market and the Portion Pack Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(2);

B.    Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has conspired with its licensees to monopolize the Compatible Cup Market and the Portion Pack Market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Illinois Antitrust Act,

740 Ill. Comp. Stat. § 10/3(1)-(3), the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

C.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain's exclusive dealing agreements are unreasonable and unenforceable restraints of trade that violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(1)-(4), the Wisconsin Antitrust Act, Wis. Stat. §§ 133.03(1)-(2), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

D.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has unlawfully leveraged its monopoly power in the Single-Serve Brewer Market to monopolize the Compatible Cup Market and the Portion Pack Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(2);

E.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has engaged in patent misuse and a declaration that Green Mountain's brewer and method patents are unenforceable as to Compatible Cups;

F.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has unlawfully tied the sale of Keurig 2.0 Brewers to 2.0 K-Cups, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)-(4), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2);

G.     Pursuant to 28 U.S.C. § 2201, a declaration that Green Mountain has engaged in concerted refusals to deal and group boycotts in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10(1)-(2), the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

H.    Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from Green Mountain's violations of the Sherman Act;

I.    Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation the Sherman Act;

J.    Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Green Mountain from implementing the announced 2.0 K-Cup Brewer lock-out technology that threatens to block Competitive Cups from working in 2.0 K-Cup Brewers;

K.    Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining Green Mountain from tying the sale of 2.0 K-Cups to 2.0 K-Cup Brewers;

L.    Pursuant to N.Y. Gen. Bus. Law § 340(5), trebled damages resulting from Green Mountain's violations of the Donnelly Act and permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation of the Donnelly Act;

M.    Pursuant to Wis. Stat. § 133.18, trebled damages resulting from Green Mountain's violations of the Wisconsin Antitrust Act;

N.    Pursuant to Wis. Stat. § 133.14, permanent injunctive relief voiding and preventing Green Mountain's unlawful contracts with its conspirators that violate the Wisconsin Antitrust Act;

O.    Pursuant to Ill. Comp. Stat. § 740 Ill. Comp. Stat. § 10/7(2), maximum compensatory and trebled damages resulting from Green Mountain's intentional and willful violations of the Illinois Antitrust Act and permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation of the Illinois Antitrust Act;

P. Pursuant to 815 Ill Comp. Stat. § 510/3, permanent injunctive relief preventing Green Mountain from continuing the unlawful acts in violation of the Illinois Uniform Deceptive Trade Practices Act;

Q. Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon this Court's declaratory judgments;

R. Pre-judgment and post-judgment interest at the maximum legal rate;

S. TreeHouse's costs, expenses, and reasonable attorneys' fees in bringing this action;

T. An award of punitive damages; and

U. Such other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated: New York, New York
   February 11, 2014

WINSTON & STRAWN LLP
Attorneys for Plaintiffs


By: *Susannah P. Torpey*
  Aldo A. Badini
  abadini@winston.com
  Susannah P. Torpey
  storpey@winston.com
  WINSTON & STRAWN LLP
  200 Park Avenue
  New York, New York 10166
  (212) 294-6700

  Dan K. Webb (*pro hac vice* application pending)
  dwebb@winston.com
  James F. Herbison (*pro hac vice* application pending)
  jherbison@winston.com
  WINSTON & STRAWN LLP
  35 West Wacker Drive
  Chicago, IL 60601-9703

88

(312)  558-5600

Diana L. Hughes (*pro hac vice*
application pending)
dhughes@winston.com
WINSTON & STRAWN LLP
101 California Street
San Francisco, CA 94111
(415) 591-1000

89