———————————————————— x

IN RE:

KEURIG GREEN MOUNTAIN SINGLE-
SERVE COFFEE ANTITRUST LITIGATION

———————————————————— x

TREEHOUSE FOODS, INC., BAY VALLEY
FOODS, LLC, and STURM FOODS, INC.,

          Plaintiffs,

v.

KEURIG GREEN MOUNTAIN, INC.,

          Defendant.

———————————————————— x

:   ECF Case

:   MDL No. 2542

:   Master Docket No. 1:14-md-02542-VSB

:
:

:   Civil Action No. 1:14-cv-00905-VSB

:

:   **AMENDED AND SUPPLEMENTAL
COMPLAINT AND DEMAND
FOR JURY TRIAL**

:   **REDACTED**

:   **CONTAINS INFORMATION DESIGNATED AS
CONFIDENTIAL, HIGHLY CONFIDENTIAL,
OR ATTORNEYS' EYES ONLY**

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ................................................................................. 5

   I.   KGM Monopolizes Markets And Restrains Competition With Anticompetitive Contract Provisions And Coercive And Deceptive Tactics ............................ 5

   II.  KGM's Anticompetitive Contracts Cut Off Necessary Inputs And Substantially Foreclose Access To Distributors And Customers ....................................... 13

   III.  KGM Hindered TreeHouse's Market Entry By Pursuing Sham Legal Claims ............. 17

   IV.  KGM Has Engaged In A Wide Range Of Anticompetitive Conduct To Unlawfully Maintain Its Monopolies ............................................................... 19

THE PARTIES ................................................................................................. 21

AGENTS AND CO-CONSPIRATORS ............................................................... 23

JURISDICTION AND VENUE ......................................................................... 23

RELEVANT MARKETS ................................................................................... 25

   I.   Relevant Product Markets ......................................................................... 25

       A.  The Single-Serve Brewer Market ........................................................ 26

           1.   KGM Single-Serve Brewers ........................................................ 29

           2.   KGM Has Monopoly Power In The Single-Serve Brewer Market ............. 30

           3.   KGM's Monopoly Share Of Single-Serve Brewers Will Not Be Diminished By The Transition To 2.0 K-Cup Brewers ............................ 32

           4.   Barriers To Entry Are High ......................................................... 33

       B.  The Compatible Cup Market ............................................................ 35

           1.   The Compatible Cup Market Is A Distinct Economic Market .................... 36

           2.   KGM Has Monopoly Power In The Compatible Cup Market ..................... 39

           3.   Barriers To Entry Are High ......................................................... 41

           4.   The Portion Pack Market ............................................................ 44

           5.   Compatible Cup And Portion Pack Competition Does Not Take Place At Any Purported "System" Level ......................................... 46

       C.  The At-Home Market Segment .......................................................... 48

       D.  The Away-From-Home And Office Coffee Services Market Segments ............. 49

   II.  Geographic Market ................................................................................. 52

   III.  Interstate Commerce ............................................................................. 53

ADDITIONAL FACTUAL ALLEGATIONS ....................................................... 53

I.    KGM's Business Model Depends Upon Its Ability To Leverage Its Single-Serve Brewer Monopoly In Order To Restrain Competition And Extract Monopoly Profits From The Compatible Cup Market ................................... 53

II.   KGM Restrained Competition And Exercised Its Monopoly Power By Raising Prices 10% To 15% In 2010 And More In The Lead Up To The Expiration of KGM's K-Cup Filter Patents ........................................................................ 54

III.  TreeHouse Enters The Compatible Cup Market............................................ 56

IV.  KGM Retaliates Against TreeHouse By Filing A Sham Litigation And Appeal To Restrain Competition, Raise Its Rival's Costs, And Intimidate Market Entrants ....................................................................................................... 59

V.   KGM Restrains Competition With Anticompetitive Tying and Exclusionary Agreements, Cuts Rivals Off From Inputs Needed To Meaningfully Compete, And Raises Rivals' Costs ........................................................................... 62

    A.   KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Machines Needed To Make Compatible Cups In Competition With KGM ........ 63

        1.   Direct Evidence Confirms That KGM Exercises, Sustains, And Magnifies Its Monopoly Power By Coercing Suppliers To Exclude Competitors .......................................................................................63

        2.   KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Nearly 100% Of Machinery Sold In The United States To Make Compatible Cups .................................................................65

    B.   KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Inputs Necessary To Make Compatible Cups In Competition With KGM .......... 67

        1.   KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Suppliers Of Plastic Cups Used To Make Compatible Cups .......................................................................................................67

        2.   KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Suppliers Of Lids Used To Make Compatible Cups..................71

    C.   KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Roasters And Brands And Conspires To Allocate Markets, Exclude Competition, And Induce Competitive Cup Makers To Take An Anticompetitive License ....................................................................................... 72

        1.   KGM Enlists Competitor Co-Conspirators To Restrain Competition By Excluding Competitive Cup Makers and Agreeing Not To Bring Competitive Brewers To The Market ..........................................................72

        2.   KGM Has Unlawfully Restricted And Substantially Foreclosed Competition Through A Series Of Agreements Allocating The Compatible Cup Market Across Nearly All Large Coffee and Tea Brands ........................................................................................................81

        3.   KGM Insists That Competitive Cup Makers Must Pay Unjustified Royalties To Become "Authorized" To Access Keurig Brewers ................87

D.     KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Distributors Through Anticompetitive Tying And Exclusionary Agreements ................................................................................. 90

E.     KGM Has Unlawfully Restricted Access To Retailers And Grocers Through Anticompetitive Tying and Exclusionary Agreements ......................... 96

F.     KGM Has Leveraged Its Monopoly With Tying Agreements In The Single-Serve Brewer Market To Unlawfully Maintain Its Monopoly In the Compatible Cup Market and Vice Versa ................................................................ 99

       1.     KGM Leverages Its Monopoly In The Single-Serve Brewer Market And Ties The Sale Of K-Cups To Brewer Sales By Prohibiting Distributors From Selling Competitive Cups ............................... 99

       2.     KGM Leverages Its Monopoly In The Compatible Cup Market And Ties The Sale of Single-Serve Brewers To Compatible Cup Sales By Prohibiting Distributors And Roasters From Selling Competitive Brewers ............................................................. 104

VI.    KGM Has Leveraged Its Monopoly In The Single-Serve Brewer Market To Coerce Consumers To Purchase K-Cups Instead Of Competitive Cups ..................... 105

A.     KGM Has Coerced Consumers By Threatening Not To Honor Consumers' Warranties If They Use Competitive Cups ............................................ 105

B.     KGM Has Coerced Consumers By Disparaging Competitive Cups ................. 106

C.     KGM Has Coerced Consumers To Use K-Cups By Restraining Access to Competitive Cups ................................................................................. 107

VII.   KGM Has Successfully Implemented Its Plan, "Project ███," To Unlawfully Recapture Market Share Lost To Unlicensed Competitive Cup Makers By Removing Competitive Cups From Retail Shelves ...................................................... 107

A.     KGM Implemented Project ███ To Create A Barrier To Entry For Competitors To Give KGM A Sufficient Market Lead ...................................... 108

B.     The 2.0 K-Cup Brewer's Lock-Out Mechanism Has No Legitimate Consumer Benefit ................................................................................. 110

       1.     The Lock-Out Mechanism Cannot Read Recipes And Does Not Adjust The Way The Brewer Brews One K-Cup Over Any Other K-Cup ................................................................................. 110

       2.     KGM's Brewer Redesign Sacrificed Consumer Safety, Brewer Performance, And Beverage Quality For Profits ....................... 115

C.     KGM Used The Impending Lock-Out To Coerce Retailers To Stop Selling Competitive Cups ................................................................................. 117

D.     KGM Cannot Justify Tying K-Cup Purchases To Brewer Purchases On The Basis That They Create A "System" ........................................................ 118

E.     KGM Cannot Justify Tying K-Cup Purchases To Brewer Purchases On The Basis That Closing The Purported "System" Provides Economic Benefits To Consumers ...................................................................... 120

VIII. The Introduction Of 2.0 K-Cup Brewers Allowed KGM To Exercise Its Monopoly Power By Excluding Competition, Reducing Consumer Choice, And Raising Prices ........................................................................................... 121

IX. The Introduction Of 2.0 K-Cup Brewers Injured TreeHouse's Ability To Compete For Sales Of Competitive Cups .................................................... 123

X. KGM Has Misled Consumers And Retailers Regarding Material Qualities And Characteristics Of Its K-Cup Brewers, K-Cups, And Competitive Cups Made By TreeHouse And Others, Depriving Plaintiffs Of Sales And Eroding Their Goodwill ........................................................................................................... 123

   A. KGM's Misrepresentations To Consumers ........................................... 125

      1. KGM Has Misled Consumers Regarding The Compatibility Of Unlicensed Competitive Cups With The 2.0 K-Cup Brewer ..................... 125

      2. KGM Has Misled Consumers Regarding The Quality, Performance, And Safety Of Unlicensed Competitive Cups ........................................... 131

      3. KGM Has Confused And Misled Consumers Regarding How The Use Of Unlicensed Competitive Cups Affects Their Brewer Warranties ................................................................................................... 137

      4. KGM's Misrepresentations To Consumers Have Harmed TreeHouse ....... 140

   B. KGM's Misrepresentations To Retailers ................................................ 140

      1. KGM Has Misled Retailers Regarding The Current And Future Compatibility Of Unlicensed Competitive Cups With The 2.0 K-Cup Brewer And Future K-Cup Brewers ............................................ 140

      2. KGM Has Misled Retailers Regarding The Quality, Performance, And Safety Of Unlicensed Competitive Cups ........................................... 145

      3. KGM's Misrepresentations Regarding Its Discontinuance Of 1.0 K-Cup Brewers ................................................................................... 146

      4. KGM's Misrepresentations To Retailers Have Harmed TreeHouse ......... 148

      5. KGM's Misrepresentations Have Interfered With TreeHouse's Business Relations, Including Those With ███████ ................................. 148

XI. KGM Has Harmed Competition, Competitive Cup Makers, Suppliers, Retailers, Distributors, Commercial Customers, And Consumers ............................................. 153

   A. Restraints On Price Competition Have Caused Supracompetitive Prices Harming Consumers, Commercial Customers, Retailers, And Distributors ...... 153

   B. Restraints On Competition Have Reduced Output And Availability Of Preferred Brands, Thereby Harming Suppliers, Competitive Cup Makers, Retailers, Distributors, Commercial Customers, And Consumers .................... 154

   C. KGM Has Substantially Foreclosed Access To The Office Coffee Services Market Segment ............................................................................... 155

   D. Harm Specific To The TreeHouse Companies ................................................. 156

COUNT ONE, Monopolization Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3) Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)................................................................................................................. 157

COUNT TWO, Exclusive Dealing Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and Section 3 of the Clayton Act, 15 U.S.C. § 14 Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(1)-(4) Wisconsin Antitrust Act, Wis. Stat. §§ 133.03(1)-(2) Donnelly Act, N.Y. Gen. Bus. Law § 340 .......................................... 160

COUNT THREE, Monopoly Leveraging  Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3) Wisconsin Antitrust Act, Wis. Stat. § 133.03(2) ............................................................... 161

COUNT FOUR, Sham Litigation Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3) Wisconsin Antitrust Act, Wis. Stat. § 133.03(2) ................................................................... 163

COUNT FIVE, Patent Misuse ............................................................................. 164

COUNT SIX, Tying Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 and Section 3 of the Clayton Act, 15 U.S.C. § 14 Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(4) Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)......................... 166

COUNT SEVEN, Attempted Monopolization In The Alternative Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3) Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)............................................. 168

COUNT EIGHT, Conspiracy to Monopolize Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2 Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(1)-(3) Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2) Donnelly Act, N.Y. Gen. Bus. Law § 340 ....................................................................................................... 169

COUNT NINE, Conspiracy, Concerted Refusals to Deal & Group Boycott Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10(1)-(2) Wisconsin Antitrust Act, Wis. Stat. § 133.03(1) Donnelly Act, N.Y. Gen. Bus. Law § 340 ............................................................................. 171

COUNT TEN, False, Deceptive, and Misleading Promotion/Advertising Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), Illinois Consumer Fraud and Deceptive Business Practices Act,  815 Ill. Comp. Stat. 505/1, *et seq.*, Illinois Uniform Deceptive Trade Practices Act,  815 Ill. Comp. Stat. 510/1, *et seq.*, New York Consumer Protection Act, N.Y. Gen. Bus. Law §§ 349-50................................. 172

COUNT ELEVEN, Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.* ........... 174

COUNT TWELVE, Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, *et seq.*................................................................... 174

COUNT THIRTEEN, Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/1, *et seq.* .................................................................................................. 175

COUNT FOURTEEN, Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.* ...................................................................................................... 176

COUNT FIFTEEN, Wisconsin Common Law Unfair Competition ......................................... 176

COUNT SIXTEEN, Negligent and Intentional Interference with Business Relations Under New York Law........................................................................ 177

COUNT SEVENTEEN, Tortious Interference with Contract Under New York Law ............... 178

COUNT EIGHTEEN, Tortious Interference with Contract Under Wisconsin Law ................. 179

COUNT NINETEEN, Tortious Interference with Prospective Business Expectancy Under Illinois Law ............................................................................. 179

COUNT TWENTY, Tortious Interference with Contract Under Illinois Law........................... 180

PRAYER FOR RELIEF ..................................................................................................... 182

JURY TRIAL DEMANDED................................................................................................ 185

Plaintiffs TreeHouse Foods, Inc., Bay Valley Foods, LLC ("Bay Valley"), and Sturm Foods, Inc. ("Sturm," and, collectively with TreeHouse Foods, Inc., and Bay Valley, "TreeHouse" or "Plaintiffs"), bring this action for damages and permanent injunctive relief against Defendant Keurig Green Mountain, Inc. ("KGM" or "Defendant"), formerly known as Green Mountain Coffee Roasters, Inc. ("GMCR"), and successor to Keurig, Inc. ("Keurig").[1] Plaintiffs allege as follows:

1.     This is an action for damages and permanent injunctive relief against KGM for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; Section 3 of the Clayton Act, 15 U.S.C. § 14; various statutory and common laws of New York, Wisconsin, and Illinois; and Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).  Among other things, this action seeks a declaration that KGM's hundreds of unlawful Keurig Authorized Distributor Agreements and other contracts are null and void and that the anticompetitive provisions contained therein cannot be enforced against parties to these contracts.

2.     KGM has engaged in a wide range of anticompetitive conduct that was and is intended to, and has had the effect of, unlawfully maintaining KGM's monopolies in multiple markets.  This anticompetitive conduct ranges from entering into more than 600 unlawful tying and/or exclusionary contracts prohibiting companies from dealing with KGM's competitors; to conspiring with KGM's competitor coffee roasters and beverage brands to suppress competition from lower-priced products; to blocking competitors' access to brewers unless they pay unjustified royalties or raise their costs to reverse engineer a workaround to an anticompetitive

---

[1] KGM was previously named Green Mountain Coffee Roasters, Inc., and is the successor to Keurig, Inc., which became a wholly-owned subsidiary of the Defendant in 2006, but was merged into the Defendant on or around December 31, 2013, when Defendant was still named GMCR.  For ease of reference, the Defendant is referred to as KGM throughout the Amended and Supplemental Complaint, whether in its capacity as KGM, GMCR, or Keurig, except where necessary for purposes of clarity.

lock-out mechanism; to coercing and giving distributors and retailers false reasons to stop selling competitors' products; to coercing and giving false reasons to consumers not to purchase competitors' products; and to filing sham litigation to hinder competitors' market entry.

3.     Specifically, KGM has monopolized the market for the sale of pressurized hot water brewing equipment that can be used to brew one or more servings at a time of coffee, tea, cider, hot cocoa, or other hot beverages or food products, such as soups and oatmeal, from a portion pack that is inserted into the brewer ("Single-Serve Brewers").  KGM has also monopolized the market for the sale of disposable cartridges, capsules, pods, or packs containing prepared beverage or food product portions that are used in Single-Serve Brewers to make a wide variety of beverages and food products ("Portion Packs"), as well as the market for the sale of the most popular type of Portion Pack, K-Cup-format Portion Packs ("Compatible Cups"), which are disposable pods or cups that are compatible with one or more Single-Serve Brewers manufactured or licensed by KGM for use with K-Cups ("K-Cup Brewers").

4.     KGM sells "K-Cups," which are Compatible Cups that are made by, or under a license from, KGM.  KGM previously owned certain patents pertaining to K-Cup filters ("K-Cup Filter Patents") that allowed it to exclude competition for the sale of most K-Cup-format Portion Packs made by competitors ("Competitive Cups"), but those patents expired in 2012.  Rather than compete on the merits or fulfill its statutory obligation under the U.S. patent laws to enable competitors to practice its invention after its patents expired, KGM has abused its dominance by coercing companies at every level of the Compatible Cup supply and distribution system to enter into anticompetitive "K-Cup Exclusivity," "Keurig Loyalty," and "Non-Competition" contracts to unlawfully maintain KGM's monopoly long after its patents expired.  To this day, this network of more than 600 contracts has almost entirely prevented competitors from selling

Compatible Cups to office customers, despite office customers' interest in purchasing competitors' lower-priced, high-quality Competitive Cups. As TreeHouse and other competitors typically sell Competitive Cups for 15-25% less than KGM K-Cups, KGM's anticompetitive contracts have forced office customers to pay higher prices and have restrained their freedom to choose the products they would otherwise buy.

5.       Having succeeded in foreclosing almost all access to office customers, KGM next implemented what it called "Project ███" in order to restrain competition from Competitive Cups in the home market, including by constraining competitors' access to the retail shelf space required to reach the majority of consumers. To this end, KGM planned to incorporate a lock-out mechanism in brewers which it said would prevent Competitive Cups from working in new Keurig 2.0 brewers. Recognizing that competitors could likely reverse engineer a workaround, KGM used the lock-out to coerce retailers to stop selling competitors' products well in advance of the lock-out's implementation. Among other things, KGM threatened that consumers would blame the retailer if it sold Competitive Cups that, according to KGM, would not work in the monopoly share of brewers being sold. KGM deceived retailers and consumers by claiming falsely that, among other representations detailed further below: (1) the new technology benefitted consumers by tailoring the brewing process to a unique "recipe" for the specific inserted beverage; (2) competitors would not be able to reverse engineer the lock-out technology; (3) KGM would pull all first-generation KGM brewers from the shelves; and (4) that the lock-out was "critical" for brewer performance and consumer safety. As internal KGM documents reveal, however, consumer safety was simply the pretext concocted as KGM's ████████ to cover up its anticompetitive plan to create a new ████████████████ through the use of an ████████████████████████████████████ in

order to give KGM a ████████████████ to unlawfully maintain its monopoly position. Indeed, as KGM has admitted, the only tests KGM had performed ████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████ as KGM K-Cups.

6. Although a small number of competitors were able to enter the market with limited success following the expiration of KGM's K-Cup Filter Patents, KGM has continued to dominate the markets in which it competes. Even before KGM's most recent exclusionary plan to restrain competition for retail sales began to show its effects, KGM controlled approximately 89% of the market for the sale of Single-Serve Brewers and at least approximately 73% of the market for the sale of all Portion Packs used in Single-Serve Brewers. KGM's Portion Pack market share was even higher if considering only the market for Compatible Cups, which is the market that KGM analyzes for competitive purposes. As KGM's President and Chief Executive Officer, Brian Kelley, acknowledged, for many years, KGM controlled 100% of the market for the sale of Compatible Cups. While that market share began to decline when consumers had greater access to competitors' lower-priced Competitive Cups, Mr. Kelley admitted that even as of February 2014, KGM still controlled 86% of the Compatible Cup market. Moreover, KGM's declining market share has sharply reversed course since February 2014, as the exclusionary effects of Project ████ KGM's most recent plan to unlawfully maintain and augment its monopoly, have begun to show. Despite competitors' substantially lower prices and the absence of any relevant patent protection, KGM has now recaptured most of the market share it had temporarily lost to Competitive Cup makers after the expiration of KGM's patents. KGM now controls approximately 93% of the Single-Serve Brewer market and 95% of the market for Compatible Cups.

## NATURE OF THE ACTION

**I.    KGM Monopolizes Markets And Restrains Competition With Anticompetitive Contract Provisions And Coercive And Deceptive Tactics**

7.    This is not the typical conspiracy case in which the agreement element of Section 1 of the Sherman Act will be the subject of significant factual dispute.  Here the agreements — *more than 600 contracts between KGM and its suppliers, competitor roasters, licensees, distributors, and customers* — are in black and white, as are the anticompetitive provisions KGM has, on information and belief, inserted into each and every one of them.  The question instead will be whether KGM's anticompetitive contract provisions, including its standard, form "**K-Cup Exclusivity**," "**Keurig Loyalty**," and "**Non-Competition**" provisions did precisely what they sound like they did:  unduly exclude and restrain competition.  As demonstrated by KGM's persistent market dominance, which yielded only ever so slightly to new competitors offering substantially lower-priced, high-quality products after KGM's patents expired, the answer is clear.  Indeed, internal documents show that KGM has long recognized that its ███ ██████████    include:  ████████████████████████████████████ ███████    (Emphasis added.)  While a large market share is not required to show that these agreements are unlawful either individually or in the aggregate, KGM's market dominance has enabled it to subject hundreds of market participants to its unlawful contract provisions, thereby exacerbating the anticompetitive effects flowing from its network of unlawful contracts.

8.    Nor is this a typical monopoly case in which the alleged monopolist's ability to exclude competition or raise prices can reasonably be challenged.  Faced with the inevitable threat of lost market share upon its patent expiration, KGM planned to introduce a new brewer designed to maintain its monopoly.  Its initial plan, however, fell through, and thus KGM had to act fast and deceptively to achieve through an abuse of its dominance and conspiratorial conduct

what it had failed to do on the merits of its purported "innovation." This subsequent plan, Project ███ proved to be a highly effective means of unlawfully recapturing and maintaining KGM's market share.

9. In 2012, KGM had just introduced the Vue brewer, which was KGM's first attempt to redesign a brewer to prevent consumers from choosing to brew lower-priced Portion Packs. But KGM had several problems. The RFID chips KGM intended to use to tell the brewers whether the inserted Portion Packs were "authentic" packs produced by KGM were proving costly and kept falling off the lids. Even worse, consumers did not want to buy the brewer despite KGM's spin that the brewer's interactive technology "enable[d] the machine to default to optimum settings." The launch of the Vue around May 2012 was widely recognized as a commercial failure and KGM's patents were set to expire in a mere matter of months.

10. KGM needed a new way to prevent consumers from choosing Competitive Cups over K-Cups and it needed it fast. The answer was Project ███ which was the code name KGM gave to the project it otherwise described as the ████████████████████████ To launch Project ███ Kevin Sullivan, KGM's Chief Technology Officer, met with KGM's consultant, ████, in July 2012 to discuss ████████████████████████████ ██████ in KGM's next generation of brewers ("2.0 K-Cup Brewers"), which KGM wanted to design and have on the shelves in a record ████████ to lock out competition. As Mr. Kelley stated during an earnings call on November 20, 2014, KGM developed 2.0 K-Cup Brewers in less than a year, which was "a full six months faster than any of [KGM's] prior brewer development efforts."

11. In a day-long workshop on July 24, 2012, KGM and ████ agreed to what they called ████████████████ that would create barriers to entry to exclude potential

competitors, including that any lock-out mechanism must at least: (1) be able to ██████████ ██████████████████████████ (2) ████████████████████████████████████ (3) be ████████████████████████████████████ and (4) be ██████████████████████ among other things.  KGM informed ██████ that ████████████████████████████ ████████████████████████████████████████ KGM and ██████ also agreed that the lock-out would be ██████ instead of ██████ so that KGM could use the impending lock-out as a ████████████████ This would mitigate the risk that ██████ ████████████████████████████████████

12.     The documents show that KGM would also continue to employ its proven anticompetitive strategy of contracting for the ████████████████████████ so that Competitive Cup makers ██████████████████████████████████ ██████ Kevin Sullivan was tasked with ████████████████████████████████ ████████████████████████████████ in order to reach an opinion on the ink's ability to pose a ████████████████████████ As KGM told ██████ during the meeting, ████████████████████████████████████████ ████████████████████████

13.     In two memoranda that document these initial Project ██████ discussions, there is no reference to how such a lock-out mechanism might benefit consumers, improve the performance of the brewer, improve the quality of the brewed beverage, better protect consumers, or otherwise be desirable to anyone other than KGM.  In fact, the only reference to consumer safety at all is under the header ██████████████ Specifically, KGM and ████████ discussed that the pretext KGM would use to justify the lock-out would be based on the feigned protection of consumer safety: ██████████████████████████████████

██████████████████████████████████████████ Ex. 1 at 2 (attaching notes from July 24, 2012 meeting). These two documents are otherwise entirely dedicated to determining how to create barriers to entry that could exclude Competitive Cups from the market. *See* Exs. 1, 2 (attaching agenda for July 24, 2012 meeting).

14. KGM's plans to maintain its market share post patent expiration were also explored in October 2012 with another consultant, ████, which KGM engaged to see if it would be possible to ███████████████████████████████████████████████████ ███████████████████ As in Project ████, a goal of the ██████████████████████ was to ████████████████████████████████████████████

15. After KGM's K-Cup Filter Patents expired in 2012, a number of Competitive Cup makers entered the market and began winning market share away from KGM. Although competitors were not able to penetrate the Away-From-Home market because KGM's anticompetitive contract strategy had nearly entirely foreclosed access to that market, consumers and retail customers demonstrated a strong demand for the substantially lower-priced, high-quality Competitive Cups that were now being produced. KGM realized it could not wait for its new lock-out brewers to hit the market, especially after it realized that Competitive Cup makers could likely reverse engineer and overcome the lock-out because KGM was not willing to sacrifice its profits on an expensive ink reader that could actually read "recipes."

16. Thus, KGM decided to use the delay and its control over the Single-Serve Brewer market to its advantage by lying about the technology it planned to launch before KGM could be proved wrong. KGM threatened retail customers that if they did not stop selling Competitive Cups, then they would only be left with angry consumers whose cups did not work in 2.0 K-Cup Brewer models when they hit the shelves and replaced all of the first-generation brewers ("1.0 K-

Cup Brewers").  Informed by its experience with the Vue, KGM knew it was not enough to tout the limited capabilities of its interactive technology, which merely triggered default settings.  So KGM lied to customers and consumers by telling them, among other things, that the ink-reading, lock-out technology actually allowed the brewers to read the "recipes" for K-Cup beverages in order to adjust the brewing process to the particular beverage that was inserted and that the lock-out was "critical" for the brewer's performance and for consumer safety — just as KGM had planned would be its ██████████ justifying the lock-out.

17.     KGM also followed through with Project ████ by incorporating "interactive technology" into its next-generation of K-Cup Brewers, known as "Keurig 2.0" ("2.0 K-Cup Brewers"), to identify whether an inserted Compatible Cup is either a next-generation K-Cup that is made or licensed by KGM ("2.0 K-Cups") or a Competitive Cup (which has not been licensed by KGM).  If the 2.0 K-Cup Brewer senses that a Competitive Cup has been inserted, the brewer is programmed not to brew it.  KGM's technology is therefore designed to block Competitive Cups from working with 2.0 K-Cup Brewers, even though KGM does not currently have any patent protections extending to 2.0 K-Cups.

18.     KGM has failed to articulate any demonstrable consumer benefit achieved by locking Competitive Cups out from 2.0 K-Cup Brewers, nor could it, as many consumers prefer the price, taste, and/or quality of Competitive Cups to K-Cups.  KGM's anticompetitive product redesign was thus not legitimately intended to benefit consumers, but was rather its latest of many anticompetitive acts designed to maintain its monopoly over the Compatible Cup market by excluding competition and the lower-priced Competitive Cups that consumers demand.  Indeed, Mr. Kelley has admitted that the lock-out technology could be programmed by KGM to be switched on or off after a certain number of uses, thus demonstrating that this technology

cannot plausibly be considered to be integral or key to any consumer benefit offered by the new product. KGM has further admitted that besides locking out Competitive Cups, the ink at most communicates whether the inserted cup is ██████████████████████, which as KGM has admitted is a ████████ in that a ████████████████████████████████ ████████████████████████.

19.     After KGM launched 2.0 K-Cup Brewers, it quickly became apparent that KGM's most powerful exclusionary tool was not in fact any purportedly "breakthrough" technology that it had rushed to market, but rather its ability to abuse its dominance by coercing retailers to stop selling Competitive Cups and by locking up business partners with exclusionary agreements.

20.     Although TreeHouse has already reverse engineered Competitive Cups that work in 2.0 K-Cup Brewers, the damage to TreeHouse's and other competitors' business has already been done. KGM interfered with TreeHouse's business relations by systematically confronting competitors' retail customers with its plan to lock out Competitive Cups in order to coerce retail customers to stop selling Competitive Cups to consumers and then foreclosed future competition by entering into unduly restrictive and anticompetitive agreements with those customers. As a result, and even aside from KGM's efforts to prevent consumers from using Competitive Cups with the 2.0 K-Cup Brewer (and even if all of KGM's competitors succeed in reverse engineering the 2.0 Brewer lock-out mechanism), competition will continue to be unlawfully restrained by these anticompetitive agreements until they are invalidated.

21.     The anticompetitive effects of Project ████ have already begun to show in the market. Although sales of Competitive Cups to consumers for use at home had been increasing since the expiration of KGM's K-Cup Filter Patents, albeit not as quickly as they would have absent KGM's anticompetitive conduct, that trend quickly reversed course in Fall 2014. By

November 2014, KGM had further succeeded in unlawfully maintaining and enhancing its market share.  This increase in market share was the direct result of KGM's monopolistic plan to exclude competition through its one-two punch tying K-Cups to brewers and using deceptive, strong-arm tactics to coerce retailers to stop selling Competitive Cups.

22.    As KGM explained during its November 19, 2014 earnings call:

> We have now signed the large majority of previously unlicensed portion pack volume to our system and we're in the process of transitioning these brands.
>
> Since last quarter, we announced new relationships with Kraft, Meijer, W.B. Mason and SUPERVALU, and began shipping Keurig-manufactured store brands to several new customers, including Walmart and Sam's Club.
>
> As we said previously, we have also signed brands that we have not yet publicly announced.  In the IRI data for the four-week period ending November 2nd, you've begun to see the share shift toward the Keurig-licensed packs.

23.    KGM's increase in market share is not attributable to the free and fair interplay of the market, but rather KGM's false, deceptive, and misleading advertising and/or promotional efforts, directed at both consumers and retailers, that misrepresent key characteristics of its K-Cup Brewer, its K-Cups, and the Competitive Cups made by Plaintiffs and others.  KGM has baselessly insinuated that all Competitive Cups are incompatible with 2.0 K-Cup Brewers; that KGM would pull all 1.0 K-Cup Brewers from the shelves; that Competitive Cups are inferior to K-Cups in terms of quality, performance, and safety; and that use of Competitive Cups may affect the status of consumers' K-Cup Brewer warranties.  KGM has disseminated these messages to the public at large and to a substantial number of retailers responsible for selling hundreds of millions of dollars' worth of Compatible Cups on an annual basis, with the purpose and effect of depriving TreeHouse and other Competitive Cup makers of significant sales to both

retailers and consumers and causing harm to their goodwill so that Competitive Cup makers are less able to compete for future sales.

24.     KGM's unlawful maintenance of its monopoly is directly attributable to KGM's false statements that it was going to pull all 1.0 K-Cup Brewers from the shelves and that Competitive Cup makers would not be able to reverse engineer a workaround.  As Nasdaq reported:

> Jadgale [a financial analyst] foresees huge gains in single portion coffee as the new Keurig 2.0 locks out unlicensed packet providers.  In just the last year and a half, unlicensed sellers have gone from zero to roughly 14% of the K-Cup market, he notes.
>
> 'The Keurig 2.0 brewer will not allow any unlicensed cups to work with it,' he said.
>
> Jadgale sees signs that the strategy is already working.  He notes that several retailers — including Target (TGT) — that had been unlicensed have recently entered into licensing arrangements with Keurig.  He suggests that retailers prefer sharing coffee packet revenue with Keurig to being locked out of the business entirely.[2]

25.     Consumers too are now paying the price.  Not only has KGM exercised its monopoly power by excluding lower-priced, high-quality Competitive Cups from retail shelves, but KGM has also raised K-Cup prices after further restraining competition.

26.     As one financial analyst who has studied KGM for many years summed up:

> [T]he core of our thesis was that the company would lose its monopoly position upon expiration of the K-cup patents in 2012, and this has proven to be incorrect.  After expiration, there was a raft of competition which, in the short term, took a substantial share of the market.  In response, GMCR management developed a clever strategy to re-close the system and preserve its monopoly position.  It announced (and recently launched) a new brewer.  While GMCR claims that the next generation brewer is for the consumer's benefit, the principal new feature is that it recognizes and refuses to brew coffee from competitor's K-cups.

---

[2]     Keurig Brews Plan for Coffee Domination, Fizzy Profit (July 17, 2014), *available at* http://www.nasdaq.com/article/keurig-brews-plan-for-coffee-domination-fizzy-profit-cm371033.

> … It's hard to see why a consumer would choose the new brewer,
> which offers fewer coffee choices at higher prices. Recognizing
> that its customers are the large retailers rather than consumers,
> GMCR scared the retailers, advising them that selling incompatible
> K-cups would lead to user complaints. GMCR then convinced the
> retailers to pressure competitive brands to buy licenses from
> GMCR, which they did in order to maintain retail
> distribution. GMCR won back several private label accounts for
> the same reason. The result is that GMCR's monopoly is largely
> restored and our core thesis is defeated. The company recently
> announced a 9% price increase on November 1.[3]

27.     Thus, after succeeding in restraining competitors' ability to sell Competitive Cups

to both offices and consumers, KGM further exerted its monopoly power by raising prices on all

K-Cups, effective November 3, 2014 — not long after KGM regained most of the market share it

had previously lost Competitive Cup makers.

## II.     KGM's Anticompetitive Contracts Cut Off Necessary Inputs And Substantially Foreclose Access To Distributors And Customers

28.     To monopolize through the foreclosure of potential competition, KGM has also

systematically tied up supply and distribution channels for Competitive Cups by entering into

unlawful tying and exclusive dealing agreements with companies at every level of the

Compatible Cup distribution system — from sellers of machinery used to make Compatible

Cups; to sellers of Compatible Cup components; to competitor coffee roasters, tea packers, and

beverage companies whose products and/or brand names are used in making Compatible Cups;

and to the distributors and retailers that sell and market Compatible Cups to end user consumers,

businesses, and institutions. This ever-expanding network of agreements makes it increasingly

difficult for competitors such as TreeHouse to gain any significant share of the Compatible Cup

market, as the majority of would-be partners are tied up by KGM.

---

[3] David Einhorn, Greenlight Capital Q3 2014 Letter to Investors (Nov. 5, 2014), excerpt available at Greenlight Q3 Letter: Gains In Apple; Short Amazon.com (AMZN)? (Nov. 5, 2014), http://www.valuewalk.com/2014/11/greenlight-q3-letter-amzn/.

29.     The terms and number of these anticompetitive contracts cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups.  For example, as suppliers subjected to KGM's exclusionary terms have admitted — KGM does not restrict the ability to sell these same products for other purposes — *just so long as those products are not sold to a KGM competitor who intends to use them to make cups for use in K-Cup Brewers*.  Thus, these unduly restrictive and unreasonably lengthy, tying, and exclusive dealing agreements directly and effectively serve the anticompetitive purpose of cutting competitors off from resources they need to compete with KGM.

30.     Nor can these anticompetitive contract provisions be justified as a reasonable restraint on competition on the basis that they protect the value of any legitimate proprietary interest or deter free-riding on any investment or expertise provided by KGM to suppliers and distributors, many of which were performing the same services before KGM was even formed. KGM did not teach its suppliers how to make machinery, how to thermoform their admittedly ███████████ cups, or how to extrude lidding.  KGM did not create these distribution services, buy their trucks, hire their personnel, or even build their relationships with end customers.

31.     For example, the companies that distribute KGM's brewers were generally *already* distributing coffee and break room supplies to end customers and *already* had their relationships with those customers before KGM sought to free-ride on *their* distribution networks.  As KGM's prior CEO explained, KGM's strategy was to contract with distributors in order to "[p]iggyback the established sales and service network" that had already been created so that Keurig itself would not have to invest in "infrastructure requirements," such as "sales, service, [or] inventory."  KGM simply induced these distributors to enter into restrictive

agreements before Competitive Cups existed. Although distributors would now like to sell Competitive Cups as well, KGM prevents them from doing so by threatening to take away distributors' access to Keurig brewers, and in turn, the end customers with whom the *distributors* had cultivated relationships.

32.     KGM's exclusionary agreements with its horizontal competitor roasters and brands also unreasonably restrain trade in that they dictate where and how licensed K-Cups can be sold, thereby allowing KGM to maintain supracompetitive prices across licensed brands by restraining output. By limiting the availability of lower-priced brands, consumers must select from higher-priced options when their lower-priced options run out. KGM's agreements also restrain price competition among licensees because KGM markets licensed brands to retail and grocery customers such that individual licensees do not compete to grow their sales with a customer by offering lower prices. Indeed, because KGM limits the output of licensed K-Cups, selling out quickly by offering lower prices would not benefit a licensee because the brand could not simply restock its product to get the benefit of additional sales. This creates a further incentive for licensed brands to conspire to exclude Competitive Cup makers from the market unless those competitors agree to take a license or become "authorized" by KGM, thereby likewise subjecting the Competitive Cup makers to KGM's territorial control and output allocation.

33.     KGM's agreements with roasters and brands also prohibit such competitors from developing or supporting new Single-Serve Brewers in the K-Cup-format that would otherwise open up competition in the Single-Serve Brewer market and with Competitive Cup makers.

34.     KGM distributors, which have exceeded 600 in number, are also prohibited from dealing with Competitive Cup makers under the express terms of KGM's Keurig Authorized

Distributor ("KAD") Agreements, and KGM's Keurig Authorized Re-Distributor ("KARD") Agreements.

35. KGM's massive network of anticompetitive contracts has allowed KGM to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, has done just that — raising its K-Cup prices 10% to 15% in the fourth quarter of 2010, and again multiple times in 2011 — after TreeHouse had already begun selling non-filtered Competitive Cups. After further excluding competitors from retail chains with Project ███, KGM once again raised K-Cup prices by an additional 9% in November 2014, as noted above.

36. Notably, KGM's price increases to consumers purchasing K-Cups through the retail channel are highly correlated with KGM's monopolistic practices and resulting elevated market share. KGM repeatedly raised K-Cup prices in 2010 and 2011 leading up to the expiration of its K-Cup Filter Patents when KGM controlled virtually 100% of the Compatible Cup market. After KGM's K-Cup Filter Patents expired, K-Cup prices generally declined as Competitive Cup makers began selling less expensive filtered Competitive Cups. But as soon as KGM's anticompetitive practices enabled it to regain the majority of the market share it had lost to Competitive Cup makers, KGM raised its prices once again.

37. The network of unlawful tying and exclusive dealing agreements KGM created allowed it to leverage its monopoly over K-Cup Brewers in order to maintain its monopoly over the Compatible Cup market, and indeed, this was an intended result of KGM's business model — the profitability of which depends upon KGM's ability to maintain supracompetitive K-Cup prices and to restrain competition from lower-priced Competitive Cups.

38. KGM has similarly protected its unlawfully maintained monopoly in the Single-Serve Brewer market by entering into K-Cup agreements that restrain competitors' ability to

make brewers or to deal with competitor brewer makers. For example, licensees that do not have relationships with competing Single-Serve Brewer manufacturers when they enter an agreement with KGM are prohibited by KGM from working with competitors, such as Flavia, Kenco, and Tassimo. Licensees that have an agreement with a brewer competitor when they contract with KGM are prohibited from expanding or extending their agreements with competitors, such as Tassimo.

39.    Without anticompetitive agreements foreclosing meaningful price competition from Competitive Cups or new Single-Serve Brewer entrants, KGM would not have been able to maintain its substantial K-Cup profit margin for as long as it has following the entry of Competitive Cup makers nor would it have been able to recapture so much of the market share it had lost. Instead, KGM's market share would have eroded quickly and continuously.

**III.    KGM Hindered TreeHouse's Market Entry By Pursuing Sham Legal Claims**

40.    Although KGM was able to stave off virtually all competition until late 2010, it could not prevent TreeHouse from converting production lines it had previously used to produce a different product in order to bring the first Competitive Cups to the market in 2010 so that consumers could enjoy new brands of beverages without the monopoly mark-up in price.

41.    These Competitive Cups did not infringe any of KGM's patents because they did not contain a filter. But that did not stop KGM from pursuing a baseless lawsuit to try to keep Competitive Cups off the market. Within a matter of weeks after Competitive Cups hit the shelves, Keurig sued TreeHouse's subsidiary, Sturm, alleging that the consumers' use of these non-filtered Competitive Cups in KGM brewers *that the consumers had purchased* was an infringing act of KGM's *brewer* method patents, and that Sturm induced that infringement by selling the consumers Competitive Cups.

42.	After Sturm incurred years of litigation costs, the United States Court of Appeals for the Federal Circuit affirmed the district court's ruling, holding on appeal that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

43.	This lawsuit was not filed for any valid purpose of protecting patent rights, but was an objectively and subjectively baseless sham intended to squelch competition from Competitive Cups.	As the Federal Circuit expressly concluded, "Keurig is attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law." *Id.*	Instead of any proper purpose, the lawsuit was filed to intimidate market entrants, raise a rival's costs, and sow doubt and confusion about the legality of using or purchasing Competitive Cups.	The litigation caused TreeHouse to expend resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices. On information and belief, Sturm also lost many potential customers that would have purchased Competitive Cups but for the concern that resellers would likewise be deemed to have induced infringement by consumers, just as KGM had alleged against TreeHouse.

44.	While the litigation over Sturm's non-filtered Competitive Cups was pending, KGM's K-Cup Filter Patents expired, and TreeHouse and others began selling Competitive Cups, now with and without filters, in competition with KGM.	Although TreeHouse and others were able to enter the market, TreeHouse's ability to increase capacity and to bring Competitive Cups to consumers and businesses has been restrained by anticompetitive agreements that have restricted access to cup-making machinery, cup components, beverage brands, and virtually entire categories of potential TreeHouse customers, such as the highly profitable Office Coffee

Services ("OCS") business. These tying and exclusionary agreements are anticompetitive because, among other reasons, they have facilitated KGM's exercise of market power by impairing rivals' abilities to achieve the scale necessary to become competitively efficient and by depriving TreeHouse of efficient access to both upstream and downstream markets.

## IV. KGM Has Engaged In A Wide Range Of Anticompetitive Conduct To Unlawfully Maintain Its Monopolies

45. In short, KGM has committed numerous anticompetitive and otherwise unlawful acts in order to illegally maintain its monopoly over the Portion Pack and Compatible Cup markets, including:

- Coercing machine manufacturers and component suppliers to enter into unduly restrictive, anticompetitive, and unjustifiable exclusionary agreements restraining or eliminating access to equipment and materials needed to make Competitive Cups;

- Conspiring with its competitor roasters and beverage brands to allocate markets, reduce output, and to restrain competition from substantially lower-priced Competitive Cups, thereby maintaining supracompetitive prices and inducing would-be competitors to enter into an agreement with KGM despite the expiration of its K-Cup Filter Patents;

- Coercing coffee roasters, coffee brands, other beverage makers and brands, distributors, and retailers to enter into unduly restrictive, anticompetitive, and unjustifiable tying and exclusionary agreements prohibiting dealing with Competitive Cup makers and restraining the entry of new K-Cup Brewers;

- Filing sham litigation and continuing on appeal to pursue a "tactic" that had previously been "expressly admonished" by the Supreme Court in order to "impermissibly restrict" consumers from using Competitive Cups;

- Restraining competitive access to 2.0 K-Cup Brewers, as well as retail customer and consumer choice, by tying the purchase of 2.0 K-Cups to the purchase of 2.0 K-Cup Brewers in order to lock out Competitive Cups, even though K-Cup Brewers and Compatible Cups are distinct products that consumers demand to purchase separately and that have been purchased separately for years;

- Needlessly raising Competitive Cup makers' costs by forcing them to reverse engineer new Competitive Cups to overcome a lock-out technology that has little or no consumer benefit;

- Interfering with TreeHouse's business relations by coercing retail customers to stop selling Competitive Cups based on false and misleading statements concerning KGM's brewer and lock-out technology, K-Cups, Competitive Cups, and Competitive Cup makers' ability to reverse engineer new cups that would be compatible with Keurig 2.0; and

- Coercing consumers not to purchase Competitive Cups based on false and misleading information regarding KGM's brewer and lock-out technology, K-Cups, and Competitive Cups, including threats that use of Competitive Cups will damage consumers' brewer or void their brewer warranty, in order to drive down sales by Competitive Cup makers and restrain their ability to make future sales by harming their goodwill.

46.     As these anticompetitive acts were performed both to unlawfully maintain KGM's monopoly over Portion Packs, Compatible Cups, and Single-Serve Brewers and by employing anticompetitive agreements with unaffiliated entities to unreasonably restrain trade without adequate justification or procompetitive benefits, KGM's conduct violates both Sections 1 and 2 of the Sherman Act, as well as Section 3 of the Clayton Act, state antitrust and unfair competition statutes, and the common laws of the states of New York, Wisconsin, and Illinois. As part of KGM's anticompetitive plan further entailed deceiving retailers and consumers in order to dissuade them from purchasing Competitive Cups, this conduct further violates the Lanham Act, 15 U.S.C. § 1125(a), and the corresponding laws of Illinois and New York.

47.     KGM's efforts, individually and collectively, were intended to, and have had the effect of, substantially foreclosing competition, restricting entry, constraining output, maintaining supracompetitive prices, restraining the free and fair interplay of the market, curtailing consumer choices, and further deceiving and misleading consumers and retailers to deter them from purchasing Competitive Cups sold by TreeHouse and others.

## THE PARTIES

48.     Plaintiff TreeHouse Foods, Inc. is a corporation organized under the laws of the State of Delaware with a principal place of business in Oak Brook, Illinois.  TreeHouse Foods, Inc. is a food manufacturer that operates its business in the United States as Bay Valley Foods, LLC, and Sturm Foods, Inc.

49.     Plaintiff Bay Valley is a limited liability company organized under the laws of the State of Delaware with a principal place of business in Oak Brook, Illinois.  Bay Valley is a wholly-owned subsidiary of TreeHouse Foods.  Bay Valley enters into supply arrangements with retailers for Portion Packs used in Single-Serve Brewers.

50.     Plaintiff Sturm is a corporation organized under the laws of the State of Wisconsin with its principal place of business in Manawa, Wisconsin.  Sturm is a wholly-owned subsidiary of Bay Valley that manufactures dry groceries under private label brands, as well as its own "Grove Square" and "Caza Trail" brand Competitive Cups, among other things.  Sturm enters into contracts with suppliers of the machinery and components required to manufacture Compatible Cups.

51.     Defendant KGM is a corporation organized under the laws of the State of Delaware with a principal place of business in Waterbury, Vermont.  KGM was previously known as GMCR until on or around March 6, 2014, when GMCR changed its company name to KGM.  Defendant KGM is also the successor to Keurig, which became a wholly-owned subsidiary of the Defendant in 2006 and remained so until approximately December 31, 2013, when it was merged into Defendant.  During its corporate existence, Keurig was organized under the laws of the State of Delaware and had its principal place of business in Reading, Massachusetts.

52.     KGM designs, manufactures, and sells Single-Serve Brewers.  KGM is also a coffee roaster and owner and licensor of beverage brands.  KGM also manufactures and sells K-Cups for itself and competes with TreeHouse and other companies to manufacture, distribute, and market Compatible Cups for other companies.  KGM also owns and operates The Keurig Store, a retail store in which it sells brewers, coffee accessories, and K-Cups.  KGM also sells and distributes brewers and K-Cups directly to consumers through internet sales over its website, Keurig.com.

## AGENTS AND CO-CONSPIRATORS

53.     Various persons that are not named as defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof. These other entities have facilitated, adhered to, participated in, and/or communicated with others regarding KGM's unlawful activities. Plaintiffs reserve the right to name some or all of these entities as defendants at a later date.

54.     KGM agents that participated in KGM's unlawful activities include ███████ and ████, which conspired with KGM in 2012 to lock out competitors in order to give KGM a market lead sufficient to recapture its virtually complete market dominance and unlawfully maintain its monopoly position. On information and belief ███████████████████████ ████████████████████████████████████████████████████████████ ████.

55.     Additional suppliers, coffee roasters, beverage brands, distributors, and retailers have also entered into agreements with KGM that contain anticompetitive provisions that constitute unreasonable restraints of trade under Sections 1 and 2 of the Sherman Act and corresponding state laws.

56.     On information and belief, other corporations, partnerships, or business entities, currently unknown to Plaintiffs, are co-conspirators with KGM in its unlawful activities.

## JURISDICTION AND VENUE

57.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Plaintiffs for their damages; and under Section 43(a) of the Lanham Act, 15

U.S.C. § 1125(a).  This Court has jurisdiction over the federal law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

58.     This action arises, in part, under the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*, and the New York Consumer Protection Act, N.Y. Gen. Bus. Law §§ 349-50.  This Court has supplemental jurisdiction over Plaintiffs' claims arising under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and New York law.

59.     This action arises, in part, under the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/1, *et seq.*, the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, *et seq.*, the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA"), 815 Ill. Comp. Stat. § 510/1, *et seq.*, and Illinois common law pertaining to unfair competition.  This Court has supplemental jurisdiction over Plaintiffs' claims under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and Illinois law.

60.     This action arises, in part, under the Wisconsin Antitrust Act, Wis. Stat. § 133.03, *et seq.*, and Wisconsin common law pertaining to unfair competition.  This Court has supplemental jurisdiction over Plaintiffs' claims under these laws pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and Wisconsin law.

61.     This Court has personal jurisdiction over KGM pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

62.     This Court also has personal jurisdiction over KGM because KGM regularly does and solicits substantial business in New York, either directly or through intermediaries, is continuously and systematically present in New York, and has established minimum contacts

with New York, in particular by registering to do business in the state of New York in 2003, maintaining a registered agent for service of process in New York, doing substantial business with third parties in New York, maintaining a distribution center in New York, and conducting banking with financial institutions in New York. In light of KGM's substantial contacts with New York, the exercise of jurisdiction over KGM would not offend traditional notions of fair play and substantial justice. Furthermore, KGM's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Plaintiffs, companies with a presence in this District. The effects of the unlawful conduct alleged below were felt by Plaintiffs, as well as by consumers, in this District.

63.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(d) because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and KGM resides, is licensed to do business in, is doing business in, had agents in, or is found or transacts business in this District.

## RELEVANT MARKETS

### I.     Relevant Product Markets

64.     There are at least three separate relevant product markets in which to evaluate KGM's anticompetitive conduct: (1) the market for the design, manufacture, and sale of Single-Serve Brewers (the "Single-Serve Brewer Market"); (2) the market for the design, manufacture, and sale of Compatible Cups (the "Compatible Cup Market"); and, in the alternative to the Compatible Cup Market, (3) the market for the design, manufacture, and sale of Portion Packs (the "Portion Pack Market"). KGM tracks market shares in the Compatible Cup Market to

analyze its K-Cup market share for competitive purposes. *See* GMCR, FQ1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014).

### A. The Single-Serve Brewer Market

65. The Single-Serve Brewer Market encompasses the design, manufacture, and sale of Single-Serve Brewers. The Single-Serve Brewer is a quick, convenient, and simple way for consumers to brew one or more servings of coffee, cocoa, cappuccino, cider, or other hot beverages or food products encapsulated in a Portion Pack. Single-Serve Brewers quickly brew coffee and other hot beverages without requiring the consumer to grind beans, measure coffee, tea, or powdered beverage mixes, handle used filters, or clean up after the beverage is prepared. The Single-Serve Brewer Market includes both KGM's 2.0 K-Cup Brewers and its 1.0 K-Cup Brewers (each of which has a variety of separate models). While the Vue Brewer and 2.0 K-Cup Brewer are able to brew more than a single serving at a time, these brewers still fall within the Single-Serve Brewer category because they brew beverages and food products encapsulated in Portion Packs and are able to dispense a single serving at a time. KGM has continually referred to the Vue Brewer as a Single-Serve Brewer even though the Vue Brewer allowed users to choose many different brew sizes. KGM has similarly referred to the 2.0 K-Cup Brewer as a Single-Serve Brewer even though the 2.0 K-Cup Brewer can also brew different sizes.

66. KGM recognizes in its internal documents and agreements with third parties that KGM primarily competes for brewer sales with the few other companies that also produce Single-Serve Brewers that brew a variety of hot beverages (such as tea, hot cocoa, cappuccinos, and other hot beverages, in addition to coffee) using a low-pressure brewing method, rather than other types of brewers that brew only coffee and/or espresso (which requires a high-pressure brewing method) using either a hopper to store coffee beans or a drip brewing system.

67.     For example, in KGM's agreements prohibiting competitor coffee roasters and brands from participating in "competing systems," KGM explains that "competing systems" have the following characteristics:  (1) "A brewing chamber designed to be pierced during the brewing process to allow hot water in and the brewed beverage out;" and (2) "A pressurized brewing process that takes place at pressures less than 30 psi inside the brewing chamber" ("Competitive Brewers").  *See* Ex. 3 at § 5 (attaching Amended and Restated Purchase and License Agreement between GMCR and Caribou Coffee Company, Inc. (Dec. 20, 2011)) ("Caribou Agreement"); *see also* Ex. 4 at § 13 ███████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████ (same).

68.     KGM's agreements further provide examples of brewers that KGM admits are — *and are not* — "competing systems."  Specifically, KGM admits that:

> Examples of … systems that would be competitive include single-cup portion pack coffee systems such as those manufactured by Flavia, Kenco and Braun (the Tassimo system).  **Examples of systems that would not be competitive are hopper-based single-cup coffee systems such as those manufactured by Filterfresh and Brio and espresso pod-based systems such as Illy pod espresso machines, Café Espresso and 123spresso systems.**

*See* Ex. 3 at § 5 (Caribou Agreement) (emphasis added).

69.     KGM's Single-Serve Brewers do not compete in any significant way with traditional drip coffee-makers, French press coffee-makers, single-cup pour-over cones, instant coffee packets, or traditional teas ("Low-Priced Coffee-Makers and Hot Beverages").  Because of the unique convenience offered by Single-Serve Brewers, the wide range of products that can be brewed in a Single-Serve Brewer, and the speed with which a Single-Serve Brewer can brew a hot beverage, among other reasons, Low-Priced Coffee-Makers and Hot Beverages do not

reasonably compete with, or significantly constrain the prices of, Single-Serve Brewers or the beverages they produce.

70.　　Indeed, it is possible to prepare many more products in a K-Cup-format Single-Serve Brewer, such that a traditional coffee-maker is not a reasonable substitute. While traditional drip coffee-makers can only be used to make coffee, Single-Serve Brewers can also be used to make tea, cider, cocoa, and other hot beverages.

71.　　Because of the unique characteristics of the K-Cup-format, moreover, even food products can be prepared using some Single-Serve Brewers. For example, TreeHouse has already brought several innovative food products to the market that are prepared using a K-Cup Brewer, including K-Cup-format soups, rice dishes, and even mashed potatoes. Nature Valley has also introduced K-Cup-format oatmeal that is brewed with a Compatible Cup.

72.　　The absence of significant competition between Single-Serve Brewers and traditional coffee-makers is borne out by the price data contrasting Single-Serve Brewer pricing and traditional coffee-maker pricing. Consumers pay a premium for Single-Serve Brewers over the price of traditional drip coffee-makers. Single-Serve Brewers are, on average, four times as expensive as drip coffee-makers. Specifically, the average drip brewer price from October 2013 to September 2014 was $27, while the average price of Single-Serve Brewers for the same period was $103. Furthermore, 75% of drip coffee-makers are priced at or below around $30, while the majority of Single-Serve Brewers are priced at or above around $80. KGM has priced its 2.0 K-Cup Brewers even higher than the average Single-Serve Brewer, at $149.99 (for the K350 Brewer), $169.99 (for the K450 Brewer), and $199.99 (for the K550 Brewer).

73.　　In sum, because consumers do not consider Single-Serve Brewers and drip coffee-makers to be reasonable substitutes given their varying characteristics, uses, and pricing

structures, small but significant changes in the price of drip coffee-makers would not cause consumers to switch to Single-Serve Brewers, or vice versa.

74.    As KGM admits, Single-Serve Brewers are "[s]o different than an average coffee maker!"

75.    Sales of coffee and other hot beverages from restaurants and coffee shops likewise do not reasonably compete with, or constrain the price of, sales of Single-Serve Brewers or the beverages they produce.

76.    As KGM has acknowledged, the consumption of beverages made in Single-Serve Brewers is driven primarily by a consumer's location — *i.e.*, whether the consumer is already in the office or at home, at which point the consumer is generally already restricted to a selection of beverages available in that location.

77.    Notably, increased consumption of coffee from Single-Serve Brewers has primarily *added* to consumers' overall coffee consumption, rather than taking or substituting away from the consumption of other forms of brewed coffee.

78.    As a report relied on by KGM concluded, concerns that Single-Serve Brewers would take coffee sales away from other existing channels (such as coffee shops) were "overblown."

### 1.    KGM Single-Serve Brewers

79.    KGM designs, manufactures, and sells various Single-Serve Brewers under the brand name Keurig.  In addition, KGM licenses K-Cup Brewer technology to such brands as Mr. Coffee, Cuisinart, and Breville, among others.

80.    KGM currently sells three types of Keurig Single-Serve Brewers for use by consumers at home:  2.0 K-Cup Brewers, 1.0 K-Cup Brewers, and Rivo cappuccino and latté brewers ("Rivo Brewers"), which exclusively use Rivo Packs that are shaped differently than K-

Cups. 2.0 K-Cups and some Competitive Cups can be used in both 2.0 and 1.0 K-Cup Brewers. But while K-Cups and many Competitive Cups that were designed for use solely with 1.0 K-Cup Brewers ("1.0 K-Cups") have the same physical shape as 2.0 K-Cups, they are nonetheless incompatible with 2.0 K-Cup Brewers because they lack a special taggant ink on their lids required to initiate the brewing process in 2.0 K-Cup Brewers.

81.     Until it was discontinued in 2014, KGM also offered the Vue Brewer. KGM still sells Portion Packs compatible with the Vue Brewer, known as "Vue Cups," which are shaped differently than K-Cups and Rivo Packs. Thus, K-Cups and Rivo Packs cannot be used in the Vue Brewer and Vue Cups cannot be used in Rivo Brewers or 1.0 K-Cup Brewers. New Vue Cups that possess the special taggant ink on their lids are compatible in the 2.0 K-Cup Brewer.

82.     K-Cup Brewers are sold for a range of prices. For example, the Keurig-licensed Mr. Coffee Single-Serve Brewer for home use has been priced at $89.99, the K10 "Mini Plus" Brewer retails for $99.99, and the Keurig-licensed Cuisinart Single-Serve Coffee Brewer retails for 199.99. KGM sells its 2.0 K-Cup Brewers at list prices ranging from $149.99 to $199.99. Other K-Cup Brewers have been priced between $200-400, such as the Keurig-licensed Breville brewer at $299.95.

### 2.     KGM Has Monopoly Power In The Single-Serve Brewer Market

83.     KGM controls approximately 93% of the Single-Serve Brewer Market. As a Morgan Stanley consumer survey report observed, "[KGM] and its Keurig system dominates [the Single-Serve Brewer Market]." KGM has maintained a market share of over 90% of the Single-Serve Brewer Market since at least 2011.

84.     Brokerage and investment firm Stifel has noted that KGM's brewer market share is so "dominant" that it is "unlikely any new entrant could gain meaningful share."

85.     Indeed, market shares of Single-Serve Brewers that are not manufactured or licensed by KGM are fragmented and such brewers collectively represent only 7% of dollar sales in the Single-Serve Brewer Market.

86.     KGM's brewer sales numbers are climbing each year.  From October 2013 to September 2014, KGM sold approximately 6 million Single-Serve Brewers, up from a little over 5 million during the same period one year before.  KGM has sold nearly 3 million Keurig and Keurig-licensed Single-Serve Brewers in just the first three quarters of 2014.  Given that KGM sells its largest number of brewers during the holiday season, it is likely that KGM will sell a record number of Single-Serve Brewers in 2014.

87.     Furthermore, KGM is able to leverage the large installed base of K-Cup Brewer users.  KGM reported in September 2013 that it had sold, in total, over 30 million Keurig-branded Single-Serve Brewers, which are used in at least approximately 15 million U.S. households.  Thus, KGM has a direct line of communication to consumers who call with questions about their brewers.  KGM uses this opportunity to tell consumers they should not use Competitive Cups.

88.     Furthermore, on information and belief, KGM controls at least 95% of the share of K-Cup Brewers supplied to offices.

89.     KGM has the power to exclude competition in the Single-Serve Brewer Market.  KGM has exercised this power by coercing distributors and retail customers to enter into anticompetitive tying and exclusionary agreements, which require that only Keurig-branded K-Cup Brewers be sold by these entities.  KGM has also excluded competition in the Single-Serve Brewer Market by contractually prohibiting coffee roasters and beverage brands — KGM's

potential competitors in the Single-Serve Brewer Market — from making K-Cup Brewers or continuing to deal with existing Single-Serve Brewer makers, such as Bosch.

>**3.** **KGM's Monopoly Share Of Single-Serve Brewers Will Not Be Diminished By The Transition To 2.0 K-Cup Brewers**

90.    Many current 1.0 K-Cup Brewer owners will likely replace their brewer with a 2.0 K-Cup Brewer in the near future.  A 2014 survey showed that a substantial number of K-Cup Brewer owners had to replace their K-Cup Brewers at least once, and only a quarter of respondents estimated that their K-Cup Brewers would last more than three years.

91.    Moreover, KGM can leverage its installed base to convert consumers to 2.0 K-Cup Brewer owners.  For example, KGM has already begun shipping 2.0 K-Cup Brewers to consumers who call with complaints about how their 1.0 K-Cup Brewers are working.

92.    When asked whether retailers may choose not to carry 2.0 K-Cup Brewers because those brewers "might not support [retailers'] private label brand," Mr. Kelley responded during KGM's First Quarter 2014 Earnings Call on February 5, 2014 that:

>I want to make sure that you understand one part because there's maybe perhaps everybody doesn't understand this.  This is the Keurig system.  This will be the Keurig system.  And so it's replacing the current Keurig system that's out there.  And so this is the Keurig system that all retailers who carry Keurig today will carry going forward.

Mr. Kelley went on to say "[w]e think this adds and builds attachment rate in current Keurig owners."  As Mr. Kelley stated during an earnings call on November 20, 2014, the "Keurig 2.0 system is now in 100% of our retailers and includes 100% of partner brands."

93.    KGM has transitioned quickly to sales of 2.0 K-Cup Brewers because, as Mr. Kelley stated, "[t]here's real value in us accelerating current Keurig owners to convert to 2.0 owners."

94.     KGM has estimated that the 2.0 K-Cup Brewer will constitute ███ of the installed Single-Serve Brewer base by 2017 and ██ by 2020, as depicted below:



### 4.      Barriers To Entry Are High

95.     Barriers to entry are high and imposing for any potential entrant into the Single-Serve Brewer Market.  For example, KGM still holds patents that cover its K-Cup Brewers. Successful entry into the Single-Serve Brewer Market requires substantial technological know-how, research and design capabilities, and capital investment.

96.     Apart from intellectual property issues, KGM's network of exclusive partnerships with nearly every major coffee brand (not to mention other market participants) creates a substantial barrier to entry into the Single-Serve Brewer Market.  KGM's exclusive brand network and web of other exclusive relationships minimizes any incentive for competitors to launch competing Single-Serve Brewers because potential market entrants would not be able to offer Portion Packs containing their preferred beverage brands.

97.     KGM's CEO has described this "network effect" as follows:  "[A]s we get more brewers in the home actually more and more brands want to come into our systems and as more

brands enter our system, more consumers want to put the brewer in their home. And so it's [a] self-regenerative network effect where the more brands we add the more brewers we get and the more brewers we get, the more brands [there are] who want to come in."

98.     KGM's network of roasters and beverage brands already include nearly all the top brands in the United States, which in and of themselves cover more than 75% of the total U.S. coffee consumption. Even if a new brewer entrant could find and assemble the remaining small players that have not yet signed a contract with KGM, new brewers are placed at a significant disadvantage because the vast majority of consumers already purchase or prefer brands that are in the KGM network.

99.     As one report put it, KGM's relationships with major coffee brands "ha[ve] helped [KGM] attract customers who would normally hesitate in purchasing a pod coffee machine but are nonetheless interested in the possibility of brewing their favorite brand of coffee at the touch of a button. **Crucially, this partnership strategy has also limited the incentive for competitors to launch rival pod systems and is in turn attracting further cooperation agreements."** (Emphasis added.)

100.    Indeed, KGM's contracts with roasters and beverage brands contain explicit "Non-Competition" provisions that prohibit would-be competitors from making or supporting Competitive Brewers. KGM's agreements both prohibit roasters and brands from making their own K-Cup Brewers and from renewing, extending, and/or entering into relationships with Single-Serve Brewer makers that are not K-Cup Brewers, such as Tassimo brewers.

101.    Consumers perceive significant cost, in addition to the price, associated with switching to Single-Serve Brewers that are incompatible with K-Cups because of the limited

variety of brands of Portion Packs available to them, particularly the lack of options from major coffee brands that have exclusive arrangements with KGM.

102. In its contracts with licensees of K-Cup Brewer technology, KGM has also prohibited companies that would be potential competitors from making Single-Serve Brewers that are not compatible with K-Cups.

103. On information and belief, KGM also raises barriers to entry in the Single-Serve Brewer Market by entering into exclusionary contracts with component suppliers, original equipment manufacturers ("OEMs") that make brewers, distributors, and retail customers. This network of exclusionary contracts deters entry by making it difficult for potential entrants to find suppliers, to manufacture brewers, and to access sales channels, end customers, and other resources that are necessary to generate economies of scale and to bring new brewers to market.

104. Further, because retailers are reluctant to stock brewers unless the Portion Packs they use are readily and widely available, and Portion Packs that are compatible with any particular brewer are not widely available unless the corresponding brewers are popular, potential market entrants face a substantial competitive disadvantage vis-à-vis established brewer suppliers.

**B. The Compatible Cup Market**

105. The second relevant product market in which to evaluate KGM's anticompetitive conduct is the market for the design, manufacture, and sale of Compatible Cups, which are Portion Packs that are either: (1) compatible with K-Cup Brewers; or (2) would be compatible with K-Cup Brewers, but for the lock-out technology designed to prevent Competitive Cups from working in 2.0 K-Cup Brewers. As noted above, this market includes both K-Cup-format encapsulated plastic pods that are made by both KGM and TreeHouse; and other pods that are

compatible with K-Cup Brewers but use a soft mesh material to enclose the ingredients, such as those made by JBR, Inc. d/b/a/ Rogers ("Rogers").

106. Compatible Cups (both K-Cups and Competitive Cups) are Portion Packs that are generally only used in Single-Serve Brewers that are K-Cup Brewers.

107. The Compatible Cup Market comprises both K-Cups, which are made or licensed by KGM, and Competitive Cups, which are made by a small and dwindling number of Compatible Cup makers that are not associated with KGM. Competitive Cup makers are often described as "unlicensed" because they have refused to take an illegitimate license from KGM that would force Competitive Cup makers to pay an unjustified royalty to KGM and to limit the output of Competitive Cups sold.

108. Competitive Cup companies offer prices that are substantially lower than Keurig-branded K-Cups, and, hence, appeal to large numbers of price-conscious consumers.

109. Competitive Cups, such as those produced by TreeHouse, are typically priced at least 15% to 25% less than the K-Cups produced or licensed by KGM. *See, e.g.*, GMCR, FQ1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014) (KGM admitting that Competitive Cups "came in … at mostly 15 to 25% lower prices"). Specifically, on average, KGM K-Cups are priced at approximately \$0.60, as opposed to Competitive Cups, which are sold at about \$0.45. *See* Rabobank, In Pod We Trust, NCA 2013 Coffee Summit Presentation at 28 (October 4, 2013).

### 1. The Compatible Cup Market Is A Distinct Economic Market

110. About ███████ cups are brewed in K-Cup Brewers every day in offices and homes in North America, and billions of cups have been brewed with K-Cup Brewers since K-Cups were created in 1998.

111. KGM has itself acknowledged, in statements to the public and investors, that the Compatible Cup Market is distinct from the Portion Pack Market discussed below in that

Compatible Cups do not face competition for use in K-Cup Brewers from Portion Packs that are incompatible with the K-Cup-format.

112.    Indeed, the Compatible Cup Market, as opposed to the broader Portion Pack Market discussed below, is the market in which KGM tracks market shares of K-Cups for competitive purposes.  *See* GMCR, FQ1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014).

113.    The Compatible Cup Market is also distinct from the market for the sale of bagged coffee or other types of packaged beverages.  As numerous articles have detailed, the price of coffee delivered by K-Cups is extremely high.  The New York Times has noted that "Folgers [K-Cups], with 8 grams per capsule, work[] out to more than $50 a pound," which is "even more expensive than all but the priciest coffees sold by artisanal roasters, the stuff of coffee snobs."

114.    The ability to increase K-Cup prices above their competitive levels has not been reasonably constrained by the price of ground coffee sold to consumers.  KGM itself has stated that its K-Cups cost 167% more per serving than bagged coffee.

115.    The price-per-pound of coffee contained in K-Cups and other Portion Packs is nearly five times greater than that of ground coffee.  This has been the case because consumers who utilize Single-Serve Brewers and Compatible Cups generally find such packs to be substantially more convenient and desirable as compared with the brewed coffee from other formats.  Thus, were K-Cups or other Portion Packs competitively priced, consumers who own a Single-Serve Brewer would generally not substitute away from its use in favor of other formats in reaction to a small but significant rise in the price for the corresponding Portion Packs.

116.    While the commodity price of coffee has a direct effect on the price of ground coffee, it does not have the same effect on the price of Compatible Cups, further demonstrating that Compatible Cups do not compete with ground coffee.

117.    As KGM's CEO admitted, KGM's K-Cup prices are "insulated from rising coffee commodity costs due to a built-in price premium," and thus "single-cup pricing has continued to premiumize the category regardless of what the commodity prices of coffee have done."

118.    KGM has also reported in SEC filings that over a quarter of the green coffee that it purchases is from "Fair Trade certified sources" which diverges significantly from commodity coffee prices.

119.    The price of KGM's K-Cups relative to KGM's ground and whole-bean bagged coffee generally increased or remained flat during the two years prior to the expiration of KGM's patents.  However, immediately following the patent expiration, the price of KGM's K-Cups generally *decreased* relative to the price of KGM's bagged coffee, providing economic evidence that K-Cups compete with Competitive Cups, but do not compete with bagged coffee.

120.    KGM's own representative has acknowledged the significance of a KGM price drop in response to new competitors, noting that "if this were a market of just single serve or of just 1.0 compatible, then when the new entrants came in, you would have expected to see Keurig's price go down."[4]  This is precisely what happened when KGM's patents expired in late 2012.  The average price of KGM's bestselling K-Cups fell from about 68 cents in September 2012 to 63 cents at the end of the year.

---

[4] KGM Counsel, Sept. 4, 2014 Preliminary Injunction Hr'g Tr. at 233:22-234:4.

### 2. KGM Has Monopoly Power In The Compatible Cup Market

121.    KGM owns several businesses that sell K-Cups, such as Tully's Coffee Corporation, Timothy's Coffees of the World, Inc., Diedrich Coffee, Inc., the Original Donut Shop, and LJVH Holdings, Inc. (Van Houtte).

122.    KGM has its own beverage brands under which it sells K-Cups. KGM touts its K-Cups as the "#1 single cup brand."

123.    KGM also has entered into agreements with other coffee roasters and beverage brands to license the right to manufacture, distribute, and/or sell K-Cups through its distribution channels bearing the trademarks of numerous major players in the coffee industry, such as Starbucks, Kraft, Peet's, Kirkland Signature, Lavazza, Lipton, Snapple, Seattle's Best Coffee, Dunkin' Donuts, J.M. Smucker, and the Coffee Bean & Tea Leaf, using those brand owners' marks. KGM either owns or licenses more than sixty brands.

124.    KGM exercises control over, and benefits from the sale of, licensed K-Cups, making the sale of licensed K-Cups essentially equivalent from KGM's perspective to the sale of KGM's K-Cups. As KGM Spokeswoman Katie Gilroy described, KGM is "indifferent as to whether [it is] selling [its] own brand or a licensed pack." Indeed, when KGM reports its market share numbers, it typically includes its licensees in reported KGM share numbers.

125.    In February 2014, KGM's President and Chief Executive Officer, Brian Kelley, admitted during a conference call with financial analysts that KGM controlled 86% of the Compatible Cup Market. *See* GMCR, FQ1 2014 Earnings Call Tr. at 15 (Feb. 5, 2014) ("We had 100% of the system … and all of a sudden we have 86% …."); *see also* Citi Report, DD's K-Cup Corner v8.13 at 2 (July 18, 2013) (noting KGM controlled 92% of the K-Cup market in 2013).

126.    Although KGM lost a small amount of market share to unlicensed competitors following the expiration of its K-Cup Filter Patents in 2012, its market share numbers have never dipped below the monopoly share of the Compatible Cup Market.

127.    KGM's success in maintaining its monopoly share of the Compatible Cup Market following the expiration of its K-Cup Filter Patents is evident by its sales numbers:  KGM's consolidated net sales attributable to K-Cups were approximately $2.7 billion in 2012 and approximately $3.2 billion in 2013.

128.    In total, KGM now controls approximately 95% of the Compatible Cup Market. The remaining 5% of the Compatible Cup Market is composed of sellers, like TreeHouse, of unlicensed and private label Competitive Cups.

129.    As detailed below, after losing market share to Competitive Cups following the expiration of its patents in late 2012, KGM embarked on a quest to recapture market share in the Compatible Cup Market by acquiring or entering into exclusionary tying arrangements with other producers of Compatible Cups with whom it used to compete.  In 2014 alone, KGM has entered into several deals with manufacturers and distributors of Competitive Cups.  KGM's CEO stated that KGM was "confident" that it would "win a significant portion of unlicensed packs" by "welcoming [them] into the system" and that KGM had a "very good indication that [it was] going to continue to win more unlicensed packs."  He was right.

130.    As of October 15, 2014 a market analyst estimated that KGM had "successfully recaptured ~10 points of the 15 points of market share that it lost over the last couple of years to private-label and non-licensed brands" and that "[o]f these ~10 points … we estimate ~4 points,

or ~500 million cups are from private-label brand conversions" — with nearly half of this share loss "likely to come at the expense of [TreeHouse]."[5]

131.    Because Compatible Cups are not reasonably interchangeable with other Portion Packs, KGM locks consumers in to use the Compatible Cup format by selling its K-Cup Brewers at cost or at a loss.  It is then able to recoup and greatly exceed losses on its sales of K-Cup Brewers by obtaining a 50% margin or more on its K-Cups.  *See* GMCR Investor Day Presentation at 164 (September 10, 2013).

132.    Indeed, KGM has been able to exercise its monopoly power by profitably raising K-Cup prices more than 10% to 15% above competitive levels for extended periods of time without losing significant market share or increasing demand for either Portion Packs other than Compatible Cups or Single-Serve Brewers other than K-Cup Brewers.

133.    KGM has also exercised, sustained, and magnified its monopoly power over the Compatible Cup Market by excluding competitors from accessing machinery, inputs, distributors, and retailers that are needed to compete on a level playing field with KGM.

134.    For example, KGM has succeeded in substantially foreclosing TreeHouse's access to the market for the sale of Compatible Cups to offices and has substantially restrained competition for Compatible Cup sales to consumers for home use.

### 3.    Barriers To Entry Are High

135.    Barriers to entry are high and imposing for potential entrants into the Compatible Cup Market.  Potential manufacturers must either develop and manufacture their own K-Cup Brewers to sell with their own Compatible Cups, or alternatively gain access to customers or consumers who use K-Cup Brewers that are made or licensed by KGM.

---

[5] KeyBanc Capital Markets CONSUMER: Packaged Foods & Meats Company Update/Estimates Change/Rating Change (October 15, 2014).

136. In the first instance, potential entrants to the market cannot easily manufacture their own brewers to use their own Compatible Cups because KGM has a number of patents covering brewer technology. Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

137. In the second instance, KGM's many tying and exclusionary contracts make it difficult to gain access to K-Cup Brewers without having to pay an unjustified "royalty" to become a "Keurig-authorized" licensee in order to gain unrestricted access to K-Cup Brewers. Paying this royalty, in turn, places competitor Compatible Cup manufacturs at a competitive cost disadvantage and provides a disincentive for market entry. Indeed, KGM's public statements pertaining to its "licensees" and "authorized" or "approved" K-Cup brands in and of themselves create the misimpression that KGM has intellectual property rights that give KGM the power to lawfully exclude competitors from the market.

138. Further, there is substantial technological know-how, research and design, and capital investment required to design, manufacture, and sell a Compatible Cup that is compatible with K-Cup Brewers.

139. Compatible Cup makers must also gain access to Compatible Cup machinery suppliers, Compatible Cup component suppliers, Compatible Cup distribution networks, and Compatible Cup retail outlets.

140. Potential entrants, however, are restrained from entering the Compatible Cup Market because KGM has entered into exclusionary agreements with suppliers of the machinery and components used to make Compatible Cups. These agreements have restricted the ability of TreeHouse and other competitors to purchase machinery and inputs needed to compete on a level playing field with KGM in the Compatible Cup Market. Specifically, these anticompetitive

restrictions have prevented competitors from producing Compatible Cups on the same scale, with the same efficiencies, with competitive costs, and with a speed comparable to KGM.

141.     Because of KGM's contract provisions restraining competition, TreeHouse has been forced to incur substantial and unnecessary costs to identify the few additional companies capable of converting their product lines to enter the markets for the supply of Compatible Cup components and machinery capable of making Compatible Cups and then working with those companies to develop new components and machinery, instead of purchasing less expensive components and machinery, with lower transaction costs, from companies that already sold such products.  Because TreeHouse could not purchase products from existing suppliers that would have sold TreeHouse their products absent the restrictions on competition demanded by KGM, TreeHouse's entry into the Compatible Cup Market was delayed and its costs of entry, component and machinery purchases, and manufacturing were raised.

142.     KGM has further increased its monopoly power by launching the 2.0 K-Cup Brewer, which contains lock-out technology preventing 2.0 K-Cup Brewers from functioning with Competitive Cups produced by firms that have not successfully reverse engineered the lock-out technology, and by replacing nearly all existing K-Cup Brewers sold by KGM with the 2.0 K-Cup Brewer.  Indeed, KGM sold over 150,000 2.0 K-Cup Brewers in the first quarter that it was on the market.

143.     The need to obtain the special taggant ink necessary to make Compatible Cups that will work in 2.0 K-Cup Brewers is a formidable barrier to entry.  There are few companies that are capable of producing such ink, and KGM has an exclusive contract with at least one of them.  The additional cost of the ink also raises the costs associated with manufacturing 2.0 K-Cups.

144.    Small but significant non-transitory increases in the price of Compatible Cups do not significantly increase demand for T-Discs, capsules, or other types of Portion Packs that are incompatible with K-Cup Brewers. The reason is that most consumers of Compatible Cups own or otherwise utilize a K-Cup Brewer, and are sufficiently locked into its use to find it impractical to substitute to other Single-Serve Brewers that make use of different Portion Packs. Thus, the prices of T-Discs, capsules, or other Portion Packs that are incompatible with K-Cup Brewers do not reasonably constrain the price of Compatible Cups. TreeHouse, for example, bases the price for Competitive Cups on the price of K-Cups, but not on the price of T-Discs, capsules, or other Portion Packs that are incompatible with K-Cup Brewers.

### 4.    The Portion Pack Market

145.    Instead of using Compatible Cups, some Single-Serve Brewers instead use Portion Packs that do not fit in K-Cup Brewers, such as "T-Discs" that look like flat cookies; soft, circular pods made of the same paper that is used to make coffee filters ("Paper Pods"), or rectangular foil-sealed "Fresh Packs."

146.    Manufacturers of Single-Serve Brewers that use Paper Pods include Hamilton Beach and Philips Electronics N.V.'s "Senseo," while Bosch's "Tassimo" brewer uses T-Discs and Mars's "Flavia" brewer uses Fresh Packs.

147.    Each Portion Pack is generally only compatible with a corresponding type of Single-Serve Brewer. For example, Compatible Cups generally only work in K-Cup Brewers, while T-Discs generally only work in the Tassimo brand of Single-Serve Brewers.

148.    Once a consumer purchases a K-Cup Brewer, that consumer generally cannot use other types of Portion Packs, such as T-Discs or Fresh Packs, in the K-Cup Brewer. Thus, consumers do not view T-Discs or Fresh Packs as reasonably interchangeable with Compatible Cups for use in K-Cup Brewers.

149.	Because Portion Packs that do not work in K-Cup Brewers cannot be reasonably substituted for the use of Compatible Cups, the Compatible Cup Market is the appropriate relevant market in which to evaluate the harm caused by KGM's unlawful and anticompetitive conduct to competition for the manufacturing, licensing, and sale of Portion Packs that compete with K-Cups, *i.e.*, Competitive Cups.

150.	However, because the K-Cup-format is by far the most dominant Portion Pack format and KGM controls the dominant share of Compatible Cups, KGM's unlawful and anticompetitive conduct harms competition even across a broader, alternative market for the design, manufacture, and sale of *all* Portion Packs that are used in Single-Serve Brewers.

151.	KGM possesses and exercises monopoly power over the Portion Pack market. Specifically, KGM controls over 73% of the Portion Pack Market.

152.	KGM's share of the Portion Pack market has risen as a result of striking deals with many private label and unlicensed brands. While KGM controlled approximately 73% of the Portion Pack Market in early 2014, KGM's lucrative deals with major former competitors like Peet's and Kraft has strengthened its share of the Compatible Cup Market and therefore, by implication, the Portion Pack Market as well.

153.	For the same reasons discussed above, the Portion Pack Market is a distinct economic market that is not constrained by other forms of hot beverages, such as those prepared from ground coffee, and KGM has monopoly power over the Portion Pack Market. *See supra* ¶¶ 110-20.

154.	Barriers to entry for the Portion Pack Market are high and difficult to surmount for the same reasons discussed above with respect to the Compatible Cup Market. *See supra* ¶¶ 135-44.

155.    Potential manufacturers either must develop and manufacture their own brewers to be compatible with their own Portion Packs, or alternatively make Compatible Cups that are compatible with K-Cup Brewers or other Portion Packs that are compatible with another existing Single-Serve Brewer (*e.g.*, Paper Pods or T-Discs).

156.    In the first instance, potential entrants to the market cannot easily manufacture their own brewers to accommodate their own Portion Packs because KGM has a number of patents covering brewer technology.  Such a manufacturing effort would require successful research and development efforts, large commitments of sunk costs, and significant capital expenditures.

157.    In the second instance, there is substantial technological know-how, research and design, and capital investment required to design, manufacture, and sell a Portion Pack that is compatible with a particular Single-Serve Brewer format.

**5.      Compatible Cup And Portion Pack Competition Does Not Take Place At Any Purported "System" Level**

158.    The average price of both K-Cups and K-Cup Brewers has fallen following the expiration of KGM's K-Cup Filter Patents.  Therefore, even if one were to consider K-Cups and K-Cup Brewers as a "system," the "system price" decreased following the entry of private label and unlicensed Competitive Cups.  K-Cup price reductions have not resulted in a corresponding increase in brewer prices — which is contrary to the notion, advanced by KGM, that the relevant competition takes place at any purported "system" level.

159.    Consumers typically do not make Compatible Cup purchases based on a projection of the estimated combined cost of a Single-Serve Brewer's purchase price plus an assumed total cost of purchasing cups that will be used in that brewer over time.

160.     Compatible Cup prices have fluctuated substantially over time, which is one reason making it difficult for consumers to calculate the combined long-term cost of the K-Cup Brewer and Compatible Cups at the time of purchase.

161.     As a 2012 New York Times article explained, "it's hard to tell how much coffee costs, even if you know what you spent[,] … [which is] the case with many of the single-serve brewing machines."

162.     Moreover, KGM's methods of selling and promoting K-Cup Brewers, and requirements that it imposes upon retailers, often serve to obscure the total price of purchasing a K-Cup Brewer and corresponding Compatible Cups, causing consumers to be poorly informed about the lifetime cost of owning a K-Cup Brewer as opposed to owning a competing brewer.

163.     While K-Cups and K-Cup Brewers are sold as separate products in many stores and online, KGM typically sells K-Cup Brewers bundled with K-Cups, which makes it difficult for consumers to determine the price of the K-Cups when they purchase K-Cup Brewers.  For example, KGM sells 2.0 K-Cup Brewers at mass merchandisers, such as Costco and Sam's Club, bundled with four K-Carafe packs and 42 or 48 K-Cups.  And on the Keurig.com website, each of the 2.0 K-Cup Brewers come with four K-Carafe packs and six K-Cups.  Therefore, consumers purchasing a K-Cup Brewer do not need to purchase K-Cups at the same time in order to immediately begin using the brewer.

164.     Furthermore, consumers considering purchasing a K-Cup Brewer would not necessarily view K-Cup and Competitive Cup prices at the same time because Single-Serve Brewers and Portion Packs are typically sold in different sections of retail stores.  Generally, brewers are sold in the appliance section or aisle, while Portion Packs are sold in the grocery section or aisle.  For example, at Wal-Mart and Target, Portion Packs are sold in the tea and

coffee aisle of the grocery section, while Single-Serve Brewers are located in the housewares section near other small appliances and coffee-makers.

165.    Many owners of a K-Cup Brewer received it as a gift such that the initial decision to buy the brewer is disconnected from consideration of the long-term costs of using K-Cups versus Competitive Cups.  As KGM has admitted, almost half of all K-Cup Brewers sold in fiscal year 2013 were sold during the holiday season.  5.1 million K-Cup Brewers were sold in KGM's first quarter of 2014 (which includes the end of the calendar year) — for what KGM's CEO called "a very successful holiday for brewer sales."

166.    KGM also promotes its brewers by giving away K-Cup Brewers and a selection of K-Cups to select customers as part of its "Brewer on Doorstep" program.  KGM gave away 15,000 1.0 K-Cup Brewers and has announced a similar program for the 2.0 K-Cup Brewer.

C.    The At-Home Market Segment

167.    The Single-Serve Brewer, Compatible Cup, and Portion Pack Markets include at least two large market segments, including one covering brewers and Compatible Cups purchased by consumers for use at home (the "At-Home Market Segment") and one covering brewers and Compatible Cups purchased for use outside the home (the "Away-From-Home Market Segment").  KGM's anticompetitive conduct can be evaluated according to its business practices specific to each of these segments.

168.    The At-Home Market Segment generates approximately three billion dollars per year in revenue for KGM.

169.    No less than 15 million U.S. households have purchased K-Cup Brewers for home use.

170.    As of September 2013, KGM controlled no less than approximately 92% of the At-Home Market Segment for Compatible Cups.  Thus, Competitive Cup manufacturers

previously held the remaining 8% of the At-Home Market Segment at that time. *See* Green Mountain Coffee Roasters, Inc. Investor Day Presentation at 98 (September 10, 2013).

### D. The Away-From-Home And Office Coffee Services Market Segments

171. K-Cups are also consumed outside of consumers' homes at, among other places, food service, workplace, convenience store, higher education, and hospitality locations.

172. The Away-From-Home Market Segment encompasses Office Coffee Services customers (the "Office Coffee Services Market Segment"), convenience stores, hotels, restaurants, higher education, and hospitality locations.

173. Most K-Cup Brewers marketed to offices are different than those marketed for home use in that commercial brewers need to be professionally installed and maintained because they are typically plumbed directly into a water line. Commercial K-Cup Brewers are also designed to withstand much higher usage than their At-Home counterparts.

174. The Keurig.com website does not list the prices of most of its brewers intended for the Away-From-Home Market, except for the K155, which it lists for $249.95. Additional K-Cup Brewers marketed for offices include the K3000SE and the V1200. An interested customer must specifically "contact a distributor" to request pricing information.

175. Businesses can request a "free trial" at the click of a button on the Keurig.com website, without being shown the price of the commercial K-Cup Brewers for which they are requesting a free trial.

176. KGM also restricts the ability of distributors to advertise or display the prices of K-Cups. For example, contractual provisions provide that distributors are not allowed to █████

████████████████████████████████████████████████████████

████████████████████████████████████████ *See* Ex. 5B at § 2.1 ████████████

████████████████████████████████████████████████████████

███████████████████████ Ex. 5A at § 2.1 (Non-Exclusive Distributorship Agreement among GMCR and Distributor (Nov. 16, 2013) ("2013 KAD Agreement").  KGM also restricts the ability of distributors to promote and market K-Cup Brewers and K-Cups on the internet.  Contractual provisions provide that distributors ███████████████████████████ ██████████████████████████████████████████████ *See* Ex. 5B at § 2.3 ████████████████████ *see also* Ex. 5A at § 2.3.

177.   All KGM commercial brewers are sold to KADs for resale or lease to Away-From-Home and Office Coffee Service customers.

178.   The Away-From-Home Market Segment is a market worth more than two billion dollars on an annual basis.

179.   KGM has been the Compatible Cup and Portion Pack leader in the Away-From-Home Market Segment since at least 2009.

180.   On information and belief, KGM currently provides at least 80% of the office K-Cup Brewers and Compatible Cups to the Office Coffee Services Market Segment.

181.   On information and belief, the Away-From-Home and the Office Coffee Services Market Segments are predominantly controlled by a small network of large, national distribution companies that serve as distributors for KGM.  These distribution companies derive significant benefits from economies of scale and, as a result, the Away-From-Home Market Segment and the Office Coffee Services Market Segment are dominated by a small number of large distributors, including:  Office Depot, Staples, Vistar, United Stationers, WB Mason, BC Coffee & Supplies, Inc., SP Richards Co., Vend Catering Supply, Nestle Waters, Direct Coffee Service, Aramark, Sodexo, Compass, and Canteen.  *See also infra* ¶ 350.

182.   On information and belief, KGM distributes its products through these large distributors and has tied all of them up with restrictive Keurig Authorized Re-Distributor ("KARD") Agreements or Keurig Authorized Distributor ("KAD") Agreements. *See also infra* ¶ 350.

183.   KGM's distributors are prohibited from selling Competitive Cups to the Office Coffee Services Market Segment because doing so would violate their KARD or KAD Agreements.

184.   KGM has substantially foreclosed TreeHouse from selling to the Office Coffee Services Market Segment through the use of anticompetitive conduct including KGM's extensive network of contracts, such as the KARD and KAD Agreements.

185.   KGM has admitted that it has more than 500 KADs, which are contractually obligated to buy from KGM (or its authorized KARDs or Licensed Roasters) and which are prohibited from selling Competitive Cups.  Internal documents suggest that this number is low and that, in fact, as of 2009, KGM had more than █ KADs that it listed as operating in the United States, plus another █ or more that appear to be U.S. distributors, and another approximately █ KADs that distribute products in Canada. *See* Ex. 6 (attaching 2009 KGM list of KADs).

186.   The remaining distributors in the Office Coffee Services Market Segment, those that do not have relationships with KGM, do not control a significant enough portion of the market to allow TreeHouse to establish a foothold in the market.

187.   KGM maintains its monopoly power in the Away-From-Home and Office Coffee Services Market Segments by leveraging its monopoly over the Single-Serve Brewer Market in order to exclude competition from Competitive Cups.  Specifically, KGM and its distributors

agree to provide K-Cup Brewers to commercial or office customers at little or no cost, provided those customers agree to exclude Competitive Cup suppliers from this market segment by purchasing Compatible Cups exclusively from KGM.

188.	KGM's ability to leverage its dominant position in the Away-From-Home Market Segment was critical to establishing a position in the At-Home Market Segment.

189.	KGM has used its dominance in the office setting to leverage exposure to potential At-Home consumers.	According to then Vice President of Away-From-Home marketing, Dave Manly, "[b]ased on the market research and the unique challenges of the Keurig system, leveraging our current OCS penetration was a primary focus of our at-home launch strategy.	We planned to target Keurig office users, people already familiar with the benefits of the Keurig system, and convert them to at-home buyers, in order to build critical mass to support channel expansion."

190.	To facilitate this leveraging, Keurig enlisted its KADs to assist in marketing to potential customers in the office setting.	Keurig implemented a KAD "referral program" encouraging KADs to place displays of marketing material for the at-home brewers at their OCS customer locations and to provide compensation to KADs for each at-home K-Cup Brewer sale that resulted, and an ongoing payment for K-Cup sales to those customers.

## II.	Geographic Market

191.	The relevant geographic market is the United States.	To compete effectively within the United States, Compatible Cup manufacturers and sellers need distribution assets and relationships within the United States.	Compatible Cup manufacturers and sellers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Compatible Cup manufacturers and sellers that have such domestic assets and relationships.

### III. Interstate Commerce

192.     KGM marketed, advertised, promoted, manufactured and/or sold Single-Serve Brewers, Portion Packs, and/or K-Cups in the United States in a continuous and uninterrupted flow of interstate commerce, including through and into this judicial district.

193.     KGM's business activities substantially affected interstate commerce in the United States and caused antitrust injury throughout the United States.

194.     KGM had net sales of $4.358 billion for its 2013 fiscal year, which ended on September 28, 2013.  This number includes $3.187 billion in Portion Pack net sales and $827.6 million in Keurig Single-Serve Brewer and accessories net sales.

## ADDITIONAL FACTUAL ALLEGATIONS

### I.     KGM's Business Model Depends Upon Its Ability To Leverage Its Single-Serve Brewer Monopoly In Order To Restrain Competition And Extract Monopoly Profits From The Compatible Cup Market

195.     KGM's business model depends upon its ability to leverage its monopoly power in the Single-Serve Brewer Market in order to extract monopoly profits from the K-Cups it sells in the Compatible Cup and Portion Pack Markets.  Specifically, this model relies on KGM's ability to:  (1) drive sales of KGM's highly profitable K-Cups by excluding competition for sales of Single-Serve Brewers; (2) restrain price competition from Competitive Cups; and (3) maintain supracompetitive K-Cup prices for extended periods of time.

196.     As it admits in its own statements to the public and investors, KGM sells K-Cup Brewers at cost or even a loss in order to saturate the market with brewers that are only compatible with the K-Cup-format, thereby locking consumers in to using the K-Cup-format instead of other types of Portion Packs.

197.     K-Cups account for the bulk of KGM's profit margin, and KGM's earnings come primarily from its direct or licensed sales of K-Cups, not from its sales of Single-Serve Brewers.

198. While KGM's brewer prices are constrained by KGM's strategy to drive demand for over-priced K-Cups, KGM boosts its profits by charging a 50% margin or more on K-Cups. KGM admits, for instance, that it "sell[s] [] at home ('AH') brewers at attractive price points which are … sometimes at a loss … in order to drive the sales of profitable packs."

## II. KGM Restrained Competition And Exercised Its Monopoly Power By Raising Prices 10% To 15% In 2010 And More In The Lead Up To The Expiration of KGM's K-Cup Filter Patents

199. Keurig developed K-Cup Brewers and K-Cups in the late 1990s and obtained patents on those brewers as well as on the filters in K-Cups. For years thereafter, Keurig licensed various coffee company competitors, including GMCR, to manufacture and sell filtered K-Cups.

200. GMCR first partnered with Keurig in the late 1990s to manufacture and sell Keurig's filtered K-Cups under a license to the K-Cup Filter Patents.

201. Threatened by the inevitable expiration of the K-Cup Filter Patents that would occur in 2012, KGM (then GMCR) embarked on an aggressive plan to eliminate and restrain competition for the manufacture and sale of Competitive Cups.

202. After acquiring Keurig and its patents in June 2006, KGM aggressively eliminated potential competitors through successive acquisitions of Tully's Coffee Corporation (in 2009), Timothy's Coffees of the World, Inc. (in 2009), Diedrich Coffee, Inc. (in 2010), and LJVH Holdings, Inc. (Van Houtte) (in 2010).

203. According to one analyst's presentation, "[KGM] eliminated the licensees by buying them. … GMCR paid high prices to avoid having to compete with the licensees post patent expiration."

204. By August 2010, KGM was ranked number 2 on Fortune's List of Global 100 Fastest-Growing Companies. When reporting the ranking, KGM touted on August 19, 2010, that

for "the first nine months of fiscal 2010, the company [had] produced net sales growth of 70% over the prior year and … earnings per share growth of 89% over the same period for fiscal year 2009."

205.     Having grown into a billion-dollar publicly traded company by eliminating and restraining competition, KGM was poised by 2010 to exercise its monopoly power without fear that market entrants could constrain its prices, and indeed, it did just that.  On September 7, 2010, KGM announced "a price increase" of "approximately 10 to 15 percent" on "all K-Cup portion packs for its Keurig Single Cup brewing system sold in North America" that would "occur across all sales channels."

206.     As KGM admits, this price increase was profitable and did not result in lower sales:

> In September 2010, the Company announced a price increase on all K-Cup portion packs effective October 11, 2010.  In the twenty-six weeks ended March 26, 2011, this price increase improved net sales by approximately 6.6% over what net sales would have been if calculated based on the pricing for K-Cup portion packs in effect during the prior YTD period.

GMCR, Form 10-Q at 45 (May 3, 2011).

207.     KGM's admission demonstrates that despite KGM's price increase, consumers were locked into K-Cup purchases and did not substitute away to retail coffee shops, other Single-Serve Brewers using less expensive Portion Packs, drip coffee-makers, or other less expensive means of preparing coffee or hot beverages.

208.     In advance of the September 2012 expiration of its K-Cup Filter Patents, KGM again exercised its monopoly power in 2011 by repeatedly raising K-Cup prices to further swell its profits before facing competition for the first time from filtered Competitive Cups.  As reported by retailer Coffee Icon, KGM notified its customers by letter dated January 14, 2011

that the wholesale list price of 22/24 count sleeve product cases of K-Cups would be increasing effective as of January 24, 2011 by an unspecified amount.

209.    On information and belief, KGM raised its prices yet again in or around June 2011, as reported by retailers on-line.  As Coffee Icon commented in a subsequent post, "[p]rior to September of 2012 almost all K-Cups were owned by Keurig.  With this type of control of the K-cup market[,] Keurig had several back-to-back price increases on the K-Cups."

### III.    TreeHouse Enters The Compatible Cup Market

210.    Prior to 2010, TreeHouse did not engineer, manufacture, or sell Competitive Cups.  In or about 2010, TreeHouse decided to undertake a substantial investment in order to enter the Compatible Cup Market.

211.    TreeHouse was well positioned to enter the Compatible Cup Market because it already possessed relevant technical expertise and know-how in light of its experience engineering, manufacturing, and selling beverages and similar types of sealed cups used for other products.

212.    TreeHouse already owned production lines worth millions of dollars that had previously been used to produce another beverage product that was packaged in a sealed cup. TreeHouse was able to convert those production lines so that they could be used to manufacture Competitive Cups.

213.    Although KGM (then GMCR) controlled 100% or close to 100% of the Compatible Cup Market at that time, TreeHouse believed consumers would switch to its Competitive Cups because of the new brand offerings, substantially lower pricing, and/or the quality of the new products.  And, indeed, consumers in the Compatible Cup Market have proven to have "a high degree of price sensitivity" and to be willing to try a new brand "if it [is] less

expensive." As one 2013 market study concluded, "91.3% of Keurig users [stated] that they would try a new [Compatible Cup] brand if it were less expensive."

214. Because KGM owned K-Cup Filter Patents covering the use of filters in Compatible Cups that had not yet expired as of 2010, TreeHouse decided to manufacture and sell Competitive Cups that did not contain filters.

215. Thus, in August 2010, TreeHouse subsidiary Sturm introduced the first Competitive Cups for use in K-Cup Brewers that were neither sold by KGM nor under a KGM license.

216. As the expiration date of KGM's K-Cup Filter Patents approached, retailers and distributors were eager to offer consumers additional lower-priced alternatives to the filtered K-Cup. As retailers and distributors know, competition among Compatible Cup suppliers allows such resellers to reduce prices, increase sales, and win business from competitors with higher prices.

217. For example, Kroger Co., whose network of stores includes Ralphs, King Soopers, and Fred Meyer, announced plans on June 8, 2012 to offer store-branded, or "private label," filtered Competitive Cups for use in K-Cup Brewers. Likewise, Safeway, Inc., announced on June 15, 2012 that it would introduce its own private label, filtered Competitive Cups for use in K-Cup Brewers, but at prices below KGM's K-Cups.

218. KGM's relevant K-Cup Filter Patents expired in September 2012.

219. In response, in part, to requests from grocery retailers and foodservice distributors, TreeHouse launched its first filtered Competitive Cups in the Fall of 2012 in order to supply a lower-priced alternative to KGM's filtered K-Cups.

220. Between September 2012 and December 2013, TreeHouse subsidiary Bay Valley entered into supply arrangements with dozens of retailers for filtered Competitive Cups.

221. Since TreeHouse entered the Compatible Cup Market, consumer demand has been growing for Competitive Cups. TreeHouse, however, has been foreclosed by KGM of opportunities to sell Competitive Cups to consumers who would otherwise choose to buy them.

222. TreeHouse still has only a small share of the Compatible Cup Market, and its sales would have grown much faster and steadily had it not been for KGM's efforts to block TreeHouse's access to Compatible Cup components, machinery, distribution networks, retail customers, and consumers.

223. After Competitive Cups like TreeHouse's hit the shelves, the market suddenly "shifted." Brian Kelley explained, during the KGM 2014 first quarter earnings call, that "we had a 100% of the system, and all of a sudden we have 86% of the system, [or] something like that."

224. Although KGM had already substantially restrained the market through its anticompetitive tying and exclusive dealing agreements, KGM was unsatisfied with the prospect of losing *any* market share to Competitive Cup makers or having to compete on the merits by lowering its prices over the long-term.

225. In 2012, KGM thus embarked on a multi-prong strategy to regain complete control of the Competitive Cup Market, which entailed: (1) increasing KGM's efforts to restrain the Compatible Cup Market with unlawful and even more restrictive "non-competition," tying, and exclusive dealing agreements and threatening companies who wished to do business with Competitive Cup makers; (2) developing additional ways to leverage its monopoly in the Single-Serve Brewer Market in order to exclude competitors from the Compatible Cup Market, for example, by redesigning its brewers to lock out competition and then misleading customers and

consumers about the motivation for, and the abilities of, the lock-out technology; and (3) disparaging Competitive Cups and interfering with Competitive Cup makers' business relations through deception and strong-arm tactics.

## IV. KGM Retaliates Against TreeHouse By Filing A Sham Litigation And Appeal To Restrain Competition, Raise Its Rival's Costs, And Intimidate Market Entrants

226. As discussed above, prior to September 2012, KGM enjoyed patent protection on certain aspects of its K-Cups. KGM claimed that these patents, for example, prevented competitors from offering Compatible Cups of coffee with filters.

227. The Competitive Cups introduced by TreeHouse in 2010 did not infringe any KGM patents because these cups did not contain any filters.

228. But that did not stop KGM from filing a baseless litigation (asserting various infringement, trademark, and false advertising claims) and appeal harming competition.

229. Within just a matter of weeks after Competitive Cups hit the shelves, Keurig sued TreeHouse subsidiary Sturm, alleging in bad faith that consumers of Sturm's Competitive Cups infringed Keurig's patents directed at *brewers* and methods of using *brewers* — *not even asserting any patents covering K-Cups themselves*. Thus, Keurig alleged that Keurig's own consumers were infringing patents on the Keurig K-Cup *brewers* by using Sturm's unlicensed Competitive Cup*s*, and that Sturm was thus also liable for "inducing" infringement by these consumers.

230. Keurig's non-patent claims were likewise baseless. Keurig alleged, for example, that it was trademark infringement and false advertising for Sturm to say on its packaging that the Compatible Cups were "[f]or use by owners of Keurig coffee makers." Second Am. Compl. ¶¶ 35, 104.

231. No reasonable litigant could have realistically expected to succeed on the merits of such claims, and thus Keurig's complaint was objectively baseless.

232. The litigation was also subjectively baseless. This is indeed demonstrated, for example, by other allegations in the Complaint itself. For example, while Keurig claimed that Sturm "falsely advertised" that its Competitive Cups were "for use by owners of Keurig coffee makers," other allegations in the Complaint demonstrated Keurig's knowledge that this statement was, in fact, true.

233. Paragraph 50 of the Second Amended Complaint, for example, alleged that "Sturm is advertising such [Competitive Cups] for use in Keurig's brewers. Sturm's cartridges have no other use except in Keurig's brewers." Second Am. Compl. ¶ 50; *see also id.* ¶ 23 ("[T]he packaging for Sturm's [Competitive Cups] states they are 'For use by owners of Keurig coffee makers.' In fact, Sturm's [Competitive Cups] have no other use.").

234. Sturm asserted the affirmative defense of patent exhaustion and moved for summary judgment of non-infringement.

235. In September 2012, the United States District Court for the District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, continued to assert its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit, thereby further requiring TreeHouse to expend additional resources that could have otherwise been spent competing against KGM.

236. After Sturm incurred years of litigation costs based on Keurig's frivolous argument that the use of Sturm's Competitive Cups infringed Keurig's K-Cup Brewer patents, the Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an

"end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

237.    The Federal Circuit expressly concluded that, rather than pursuing any legitimate purpose, **"Keurig is attempting to *impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law.*"**  *Id.* (emphasis added).  As the Federal Circuit noted, the result sought by Keurig "would violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] use to be implied for the benefit of the patentee.'"  *Id.* (quoting *Quanta Computer, Inc. v. LG Elec., Inc.*, 553 U.S. 617, 630 (2008) (quoting *Adams v. Burke*, 84 U.S. 453, 457 (1873))).

238.    Keurig's lawsuit against Sturm was objectively and subjectively baseless and was instituted in an attempt to interfere with TreeHouse's ability to compete in the Compatible Cup Market, to intimidate market entrants, to raise a rival's costs, to harm TreeHouse's reputation, to sow doubt and confusion as to the legality of purchasing and selling Competitive Cups, and to deprive TreeHouse of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.  Competition was harmed as a result of KGM's baseless litigation because it cast doubt over the legitimacy and legality of Competitive Cups, reduced competition by hindering TreeHouse's market entry, dissuaded customers from purchasing lower-priced Competitive Cups that would open up competition with KGM, and deterred other Competitive Cup makers from entering the market, on information and belief.

239.    Keurig also sued another early Compatible Cup Market entrant, Rogers, making similar claims.  In Keurig's litigation against Rogers, a different federal district court likewise held on summary judgment that the Competitive Cups at issue could not infringe Keurig's brewer method patents under the doctrine of patent exhaustion.  The district court chastised

Keurig for "attempting to institute a postsale restriction that prevents non-Keurig cartridges from being used in Keurig brewers" and noted that "Supreme Court precedent prevents plaintiffs from undertaking such an end run." *Keurig, Inc. v. JBR, Inc.*, No. 11-11941-FDS, 2013 U.S. Dist. LEXIS 73845, at *35 (D. Mass. May 24, 2013).

240. On information and belief, KGM has also threatened baseless patent infringement lawsuits against other competitors, including entrants into the Single-Serve Brewer Market.

## V. KGM Restrains Competition With Anticompetitive Tying and Exclusionary Agreements, Cuts Rivals Off From Inputs Needed To Meaningfully Compete, And Raises Rivals' Costs

241. KGM has entered into unduly restrictive, anticompetitive, and exclusionary agreements with companies at every level of the Compatible Cup distribution system — from sellers of machinery used to make Compatible Cups; to sellers of Compatible Cup components; to coffee roasters and other beverage makers and brands whose beverages and/or trademarks are used in Compatible Cups; all the way down to the distributors and retailers that sell Compatible Cups to end-user consumers, businesses, and institutions.

242. This web of anticompetitive agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups. As parties to these agreements have admitted — KGM does not restrict the ability to sell these same products for other purposes. Thus, these exclusive dealing and tying agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of substantially foreclosing competitors from access to resources they need to compete with KGM.

243. Indeed, the web of exclusive dealing and tying agreements has allowed KGM to leverage its monopoly over the Single-Serve Brewer Market in order to maintain its monopoly over the Portion Pack and Compatible Cup Markets.

### A. KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Machines Needed To Make Compatible Cups In Competition With KGM

#### 1. Direct Evidence Confirms That KGM Exercises, Sustains, And Magnifies Its Monopoly Power By Coercing Suppliers To Exclude Competitors

244.    Before TreeHouse entered the Compatible Cup Market in 2010, it owned Spee-Dee Holmatic machines that it had purchased from R.A. Jones & Co. ("R.A. Jones") to manufacture a commercial product that was not related to any type of brewer or Compatible Cup.

245.    At the time TreeHouse purchased the Spee-Dee Holmatic machines to produce this other product, R.A. Jones placed no restrictions on TreeHouse's ability to purchase such machinery.

246.    In order to enter the Compatible Cup Market, TreeHouse retrofitted the Spee-Dee Holmatic machines it had previously purchased from R.A. Jones in order to convert these production lines into machines that were capable of manufacturing non-filtered Compatible Cups.

247.    In 2013, in response to positive consumer feedback and increased demand for TreeHouse's non-filtered Competitive Cups following its entry into the Compatible Cup Market, TreeHouse sought to increase its capacity to produce a higher output of non-filtered Compatible Cups by purchasing another Spee-Dee Holmatic machine from R.A. Jones.

248.    TreeHouse requested a price quote for a new machine, but on December 19, 2013, a Sales Manager from R.A. Jones responded in an email, stating: "I am quite embarrassed to be writing this email, but it needs to be done. R.A. Jones is declining to quote the new machine for soluble, non-filtered product."

249.     Under "the rules," as described by the representative, "if the cup goes into a Keurig brewer, [R.A. Jones] cannot quote it." However, R.A. Jones can still "build equipment for all types of packages, just not k-cups or anything that goes into a Keurig brewer."

250.     The Sales Manager expressed hope that the KGM "agreement will be re-written to allow [R.A. Jones] to pursue this [non-filter Compatible Cup machinery] business" with TreeHouse.

251.     The December 19, 2013 R.A. Jones email, explaining that the "agreement" with KGM prohibits R.A. Jones from quoting any equipment that could be used to make "anything that goes into a Keurig brewer," provides direct evidence that KGM coerces suppliers into entering exclusionary agreements intended to restrain competition between Competitive Cup makers and KGM. Because R.A. Jones is free to supply the same equipment for the purpose of making other non-competitive products, the restriction placed on supplying machinery used to make Competitive Cups cannot be justified on the basis that it ensures a reliable supply when KGM needs equipment. Nor can the restriction be justified by any legitimate measure to deter any purported free-riding. Indeed, R.A. Jones has been in the packaging machinery business since before Keurig was even formed. Rather, KGM's prohibition on selling machinery to other potential Competitive Cup makers is merely intended to cut off Competitive Cup makers' access to machinery that is necessary to compete with KGM on a level playing field. This agreement, in and of itself, constitutes an unlawful conspiracy in restraint of trade and provides direct evidence that KGM has exercised its monopoly power by excluding competitors from resources needed to compete with KGM.

### 2. KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Nearly 100% Of Machinery Sold In The United States To Make Compatible Cups

252.    In the December 19, 2013 R.A. Jones email, the Sales Manager further noted that "[f]rom my own personal perspective, it's very frustrating because I feel that I'm alienating a great customer in Sturm Foods." He sympathized further, stating, "I can imagine this causes problems for Sturm, because you now have to start over with another OEM. I can only offer my sincere apology."

253.    R.A. Jones's refusal did cause problems for TreeHouse. TreeHouse searched for, but was unable to find, a single other supplier in the United States that was willing to sell machinery to make non-filtered Compatible Cups. On information and belief, to this day, R.A. Jones remains the only significant United States supplier of machinery that is capable of producing Compatible Cups on a large, commercial scale.

254.    The Compatible Cup machinery market is very highly concentrated even worldwide. Indeed, KGM has itself admitted this. KGM Director of Investor Relations, Suzanne DeLong, stated in 2011 that there were only two companies *in the world* that made K-Cup packaging equipment at that time, and that both of them were under contract with KGM.

255.    Even today, there are only a few significant suppliers of Compatible Cup making machinery worldwide. Although there are two or three companies capable of producing Compatible Cup machinery on a commercial scale in Europe, on information and belief, KGM has an exclusive contract with at least one of them, and the others account for only a small share of Compatible Cup machinery even on a global basis.

256.    On information and belief, the companies KGM has exclusive contracts with account for at least approximately 90% of the machines used to make Compatible Cups worldwide, and R.A. Jones alone accounts for nearly 100% of machines sold in the United States

for the purpose of making Compatible Cups on a large, commercial scale. Being forced unnecessarily to obtain large machinery from overseas, moreover, substantially raises TreeHouse's and other Competitive Cup makers' costs, thereby depriving Competitive Cup makers of fair competition on the merits.

257.     Further, the terms of KGM's exclusive contracts with producers of Compatible Cup machinery far exceed the boundaries of what could fairly be considered a reasonable restraint of trade. For example, on information and belief, KGM's contract with ███████████ ██████████████████████████ prohibits that company from dealing with Competitive Cup makers or Competitive Brewer makers for a period of ██████ years. Specifically, the contract provides that:



258.     Thus, by coercing R.A. Jones to enter into an anticompetitive and exclusionary agreement, KGM has more than substantially foreclosed competitors from the relevant United States market for machinery used to make Compatible Cups. Indeed, as there are so few producers worldwide of machinery capable of producing Compatible Cups on a large, commercial scale (as admitted by KGM itself), KGM has substantially foreclosed access to such machinery on a global basis. Furthermore, KGM's exclusionary agreements with these machinery suppliers has had the effect of constraining TreeHouse's ability to manufacture Competitive Cups and has decreased the number of less expensive Competitive Cups available to consumers.

### B. KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Inputs Necessary To Make Compatible Cups In Competition With KGM

259.    Compatible Cups are made from several components, including a plastic cup, a foil lid, and a filter.  There are few suppliers for each of these components.

260.    The very limited universe of such component suppliers has also been acknowledged by KGM itself.  KGM listed its "rel[iance] on certain single companies for certain strategic material" as a "Risk Factor" in its Form 10-K filed with the U.S. Securities & Exchange Commission on November 20, 2013.  KGM elaborated, "We have single suppliers for certain strategic raw materials critical for the manufacture of portion packs, the processing of certain key ingredients in our portion packs [sic].  …  We have begun to look for additional suppliers for these strategic raw materials and ingredient processing."

261.    As set forth below, upon information and belief, KGM entered into unduly restrictive exclusive dealing agreements with suppliers of each K-Cup component to prevent competitors from purchasing these necessary inputs.   Such agreements have restrained TreeHouse's ability to purchase Compatible Cup components and to compete with KGM.  As a direct result of KGM's exclusionary agreements with suppliers, TreeHouse has been forced to incur substantial costs locating companies that could convert their product lines to enter the market for the supply of Compatible Cup components, such as cups, lids, filters, and foils, and had to pay higher prices to purchase inputs that were produced less efficiently and farther away, with greater shipping costs, than those that are tied up by KGM.

### 1. KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Suppliers Of Plastic Cups Used To Make Compatible Cups

262.    Before TreeHouse entered the Compatible Cup Market, the three main domestic suppliers of the plastic cups used in K-Cups were Winpak Ltd. ("Winpak"), Phoenix Cups

("Phoenix"), and Curwood, which at the time collectively accounted for all or nearly all of the market for the sale of cup components used to produce Compatible Cups.

263.    TreeHouse approached all three of these companies to find a supplier for components to make its Competitive Cups.

264.    At that time, Winpak was already supplying TreeHouse subsidiary Sturm with similar cups and lids to make products that were not used in K-Cup Brewers.  TreeHouse contacted Winpak to see if Winpak could also supply cups and lids to make Competitive Cups. After TreeHouse informed Winpak that the cups and lids it sought to purchase were intended for use in K-Cup Brewers, Winpak refused to supply the components to TreeHouse.  Winpak still supplies Sturm with lids for products that are not used in K-Cup Brewers.

265.    Upon information and belief, Winpak was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with KGM.  Also, on information and belief, such agreement has since been renewed.

266.    Because Winpak would have been free to supply the same cups and lids for use in products not intended for K-Cup Brewers, any KGM restriction prohibiting Winpak from supplying cups and lids to TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of such cups and lids.

267.    TreeHouse also met with Phoenix to see if Phoenix could supply the cup component to make Competitive Cups.  Phoenix initially agreed to supply TreeHouse.  However, shortly thereafter, Phoenix informed TreeHouse that it could not supply TreeHouse with cups for use in K-Cup Brewers due to concerns that TreeHouse was not an "authorized manufacturer" for KGM.

268. Upon information and belief, Phoenix was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with KGM. Also, on information and belief, such agreement has since been renewed and/or continues to this day.

269. Because Phoenix was free to supply cups for use in products not intended for K-Cup Brewers, any restriction prohibiting Phoenix from dealing with TreeHouse cannot be justified on the purported basis that an exclusive agreement was necessary to ensure a reliable supply of cups for KGM.

270. TreeHouse then contacted Curwood, the only known remaining domestic supplier of cup components used to make Compatible Cups known at that time. Shortly after the initial meeting, during which the parties discussed the possibility of Curwood supplying TreeHouse with cups for use in K-Cup Brewers, Curwood informed TreeHouse that Curwood could not work with TreeHouse due to Curwood's other "obligations."

271. Upon information and belief, Curwood was restrained from supplying TreeHouse with materials intended for use in K-Cup Brewers by an unduly restrictive, anticompetitive, and exclusionary agreement with KGM. Also, on information and belief, such agreement has since been renewed and/or continues to this day.

272. As a direct result of these suppliers' refusals to supply TreeHouse with materials needed to make Competitive Cups, KGM's exclusive agreements with Winpak, Phoenix, and Curwood substantially foreclosed TreeHouse's access to 100% of the market for the supply of cups that could be used at that time to make Compatible Cups.

273. KGM itself has recognized that these three manufacturers comprised 100% of the cup supply market shortly before TreeHouse entered the market. As Keurig, Inc. Process

Engineer John Walker noted in 2008, in addition to Winpak and Phoenix, ██████████ ██████████████████████████████████████ Indeed, the cups used to make Compatible Cups are extremely difficult to produce and require a substantial thermoforming expertise.

274.     Because KGM had foreclosed TreeHouse from 100% of the market for the supply of cups that were appropriate to use as Compatible Cup components, TreeHouse's remaining option was to develop new cups with a company that was not at that time in the business of manufacturing Compatible Cup components.  Developing a new cup component was a more costly and lengthy process as compared to purchasing cup components from one of the companies that already produced such components.

275.     Notably, it was not KGM that taught these companies how to thermoform, and thus KGM cannot justify its anticompetitive restrictions based on any reasonable protection of any supposed investment or to prevent any purported "free-riding."  Indeed, Winpak has been developing its expertise in this area since before KGM was even formed.

276.     Nor can any restrictions be predicated on any purported intellectual property licensed from KGM.  KGM has admitted that it has no proprietary rights on the plastic cup itself. Specifically, KGM has said that, █████████████████████████████████████ ████████████████████████████████████████ (Emphasis added.)

277.     While there have been other more recent attempts by companies to enter the market for making the cups used in Compatible Cups, on information and belief, Winpak, Phoenix, and Curwood still produce approximately 90% of the share of cups that are appropriate for use in Compatible Cups.

278.     Because KGM cut TreeHouse off from the experienced domestic cup suppliers, TreeHouse was forced to incur additional, unnecessary costs by dealing with companies that

lacked the know-how and expertise required to manufacture cups for use in K-Cup Brewers. TreeHouse's start-up costs were substantially higher than they would have been if TreeHouse had been free to purchase cups from one of the experienced cup manufacturers.

**2.**     **KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Suppliers Of Lids Used To Make Compatible Cups**

279.    Compatible Cup lids are made from a special foil laminate prepared through a technical process that involves foil extrusion and polymer coating designed to withstand more pressure than ordinary foil packaging found on other food products. Few companies have relevant expertise in this area and are able to produce such lids on a large, commercial scale.

280.    When TreeHouse sought to enter the market, WinPak and Curwood were the main suppliers of the special foil laminate that is suitable to make Compatible Cup lids. As detailed above, Winpak and Curwood both refused to supply TreeHouse with components after learning that TreeHouse's intended to use them to make Competitive Cups.

281.    TreeHouse was able to identify another, smaller company capable of producing foil laminate for Compatible Cup lids, LMI Packaging Solutions ("LMI"). LMI, then a supplier to Sturm of other cups and lids, also refused to supply TreeHouse with foil lids to make Competitive Cups, citing other business commitments. Upon information and belief, LMI refused to supply TreeHouse because of an unduly restrictive, anticompetitive, and exclusionary agreement with KGM.

282.    Indeed, subsequent to their initial refusal, LMI later informed TreeHouse that they no longer had a relationship with KGM, and were therefore free to do business with TreeHouse.

283.    On information and belief, at or about the time TreeHouse entered the Compatible Cup Market, Winpak, Curwood, and LMI collectively accounted for 100% or nearly 100% of the

share of the market for the sale of foil laminate suitable for the production of Compatible Cup lids.

284. Although other suppliers of suitable foil laminate have since entered the market, on information and belief, Winpak, Curwood, and possibly one other company that on information and belief has an exclusive contract with KGM collectively still account for no less than approximately 70% of the market for the sale of foil laminate that is suitable for making Compatible Cups.

285. Because KGM cut TreeHouse off from almost all of the experienced domestic lid suppliers, TreeHouse was forced to incur additional, unnecessary costs by dealing with a company that lacked the know-how and expertise required to manufacture lids for use in K-Cup Brewers. TreeHouse's start-up costs were substantially higher than they would have been if TreeHouse had been free to purchase lids from one of the experienced lid manufacturers.

C. **KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Roasters And Brands And Conspires To Allocate Markets, Exclude Competition, And Induce Competitive Cup Makers To Take An Anticompetitive License**

1. **KGM Enlists Competitor Co-Conspirators To Restrain Competition By Excluding Competitive Cup Makers and Agreeing Not To Bring Competitive Brewers To The Market**

286. Over the years, KGM has obtained trademark license, manufacturing, and distribution agreements from numerous third parties to sell K-Cups using their brand names. These companies include: Starbucks Corporation, Dunkin' Brands, Inc. ("Dunkin' Donuts"), Caribou Coffee, Wolfgang Puck Coffee, and Newman's Own Organics. KGM currently owns or licenses more than sixty coffee and beverage brands.

287. As KGM itself is a roaster that owns its own brand names, KGM would be a direct, horizontal competitor of other roasters and brands, but for its "Non-Competition"

agreements with those companies. KGM and its licensees also compete for Compatible Cup sales with unlicensed competitors, such as TreeHouse. As set forth in the Form 10-K of The J.M. Smucker Company ("Smucker") submitted to the U.S. Securities and Exchange Commission:

> Through a manufacturing and distribution agreement with Keurig, [Smucker] compete[s] in the single serve coffee market with the *Folgers*, *Folgers Gourmet Selections*, and *Millstone* premium coffees *K-Cup* products. Additionally, we plan to launch *Café Bustelo K-Cup* packs in July 2014. **K-Cup competitors include Green Mountain, Starbucks, Eight O'Clock, Maxwell House, and** *Gevalia*, *as well as many private label brands.*

Smucker's Form 10-K, at 5 (Apr. 30, 2014) (emphasis added). Until recently after the date of this 10-K, virtually all private label brands had been produced by unlicensed Competitive Cup makers, such as TreeHouse and Rogers.

288.    Upon information and belief, many, if not all, of these agreements between KGM and its licensees have multi-year terms and include a "K-Cup Exclusivity" provision, which prevents licensed roasters and brands from also entering into any agreements with KGM's competitors, such as TreeHouse, relating to the production of Compatible Cups.

289.    Specifically, licensed roasters and brands agree: (1) not to sell beverage products to Competitive Cup makers; (2) not to license brands to Competitive Cup makers; and (3) not to permit Competitive Cup makers to manufacture Competitive Cups for the brand:





*See* Ex. 4 at § 12.1 ███████ Agreement) (emphasis added); Ex. 7 at § 10 (attaching ███

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ )

(including similar exclusivity provision) ███████████ Agreement"); Ex. 3 at § 4 (Caribou

Agreement) (agreeing "not to sell coffee, Tea or Other Hot Beverage Products to any third party

for the specific intended use of producing Keurig Portion Packs or any other product intended for

use in the Keurig Brewing System;" and (2) not to license any trademarks for use by third parties

in connection with products "intended for use with the Keurig Brewing System.").

     290.    Some restrictions demanded by KGM are even broader, prohibiting competition

in the coffee business as a whole. For example, the 2013 "Noncompetition Agreement Between

Green Mountain Coffee Roasters, Inc. and Global Baristas, LLC" provides that Tully's "will not,

and will cause its respective subsidiaries and Affiliates not to, directly or indirectly, operate in

the Coffee Business in [the] United States of America, Canada, Mexico and the Islands of the

Caribbean" for five years. *See* Ex. 8 at 1 (attaching Noncompetition Agreement Between GMCR

and Global Baristas, LLC (Jan. 25, 2013)) ("Global Baristas Noncompetition Agreement").

Although Global Baristas concurrently entered into a supply and license agreement for KGM to

supply K-Cups using the Tully's brand, the broad prohibition on competition is not reasonably

necessary or tailored to achieve any procompetitive benefits associated with that arrangement.

291.    In addition to agreeing not to compete with KGM by working with Competitive Cup makers, licensed roasters and brands also expressly agree not to compete against KGM in the Single-Serve Brewer Market.  Specifically, licensed roasters and brands agree not to develop or sell any K-Cup Brewers in the United States, Canada, or other specified countries:



*See* Ex. 4 at § 13.1 ▮▮▮ Agreement) (emphasis added); *see also* Ex. 3 at § 5 ("**No Participation in Competing Systems**" such as "Flavia, Kenco and Braun (the Tassimo system)"); Ex. 7 at § 10 ▮▮▮ Agreement) (including similar ▮▮▮ provision).  Moreover, if a roaster or brand already has an agreement in place with a brewer competitor, KGM prohibits that roaster or brand from expanding or extending the agreement with the competitor.  *See* Ex. 4 § 13.2 ▮▮▮ Agreement) ▮▮▮

292.    In this way, KGM has eliminated competition with the largest roasters and brands that would otherwise be the companies with the most financial incentives to enter into the Single-Serve Brewer Market and to increase output or decrease prices by working with Competitive Cup makers.  By demanding that companies who contract with KGM for the supply of K-Cups accept provisions prohibiting those companies from making or selling Competitive Brewers, KGM is leveraging its monopoly in the Compatible Cup Market to unlawfully maintain its monopoly in the Single-Serve Brewer Market.  *See also infra* ¶¶ 387-89.  The restraint on

competition in the Single-Serve Brewer Market, in turn, further restrains competition in the Compatible Cup Market by eliminating new brewers that could otherwise increase demand for Competitive Cups. Thus, the restraint on K-Cup Brewer sales serves to further reduce output and maintain supracompetitive K-Cup prices.

293. These anticompetitive restrictions are not reasonably necessary or tailored to achieve any procompetitive benefit. Rather, they are naked restraints placed on competition agreed to among companies that would be direct, horizontal competitors, but for their agreement not to compete.

294. Moreover, as these agreements are made across some if not all of the largest beverage brands in the world, these agreements substantially foreclose and unreasonably restrain an enormous amount of competition. And they do so for an unreasonable time period with an initial term of ███████████████████████████████████████████ before a competitor would even have the opportunity to persuade such companies to open up their business to newcomers. *See* Ex. 4 § 14.1 ██████████ Agreement).

295. Competitive Cup makers like TreeHouse are harmed by these non-competition agreements because they: (1) prohibit KGM's competitors from selling coffee or beverage inputs to TreeHouse; (2) prohibit KGM's competitors from entering into licensing arrangements with TreeHouse; (3) prohibit KGM's competitors from using TreeHouse to co-pack or manufacture Competitive Cups for their brands; and (4) restrain entry into the Single-Serve Brewer Market that would otherwise provide new brewers that would work with Competitive Cups, without having to incur the additional costs required to make special lids that work in 2.0 K-Cup Brewers. Each one of these agreements is an unlawful restraint of trade in and of itself,

but together they severely restrict competition, thereby harming Competitive Cup manufacturers and the Competitive Cup, Portion Pack, and Single-Serve Brewer Markets.



296.    For example, on or about August 13, 2012, ████ and TreeHouse subsidiary, Sturm, entered into a ████████████████████, under which contract Sturm was set to manufacture Competitive Cups for ████ products.  However, ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████ announced in ████ that it had entered an agreement with KGM to become a Keurig-branded licensee.  On information and belief, the contract entered into between KGM and ████ prohibited ████ from proceeding with its co-manufacturing agreement with Sturm.  On information and belief, ████████████ ████████████ was the direct result of KGM's interference with Sturm's business relations and KGM's misleading and deceptive statements, including statements about the forthcoming 2.0 K-Cup Brewers, Sturm's ability to make Competitive Cups that would work in 2.0 K-Cup Brewers, and KGM's threats that using Competitive Cups in KGM K-Cup Brewers would void consumers' warranties, among other anticompetitive strong-arm tactics.

297.    Starbucks, Wolfgang Puck, and other beverage brands also discussed entering into potential business relationships with TreeHouse, but ultimately concluded they could not do so because of their contracts with KGM.  Like the ████ agreement quoted above, ¶ 289, ████████████████████████████████████████████████ ████████████████████

298.    KGM's agreements with roasters and beverage brands also contain restrictions dictating where and how the licensed K-Cups can be sold, thereby allowing KGM to maintain

supracompetitive prices across licensed brands by controlling output. This creates a further incentive for licensed beverage brands to renew their agreements with KGM and to refuse to deal with any Compatible Cup maker that refuses to take a license or become "authorized" by KGM. On information and belief, KGM has the power to control or otherwise affect the pricing of its licensees' K-Cups.

299. Upon information and belief, KGM has entered into this web of anticompetitive and unduly restrictive exclusionary agreements with coffee roasters and/or coffee and other beverage brands as part of its expansive campaign to maintain its monopoly position in the Compatible Cup Market by excluding competitors who refuse to allow KGM to dictate the pricing, geographical territory, market segments, and/or channels of distribution in which Compatible Cups may be sold. By joining together with a conscious commitment to a common and unlawful scheme, KGM and its competitor roasters and brands can limit competition from lower-priced Competitive Cups by agreeing not to produce or support competitive K-Cup Brewers and not to do business with Competitive Cup manufacturers unless they also become licensed and cede control of their pricing and output to KGM in order to elevate prices.

300. As a result of KGM's agreements with coffee roasters and/or coffee and other beverage brands and interference with TreeHouse's business relations, consumers pay higher prices for Compatible Cups. For example, on information and belief, if ▇▇▇▇ had not terminated its agreement with Sturm and entered into an exclusive agreement with KGM, consumers would have paid lower prices for the same ▇▇▇▇▇▇▇▇▇▇▇ that are now sold at KGM's inflated prices. These agreements also have the effect of limiting the output of branded Compatible Cups, given the restrictions that KGM places on where and how many of its

licensed K-Cups may be sold, thereby restricting consumers' access to such cups in consumers' preferred locations or when allotted amounts run out.

301.    This expansive system of exclusionary and non-competition agreements is orchestrated by KGM, and coffee and other beverage brands that enter into a license or manufacturing agreement with KGM ████████████████████████████████████

███████████████████████████████████████ *See* Ex. 4 at 67

███████ Agreement) ███████████████████████████████████████

███████████████

302.    KGM's agreements further demonstrate that the competitor roasters and brands use KGM as a conduit for securing agreements from other competitors in order to ensure that prices can be maintained at supracompetitive levels.  For example, in the agreement between KGM and ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████ *See* Ex. 4 at

66 ██████ Agreement).   By incorporating a ██████████ provision, KGM and ████████████████████████████████████████████

████████████████████████

303.    In addition to restraining competition in the upstream markets for the purchase of inputs and the manufacture of Compatible Cups, KGM's agreements with roasters and brands also restrain competition in the downstream markets for the sale and distribution of Compatible Cups.  KGM's agreements with roasters and brands give KGM access to those companies' pre-existing distribution networks and convert them into KADs that are prohibited from selling Competitive Cups.  For example, a company providing distribution for a roaster that enters into a

non-competition agreement with KGM becomes a "Roaster Nominated Keurig Authorized Distributor" or "RNKAD," which is defined by KGM as:

> A company that was nominated by a Licensed Roaster and has an effective distribution agreement with Keurig that specifies a geographical territory and channels of distribution. These companies purchase Keurig Products from Keurig and exclusively the nominating Licensed Roaster's K-Cups from the nominating Licensed Roaster, KARDs, or Keurig for resale.

*See* Ex. 3 at 5 (Caribou Agreement). Thus, KGM's anticompetitive agreements with roasters and brands have network effects that substantially foreclose access not only to those roasters and brands, but also to the distributors that provide services for those roasters and brands.

304. Just as co-conspirator roasters and brands enter into non-competition agreements with KGM with knowledge as to other agreements and terms at the roaster and brand level, KGM's roaster and brand competitors also enter into their agreements with express knowledge of KGM's exclusionary distribution agreements. This is demonstrated, for example, by the Caribou Agreement. *See* Ex. 3 at at §§ 1.11, 1.13. The Caribou Agreement expressly recites the fact that "Keurig Authorized Distributors" and "Keurig Authorized Re-Distributors" enter into "distribution agreement[s] with Keurig that specif[y] a geographical territory and channels of distribution for the purchase … of [both bulk or non-bulk] quantities of Keurig Brewers from Keurig and Keurig Portion Packs from Licensed Roasters, [other authorized distributors], or Keurig for resale." *See id.*

305. As agreed to between KGM and roasters and brands, such as ███████ and Caribou, KAD Agreements contain a corresponding restriction ███████████████████ ████████████████████████████████████████ *See* Ex. 5B at § 2.1 █████████████████████; 5A at § 2.1 (2013 KAD Agreement).

306. On information and belief, KARD Agreements similarly prohibit bulk wholesalers from selling K-Cups outside of locations, channels, or stores specified by KGM.

307. This massive hub-and-spoke conspiracy has the anticompetitive effect of allowing KGM to allocate markets, restrain output, restrain price competition, and to exclude competitors from every level of the supply and distribution chain. Indeed, the coffee and beverage brands' agreements not to deal with Competitive Cup makers that could otherwise increase their product output and sales revenue and provide a back-up or second manufacturer or the like do not make economic sense, but for a conspiracy to sustain supracompetitive K-Cup prices by restraining price competition with Competitive Cup makers.

308. Indeed, these companies are taking on a material risk by having KGM serve as their sole suppliers for Compatible Cups. As set forth by Smucker's in its 2014 10-K filed with the Securities and Exchange Commission:

> Keurig is our single-source supplier for K-Cup packs which are used in its proprietary Keurig K-Cup brewing system. There are a limited number of manufacturers other than Keurig that are making cups that will work in such proprietary brewing system[s]. **If Keurig is unable to supply K-Cup packs to us for any reason, it could be difficult to find an alternative supplier for such goods on commercially reasonable terms, which could have a material adverse effect on our results of operations.**

Smucker's Form 10-K (June 23, 2014), at 7 (emphasis added).

### 2. KGM Has Unlawfully Restricted And Substantially Foreclosed Competition Through A Series Of Agreements Allocating The Compatible Cup Market Across Nearly All Large Coffee and Tea Brands

309. KGM's agreements with licensed roasters and brands harm competition because they restrain an enormous amount of competition throughout the entire Compatible Cup supply and distribution network. According to one analyst report dated October 17, 2011, the "only meaningful coffee brands that [KGM] does not have in its portfolio are Maxwell House (*i.e.*,

Kraft) and Peet's."  KGM entered into agreements with both of these companies in 2014.  Thus, KGM now controls Compatible Cup sales for all or virtually all prominent coffee brands, as well as some of the largest, if not the largest, tea brands.

310.    While discovery is needed to determine the exact number of anticompetitive agreements restraining competition, public statements demonstrate that KGM has agreements placing restrictions on competition with many of the largest coffee and beverage brands in the world.  At a minimum, KGM agreements with Starbucks, J.M. Smucker, Dunkin' Donuts, Kraft, Caribou, Lavazza, The Hain Celestial Group ("Celestial Seasonings"), Kahlua, Emeril's, Gloria Jean's, Bigelow, Harris Teeter, Wolfgang Puck, and Newman's Own ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

However, as KGM's "K-Cup Exclusivity" and "Non-Competition" provisions appear to be standard form provisions that KGM seeks to include in every contract it enters into with roasters and brands, it is a reasonable inference that all or virtually all of KGM's contracts with roasters and brands contain these or similar provisions.

311.    A recent analysis by Forbes reflects that following its deal with Kraft in or around August 2014, "Keurig's portion packs will include … nearly all the top brands.  These brands cover 75% of the total U.S. coffee consumption."  Indeed, according to industry analysts, Smucker alone (which owns the Folgers brand) accounts for approximately 54% of the dollar share of the U.S. roast and ground coffee market.

312.    On information and belief, the restrictions placed on doing business with Competitive Cup makers or manufacturing or supporting competitive K-Cup Brewers are

standard restrictions that KGM seeks to, and no doubt does, include in all or virtually all of its contracts with potential competitors.

313.    In December 2006, KGM entered into a multi-year agreement with Caribou under which Caribou-branded coffee would be packaged and sold in K-Cups.  The parties renewed and amended their agreement in December 2011.    Under this five-year agreement, with two automatic renewals extending the term ten years until 2016, Caribou agreed to sell KGM its coffee for KGM's packaging into K-Cups and granted KGM a license to use its trademarks in connection with the marketing and sale of Caribou K-Cups.  The contract provides that Caribou may only sell the K-Cups at Caribou coffee stores and Caribou's website for "At Home" use only.    KGM's agreement with Caribou also contains a "Portion Pack Exclusivity" provision prohibiting Caribou from "sell[ing] coffee, Tea or Other Hot Beverage Products to any third party for the specific intended use of producing Keurig Portion Packs or any other product intended for use in the Keurig Brewing System."  *See* Ex. 3 at ¶ 4 (Caribou Agreement).  The Caribou Agreement also prohibits Caribou from licensing any trademarks to any third party in connection with products "intended for use with the Keurig Brewing System."  *See id.*  The agreement also contains a "No Participation in Competing Systems" provision prohibiting Caribou from making or supporting Competitive Brewers, such as "Flavia, Kenco and Braun (the Tassimo system)."  *See id.*

314.    In February 2010, KGM entered into a multi-year agreement with Smucker, a leader in the domestic retail coffee market, under which KGM is the exclusive manufacturer of Compatible Cups under Smucker's Folgers and Millstone coffee brands.  Under the agreement, Smucker sells the licensed K-Cups in grocery stores, mass merchandise stores, drugstores, wholesale clubs, and on the Smucker retail website. KGM and Smucker expanded their

agreement in May 2014 to make Smucker's brands available in K-Cups for Keurig's commercial brewing systems. The KGM-Smucker agreement contains █████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████ *See supra* ¶¶ 288-89. The KGM-Smucker agreement also contains ███████████████████████████████████████████ ████████████████████████████ *See supra* ¶ 291.

315. In February 2011, KGM entered into an agreement with Dunkin' Donuts, a market leader in the traditional and iced coffee markets in the United States, under which KGM became the exclusive manufacturer of Dunkin' Donuts K-Cups. KGM and Dunkin' Donuts agreed that these cups would be sold exclusively at Dunkin' Donuts restaurants — not at grocery stores, where Dunkin' Donuts sells its bagged coffee — and that some Dunkin' Donuts restaurants would also sell Keurig K-Cup Brewers. In 2013, the parties extended their agreement. According to Dunkin' Brands Group, Inc.'s July 2013 8-K filing, under the new agreement, which will be in effect through February 2016, "[KGM] exclusively packages Dunkin' K-Cup packs."

316. In May 2011, KGM entered into a multi-year agreement with Starbucks, the world's largest coffee retailer, to manufacture, market, distribute, and sell Starbucks K-Cups in grocery stores. The companies renewed and expanded their agreement in May 2013 with a "minimum five-year agreement," under which Starbucks was the "exclusive licensed super premium coffee brand on the Keurig platform" and the Keurig brewer is "the exclusive low pressure single cup brewing system for fresh-brewed Starbucks coffee." Under this agreement, KGM began manufacturing additional varieties of Starbucks coffee and products from

Starbucks' other brands, such as Seattle's Best. KGM sells Starbucks K-Cups at grocery stores, and Starbucks sells its K-Cups at Starbucks' cafes and on its website.

317.     In May 2013, KGM entered into a multi-year agreement with International Coffee & Tea, LLC d/b/a The Coffee Bean & Tea Leaf, "the largest privately held specialty coffee and tea retailer in the United States," under which Coffee Bean K-Cups will be sold "in a variety of channels" beginning in the spring of 2014.

318.     In July 2013, KGM entered into a multi-year agreement with Cinnabon, Inc. under which KGM will manufacture Cinnabon K-Cups. Under the terms of this agreement, Cinnabon K-Cups will be sold in the retail and Away-From-Home Market Segment, as well as in Cinnabon restaurants.

319.     In 2014, KGM entered into and renewed many multi-year agreements, converting competitors across all market segments and winning back significant share of the Compatible Cup market that it lost to private label and unlicensed brands in previous years. Indeed, KGM has now eliminated competition from the two largest previously unlicensed branded competitors — Peet's and Kraft.

320.     KGM and Starbucks amended their agreement in March 2014 to expand the range of Starbucks K-Cup offerings and to eliminate the requirement that Starbucks be the only super-premium coffee brand available in K-Cups. This amendment enabled KGM to bring Peet's Coffee & Tea, one of Green Mountain's and Starbucks's main competitors, into what KGM describes as the licensee "family." ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████ *See supra* ¶¶ 288-89, 291.

321.     On the same day that KGM announced the amended Starbucks deal, KGM and Northern California-based Peet's Coffee & Tea announced that they had reached a multiyear manufacturing and distribution agreement for Peet's specialty coffee and tea K-Cups.

322.     In August 2014, KGM and Kraft entered into a high-profile licensing, manufacturing, and distribution agreement to make Kraft's beverage brands, including Maxwell House, Gevalia, Yuban, and McCafé (available at McDonald's) available in the K-Cup and K-Carafe formats.   After a transition period during which both Kraft and KGM will both manufacture K-Cups, KGM will eventually become the exclusive U.S. manufacturer of Kraft-branded K-Cups.

323.     KGM announced several other multi-year exclusive agreements "converting" its former competitors.

324.     In February 2014, KGM and Krispy Kreme announced a multi-year agreement under which Krispy Kreme K-Cups will be available in the grocery, retail, and Away-From-Home channels, as well as in Krispy Kreme shops.

325.     Later that month, KGM and Luigi Lavazza S.p.A. announced a multi-year agreement to make Lavazza brand coffee available in K-Cups, to be sold at specialty, grocery, and Away-From-Home retailers.

326.     In June 2014, KGM announced a new partnership with BJ's Wholesale Club, under which KGM would manufacture BJ's Wellsley Farm branded K-Cups, which are now sold exclusively at BJ's 202 East Coast stores and its website.

327.     In July 2014, KGM announced a new partnership with Harris Teeter, a North Carolina-based grocery store with locations in Midwestern and Southern states under which KGM is the exclusive manufacturer of Harris Teeter branded K-Cups.

328.   On or about March 2014, ████████ signed an agreement with KGM to make ████████████████████ products. ████████████████████████

████████████████████████████████████████

████████████████████ *See supra* ¶ 296.

329.   KGM has also entered into similar agreements with Newman's Own Organics Coffee, Gloria Jean's Coffee, and Wolfgang Puck, as well as agreements to manufacture and distribute non-coffee products with companies, such as Bigelow Tea, Twinings North America, Inc., Swiss Miss, Snapple, Celestial Seasonings, Campbell's, and most recently, Coca-Cola.

330.   KGM expanded its partnership with the Coca-Cola Company in September 2014. After signing a ten-year deal with KGM in February 2014, the companies announced a new deal to make Coca-Cola's Honest Tea branded beverages available in K-Cups.  On information and belief, Coca-Cola is also prohibited from dealing with Competitive Cup makers under a contract that forecloses Competitive Cup makers' access to Coca-Cola distributors.

> **3.     KGM Insists That Competitive Cup Makers Must Pay Unjustified Royalties To Become "Authorized" To Access Keurig Brewers**

331.   Since KGM's K-Cup Filter Patents have expired, there is no legitimate justification for this division of markets across competitors or the restraints placed on dealing with Competitive Cup makers that could plausibly be grounded in any valid patent rights.  Nor is there any basis for KGM to demand that Competitive Cup makers take a purported "license" or become "authorized" to sell Competitive Cups or to have access to KGM's extensive distribution network.  KGM's lawful right to exclude Competitive Cup makers from the Compatible Cup Market has expired and it cannot extend this right beyond the term it was granted by the U.S. Patent Office simply because it was the first to make K-Cup Brewers or K-Cups.  Indeed, as a quid pro quo for its initial, now expired, right to exclude competition, it was statutorily required

to enable competitors to practice its invention upon the expiration of its patent.  *See* 35 U.S.C. § 112.  KGM, however, has sought in effect to extend the term of its now-expired patents by demanding royalties for the right to make Competitive Cups.

332.    As Brian Kelley stated during the November 20, 2013 investor call, KGM "will continue to convert current unlicensed players into licensed Keurig system partners," noting that "obviously [its] goal" is to "convert … as many [Competitive Cup makers] as [it] can."

333.    Stifel has explained that KGM viewed its "introduction of Keurig 2.0 … as an opportunity to convert unlicensed [Competitive Cup makers] to licensed partners."  It further observed that "Green Mountain is pushing retailers on the need to become a licensed partner before the system closes to prevent losing consumer relevance."

334.    In order to become an "authorized" or "licensed" "Keurig system partner," however, KGM demands that its purported "licensees" cede their independent decision-making authority to KGM as to where and how many Competitive Cups can be sold by the "licensee." Such agreements have the effect of allocating markets, restraining output, and allowing KGM to maintain supracompetitive prices.

335.    For example, in 2012 discussions led by KGM concerning its proposal for TreeHouse to become an "authorized" licensee, KGM demanded that TreeHouse █████████ ████████████████████████████████████████████████████████████████████████ ██████████████████  KGM threatened TreeHouse that ██████████████████████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████

336.    KGM additionally demands a royalty payment or other consideration under the purported "license," despite the fact that its K-Cup Filter Patents expired over two years ago.

Such monopoly rents have the effect of raising rivals' costs, increasing prices, and restraining free and fair competition on the merits.

337.    Indeed, KGM's Investor Day slides, dated September 10, 2013, make no claim that KGM's new "interactive" brewer technology used to "recognize licensed portion packs" and to exclude Competitive Packs is patented.

338.    KGM used the 2.0 K-Cup Brewer launch to coerce Competitive Cup makers to enter into anticompetitive agreements with KGM by enlisting the help of Competitive Cup makers' retail customers.  Specifically, KGM contacted retailers leading up to the launch of the 2.0 K-Cup Brewer to inform them that the Competitive Cups they were purchasing would not work in 2.0 K-Cup Brewers and then inducing those retailers to urge their suppliers of Competitive Cups to contact KGM to become "authorized" or "licensed" partners.

339.    Thus, KGM's efforts to "convert" "unlicensed" competitors, such as TreeHouse, to "licensed" or "authorized" Keurig manufacturers have only increased in the lead up to the release of 2.0 K-Cup Brewers.  Accordingly, the Federal Circuit's decision in the *Sturm* litigation holding that KGM's assertion of brewer patents was an impermissible attempt to restrict consumers' use of Competitive Cups in 1.0 K-Cup Brewers did not adequately resolve this controversy.  Indeed, that litigation did not involve any patents on K-Cups or their components themselves, nor did it involve 2.0 K-Cup Brewers.  Indeed, when KGM sought to convert TreeHouse to an "authorized" licensee, KGM ███████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████

**D. KGM Has Unlawfully Restricted And Substantially Foreclosed Access To Distributors Through Anticompetitive Tying And Exclusionary Agreements**

340. KGM distributes K-Cup Brewers and K-Cups to the Away-From-Home Market Segment and to a portion of the At-Home Segment through a nationwide network of more than 600 distributors that are classified by Keurig as: (1) "Keurig Authorized Re-Distributors" or "KARDs;" (2) "Keurig Authorized Distributors" or "KADs;" or (3) "Roaster Nominated Keurig Authorized Distributors" or "RNKADs."

341. According to KGM's agreements, a KARD "means a Person authorized by Keurig to purchase Keurig Packs from Licensed Partners of Keurig Products from Keurig for the exclusive purpose of selling Keurig Products only to KADs." KARDs purchase "K-Cups from Keurig in large quantities for the purpose of selling smaller quantities of K-Cups or Keurig Products to KADs and RNKADs and only to KADs and RNKADs."

342. A KAD "means a Person authorized by Keurig to purchase Keurig Products and Keurig Packs from Keurig, Licensed Partners or Keurig Authorized Re-Distributors and to sell, rent or lease such Keurig Products and Keurig Packs in a defined territory."

343. An RNKAD is a distributor that was "nominated by a Licensed Roaster and subsequently authorized by Keurig to purchase Keurig Products from Keurig and nominating Licensed Roaster's K-Cups from only the Nominating Licensed Roaster's K-Cups to Office Coffee Market and Food Service Market customers in defined territories."

344. All of Keurig's KADs, KARDs, and RNKADs (collectively, "KADs"), on information and belief, are required to sign multi-year agreements containing an exclusivity provision prohibiting these companies from distributing Competitive Cups. These exclusivity provisions have had the purpose and effect of substantially foreclosing Competitive Cup makers'

access to the Office Coffee Services Market and the Away-From-Home Market Segment more broadly.

345.    Specifically, KGM's agreements with distributors contain a "Keurig Loyalty" requirement that provides:

> 3.2. Keurig Loyalty. **Distributor shall not directly, indirectly or through an affiliate promote, market, sell or otherwise make available (a) any beverage base or portion pack product, other than Keurig Packs, that can be used in a Keurig Brewer, (b) any brewer other than a Keurig Brewer that is intended for use or usable with Keurig Packs,** or (c) any accessories to Keurig Brewers that are not approved by GMCR and are related to the functionality of any Keurig Brewer, including without limitation any accessory that is intended to replace or allow the re-use of Keurig Packs.

*See* Ex. 5A at § 3.2 (2013 KAD Agreement)(emphasis added); *see also* Ex. 5B at § 3.2 ▮▮▮▮▮▮ ▮▮▮▮▮▮

346.    Before TreeHouse entered the market, KGM had already entered into more than 600 restrictive agreements with KADs prohibiting them from selling Competitive Cups.  Thus, even though TreeHouse sells high-quality Competitive Cups at substantially lower prices than KGM, TreeHouse and other Competitive Cup makers have been almost entirely blocked from selling Competitive Cups into the Office Coffee Services Market and the Away-From-Home Market more generally.   The sheer number of KADs, each with their restrictions on selling Competitive Cups and Competitive Brewers, means that access to K-Cup Brewers is almost entirely foreclosed in the Away-From-Home Market.

347.    Although TreeHouse has sought to supply Competitive Cups to the Office Coffee Services Market Segment, it has been repeatedly turned away on the basis that distributors, such as Vistar, Aramark, and United Stationers, have "several years left" on their agreements with KGM.  On information and belief, Vistar, Aramark, and United Stationers collectively supply the majority share of K-Cups to the Office Coffee Services Market Segment.

348.     KGM has made it nearly impossible to compete on the same scale as KGM with comparable efficiencies of scale and network effects because KGM has locked up nearly all of the large distributors, or KARDs, that have a national network of warehouses and distribution centers that can be used to reach smaller KADs that can operate with smaller trucks or vans and with less of a national warehousing infrastructure.

349.     On information and belief, KGM has anticompetitive agreements with the following large, national KARDs that prohibit them from selling Competitive Cups:  Office Depot, Staples, Vistar, United Stationers, WB Mason, BC Coffee & Supplies, Inc., SP Richards Co., Vend Catering Supply, Nestle Waters, Direct Coffee Service, Aramark, Sodexo, Compass, and Canteen.   KGM's exclusionary agreements with these companies alone foreclose Competitive Cup makers' access to approximately 80% or more of Compatible Cup Market sales to Office Coffee Services customers, on information and belief, and restrain Competitive Cup makers' ability to compete on a level playing field with KGM.

350.     The degree of foreclosure on a regional level has been equally, if not more, severe.  For example, in the New York region where one would expect a lot of competition, KGM has foreclosed access, on information and belief, to approximately 90% of Compatible Cup Market sales to Office Coffee Services customers through anticompetitive agreements with the following KADs:  Canteen, WB Mason, US Coffee, Corporate Coffee/Aramark, Evans Coffee, Corporate Essentials, LLC, Arctic Falls, Paramount Coffee Service, Perkaroma, Galaxie Coffee Service, Benanati Coffee, Imagetech Coffee, Proftech, Ideal Vending, Breaktime Refreshments, Big City Refreshments, and Cup of Jo.

351.     Competitive Cup makers' foreclosure is exacerbated by the fact that KAD agreements prohibit KADs from selling Competitive Cups even in office locations that do not

have a KGM brewer.  Distributors generally have a large number of office customers on their route.  As unlikely as it may be given KGM's market share, even if a distributor had only one out of many customers on its route that had a KGM brewer and the rest all had a Flavia brewer or even no brewer, that KAD would still be prohibited under its KAD agreement from selling the other customers either Competitive Cups or Competitive Brewers.  As virtually all offices are already being serviced in some way by a distributor, and virtually all distributors must be able to carry the market's dominant brewer for at least one customer, KAD agreements have the effect of locking both Competitive Cups and Competitive Brewers out of offices regardless of whether they have or want a KGM brewer at all.

352.    TreeHouse and other Competitive Cup manufacturers cannot simply find other distributors competing for these accounts and seek to hire them instead to distribute Competitive Cups.  Because KGM dictates particular territories in which each KAD operates, there is limited competition between distributors and sales are driven primarily by long-standing relationships between the already restricted KADs and their end customers.  KADs in different territories are restricted from competing with one another because selling outside of the territory assigned by KGM would constitute a breach of the KAD agreement.  Thus, even if KGM terminates and replaces a KAD in a particular territory, the former KAD would not have the information or access to other customers that would enable the former KAD to compete for new accounts.

353.    Moreover, TreeHouse and other Competitive Cup makers are restrained from enticing current and *even former, terminated* KADs from switching from distributing K-Cups to distributing Competitive Cups because KGM's restriction on selling Competitive Cups survives termination of the KAD agreement.  Specifically, KGM's "Terminated Distributor Terms" provide that "[d]istributor shall only sell or use K-Cups or Keurig Products supplied by Keurig

or KARDs or Keurig Packs supplied by Licensed Partners." There is no procompetitive justification for restricting terminated distributors in such a fashion.

354. Accordingly, the estimated foreclosure percentages provided above are likely low because they only take currently operating distributors into consideration and do not account for currently unknown distributors that have been terminated by KGM, but are still prohibited from selling Competitive Cups under their "Terminated Distributor Terms."

355. Even if Competitive Cup makers purchased their own trucks and hired their own employees in an attempt to bring Competitive Cups to offices, they would not have access to the office managers who make purchasing decisions in close coordination with the KAD who owns the customer account. Moreover, entering into the OCS distributor business would be inefficient for a Competitive Cup maker because OCS distributors do not simply deliver Compatible Cups, but rather a range of products.

356. Distributors also provide value-added services to office manager customers that make them integral to the efficient management of corporate offices. For example, distributors keep track of break room inventories across multiple products; unload and stock products, install, clean, and repair break room equipment, accessory products such as free-standing cabinets that support a brewer and hold a week's supply of used K-Cups, and product displays; and bill and provide receipts to office managers across bundles of products, rather than forcing them to keep track of numerous small receipts for many products.

357. Accordingly, purchasing Competitive Cups through Amazon or a retail store generally is not a viable, cost effective, or efficient option for office managers. Distributors can achieve greater efficiencies and economies of scale by packing multiple products together that an office customer will keep stocked in its coffee or break room, including Compatible Cups, water,

water filters, soda, creamers, sweeteners, cups, paper products, snacks, condiments, and cleaning supplies, among others. Office managers would greatly increase their transaction costs, expenses, and time devoted to inventorying and stocking the break rooms themselves if they were forced to purchase their products individually through Amazon or retail stores.

358. Although KGM initially induced KADs to sign contracts with the promise of ███████████████████████████ KGM has increasingly squeezed KADs with higher and higher prices. Without competition for distribution services from multiple Compatible Cup suppliers, many distributors have experienced margin erosion under the KAD distribution system and have expressed a preference to do business with multiple Compatible Cup manufacturers, but are prohibited from doing so.

359. For example, in 2011, Canteen, a KAD that supplies the Office Coffee Services Market, expressed an interest in buying Competitive Cups from TreeHouse. Several Canteen franchises throughout the country either placed orders for TreeHouse subsidiary Bay Valley's Competitive Cups or began the process of completing credit applications in order to make future purchases from Bay Valley. However, in December 2011, Canteen employees forwarded an alert they received cancelling the purchases from Bay Valley, exclaiming, "What the heck!?" The reason provided for the cancellation in the alert was that "Legal has informed us [that] the use o[f] Non-K-cups in the Keurig brewers is in direct violation of the KAD Keurig agreement and could put our KAD brewer equipment agreements in jeopardy." The email exchange was forwarded to TreeHouse with the message, "We got some bad news today regarding Canteen and Grove Square. Keurig/Green Mountain is insisting that Canteen not purchase anymore [sic] Grove Square. Canteen has an equipment contract with Green Mountain [which] they say is being violated."

360.    Market research indicates that distributors feel "generally unhappy" with and "restricted" by the terms of KGM's multi-year KAD Agreements.  Distributors have also expressed dissatisfaction with KGM's "arrogance" and lack of partnership in what they describe as a "contentious" relationship.

361.    Despite widespread displeasure with the KAD distribution system, it persists because KGM has leveraged its monopoly over the Single-Serve Brewer Market to coerce distributors into unfavorable and exclusionary agreements, which protect KGM's monopoly profits in the Compatible Cup Market.  These exclusionary agreements are not common for any other products provided by distributors to the Away-From-Home Market.  KGM coerces these companies to submit to these anticompetitive provisions by threatening to take away their access to Keurig brewers, and in turn, the end customers with whom the distributors — not KGM — had cultivated relationships over years of hard work.  As discussed above, KGM did not itself develop these distribution routes or customer relationships.  *See supra* ¶ 31.  It merely locked them up with strong-arm tactics and threats.

362.    Notably, the standard KAD Agreement also has the effect of locking in office and commercial customers that might otherwise switch if they were made better aware of KGM's supracompetitive K-Cup prices because KAD Agreements restrict distributors' ability to display prices for K-Cups, further insulating KGM from competitive pricing.  *See supra* ¶ 176; Ex. 5B at §§ 2.1, 2.3 ███████████████████████ Ex. 5A at §§ 2.1, 2.3 (2013 KAD Agreement).

### E.    KGM Has Unlawfully Restricted Access To Retailers And Grocers Through Anticompetitive Tying and Exclusionary Agreements

363.    KGM also enters into anticompetitive, tying, and exclusionary agreements with retailers of K-Cups and Single-Serve Brewers that ultimately are purchased by consumers in the At-Home Market.

364.     For example, a January 2013 agreement between KGM and Global Baristas, LLC, provides under the heading "Restrictions on Competition" that except under limited circumstances dictated by KGM, "during the Term of this Agreement, Tully's covenants and agrees not to permit, to the extent permitted by law, any third-party coffee product, including, but not limited to, bulk and fractional pack coffee products, to be marketed, used or sold in any Licensed Retail Stores."  *See* Ex. 9 at § XVIII (attaching License Agreement Between GMCR and Global Barristas, LLC (Jan. 25, 2013)) ("Global Baristas License Agreement").  Notably, the term of the agreement "is perpetual."  *Id.* at § V.

365.     These "Restrictions on Competition" are not reasonably necessary or tailored to achieve any procompetitive benefit.  As KGM is the owner of a K-Cup retail store itself, this agreement constitutes a horizontal agreement among direct competitors not to compete.

366.     As another example, ██████ a retailer that sells both Compatible Cups and Keurig Brewers, recently switched its private label program from another unlicensed Competitive Cup maker to KGM and additionally stopped stocking other unlicensed brands that were not part of ██████  private label program.

367.     ████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████ On information and belief, ██████ was not permitted to purchase or stock

any Competitive Cups pursuant to the terms of its agreement with KGM, and was instead required to only purchase and stock K-Cups (including licensed K-Cups).

368.    On information and belief, ▮▮▮ has executed a multi-year agreement for sales of 2.0 K-Cup Brewers with KGM that prohibits ▮▮▮ from purchasing any Competitive Cups from companies that are not "licensed" or "authorized" by KGM, regardless of whether or not Competitive Cup makers are already selling Competitive Cups that work in 2.0 K-Cup Brewers.

369.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

370.    On information and belief, ▮▮▮ chose to work exclusively with KGM as the result of promotional efforts directed by KGM to ▮▮▮ misrepresenting that Competitive Cups would not work in 2.0 K-Cup Brewers and that the quality, performance, and/or safety of Competitive Cups were inferior to those of K-Cups.

371.    On information and belief, KGM also leveraged its monopoly power in the Single-Serve Brewer Market in advance of holiday sales of 2.0 K-Cup Brewers in order to coerce ▮▮▮ into entering a tying agreement prohibiting ▮▮▮ from selling Competitive Cups. ▮▮▮ is advertising 2.0 K-Cup Brewers as a highlighted "Big Deal" during its "Thanksgiving and Black Friday Weekend Deals."

372.    KGM also enters into exclusionary agreements with office specialty stores, such as Staples.  TreeHouse sought to supply Compatible Cups to Staples, but Staples had an agreement with KGM and was thus unable to enter into a supply arrangement with TreeHouse.

### F. KGM Has Leveraged Its Monopoly With Tying Agreements In The Single-Serve Brewer Market To Unlawfully Maintain Its Monopoly In the Compatible Cup Market and Vice Versa

#### 1. KGM Leverages Its Monopoly In The Single-Serve Brewer Market And Ties The Sale Of K-Cups To Brewer Sales By Prohibiting Distributors From Selling Competitive Cups

373.    KGM's exclusionary agreements and coercive tactics unlawfully tie purchases of its K-Cups to purchases of its K-Cup Brewers because KGM agrees to sell K-Cup Brewers to distributors and certain retailers only on the condition that the buyers also purchase K-Cups or at least agree that they will not purchase Competitive Cups.  By leveraging its monopoly power in the Single-Serve Brewer Market by prohibiting brewer purchasers from buying Competitive Cups, KGM has abused its market power and harmed Competitive Cup makers' ability to compete on the merits for customers or to establish sales channels for their products.

374.    As set forth above at ¶ 345, KGM's "Keurig Loyalty" tying provision expressly prohibits distributors servicing either the Away-From-Home or At-Home Market Segments from selling Competitive Cups.  This tying provision is a standard provision contained in more than 600 distributor agreements, as reflected by KGM's mass form letters to all "Keurig Authorized Distributors" addressing the ramifications for failing strictly to abide by this provision.  *See* Ex. 10 at 1-2 (attaching Mar. 26, 2012 KGM Ltr. to KADs re "Use of Non-Licensed Portion Packs in Keurig Brewers") ("KGM Ltr. to KADs").

375.    KGM wields this tying provision to threaten that distributors will be cut off from these dominant and expensive brewers, as well as related parts and services.  Distributors need access to such brewers, parts, and services to maintain their customers, and thus, their livelihood.  Although KGM and some KADs view their agreement primarily as "an equipment contract" for the sale of brewers, as reflected by the exchange between KGM and Canteen set forth above

(¶ 359), KADs are forced to buy K-Cups exclusively in order to have continued access to KGM's brewers.

376. For example, as set forth in its March 26, 2012 mass mailing to all KADs, KGM warned that "[a]ny portion pack that you promote, market, sell or otherwise make available that is not made by a Licensed Roaster **subjects you to termination of your Keurig Agreement.**" *See* Ex. 10 at 2 (KGM Ltr. to KADs) (emphasis added); *see also supra* ¶ 359 ("[U]se o[f] Non-K-cups in the Keurig brewers is in direct violation of the KAD Keurig agreement and could put our KAD brewer equipment agreements in jeopardy.").

377. As the President of Fox Vending, Inc., one of KGM's former KADs, stated under oath, "Keurig is introducing an even more restrictive 'loyalty agreement' and increasing its enforcement efforts related to loyalty provisions," requiring that "our KAD's could only sell Keurig/GMCR K-Cups no rouge [sic] packs could be sold." *See* Ex. 11 at ¶ 6 (attaching Decl. of Jennifer Fox in Support of Roger's Motion for a Preliminary Injunction (Aug. 11, 2014)) ("Fox Decl.").

378. KGM further uses its leverage in the Single-Serve Brewer Market to threaten KADs with an unlawful tie-in warranty that they or their customers will be financially responsible for any repairs to their brewers if Competitive Cups are used in those brewers. Specifically, KAD agreements provide that the warranty set forth in KAD agreements "shall not apply, and Keurig shall have no obligation under such warranty or otherwise, to Distributor or any third party with respect to applicable Keurig Products under the following circumstances," including, "[u]se of any cartridge, capsule, pod or other beverage base container, other than a Keurig Pack, in a Keurig Brewer." Ex. 5B § 6.2.6 (Form 2014 KAD Agreement); Ex. 5A § 6.2.6 (2013 KAD Agreement).

379. In its March 26, 2012 mass mailing to all KADs, KGM further stated that KGM would provide KADs with marketing materials to provide to their customers "stressing the importance of only using Keurig Brewed portion packs in our equipment." Ex. 10 at 2 (KAD Ltr. to KADs). Thus, not only does KGM use this tying provision to coerce distributors to forego purchases of Competitive Cups, but it further uses this to coerce distributors to disparage Competitive Cups in the market place to end customers and consumers.

380. In addition to prohibiting distributors from selling Competitive Cups, these form KAD and KARD agreements also affirmatively require distributors to purchase both Keurig-branded brewers (*i.e.*, 1.0 and 2.0 K-Cup Brewers) and Keurig-branded Portion Packs (*i.e.*, 1.0 and 2.0 K-Cups). The form KAD agreement contains provisions governing "Keurig Pack Purchasing" and "Brewer Minimum Purchasing Requirements" that provide as follows:

> 3.3. Keurig Pack Purchasing. ***Distributor shall order and purchase Keurig Packs directly from and only from GMCR, Licensed Partners or KARDs, unless otherwise agreed to in writing by GMCR.*** Nothing shall be construed within this Agreement, implied or not, to bind or require Licensed Partners or KARDs to sell Keurig Packs to Distributor.

> 3.4. Brewer Minimum Purchase Requirements. Subject to the other terms of this Agreement, and ***in order to remain entitled to all of the benefits of this Agreement, Distributor shall purchase at least six (6) Model B3000 (or the GMCR designated equivalent, as set forth on Schedules 1.1 and 1.2 attached hereto) Keurig Brewers in each six month period following the date of this Agreement***, with measurement of such requirement to occur on the last day of each March and September following the date of this Agreement. The minimum purchase requirements for Distributor set forth in this Section are hereinafter referred to as the "Minimum Purchase Requirements".

Ex. 5A at §§ 3.3, 3.4 (2013 KAD Agreement) (emphases added); *see also* 5B at §§ 3.3, 3.4

████████████████████

381. Thus, KADs and KARDs must purchase K-Cup Brewers and K-Cups from KGM, even if they would prefer to purchase only K-Cup Brewers from KGM and purchase Competitive

Cups from other sources or purchase a combination of K-Cups and Competitive Cups. KGM leverages its monopoly power in the Single-Serve Brewer Market to tie these two distinct products together. A second unlawful tie occurs when KAD and KARD customers make their purchases, in that customers that wish to purchase Portion Packs from the KADs and KARDs are left with no choice but to purchase K-Cups at KGM's supracompetitive prices. Indeed, as the President of Fox Vending, Inc., further swore under oath:

> **Keurig uses these KAD agreements to cement its dominant market position in the office coffee services market by forcing vendors to supply only licensed Keurig products, thereby locking customers into the K-Cup ecosystem.** Distributors must sign a KAD agreement that includes a 'loyalty agreement' that requires the KAD to only sell Keurig-branded or authorized single-serve coffee brewers and Compatible Cups. **These exclusive agreements eliminate any competition from the office coffee distributor market** and thus allow Keurig to maintain prices significantly above the prices charged for non-licensed portion packs ....

Ex. 11 at ¶ 5 (Fox Decl.) (emphases added).

382. A failure to comply with these types of provisions constitutes a material breach of such agreements and could serve as grounds for termination by KGM. Distributors that enter into KAD or KARD agreements with KGM generally cannot bargain away these tying requirements because few if any of them could risk being terminated by KGM in light of the network effects created by KGM's installed base for Single-Serve Brewers, its agreements with major beverage brands, and its control of the sales channels for Compatible Cups. As illustrated by the experience of Fox Vending, Inc., for example, KGM's termination of such agreements may result in an inability for the terminated parties to obtain parts and service for KGM products and/or an inability to purchase new KGM products at wholesale. *See* Ex. 11 at ¶¶ 4, 9 (Fox Decl.). Terminated parties thus are placed at a great disadvantage and face a very high risk of losing their existing customers when their KGM machines need to be serviced or replaced.

383.     As all distributors that service the Away-From-Home Market must sign a KAD or KARD agreement, KGM's tying provision unlawfully restrains competition in not just the Office Coffee Services Market, but also the other Away-From-Home Market segments, such as convenience stores, restaurants, hotels, and foodservice management companies.  On information and belief, KGM also directly threatens end customers in the Away-From-Home Market that brewers will be removed from convenience stores, restaurants, or other offices if Competitive Cups are used in the machines installed on site.

384.     On information and belief, KGM also ties K-Cup purchases to the sale of brewers under agreements with retailers selling into the At-Home Market Segment and otherwise leverages its dominance in the Single-Serve Brewer Market to prohibit the sales of Competitive Cups.  For example, on information and belief, KGM threatens retailers that it will not provide its brewers for important holiday sales such as Black Friday unless retailers agree not to sell Competitive Cups.  *See supra* ¶ 371.

385.     KGM's actions have had a chilling effect on distributors, customers, retailers, and consumers who would like to purchase or sell Competitive Cups but are prohibited by KGM from doing so.  These unlawful tying agreements eliminate competition on the merits for potential customers and deprive Competitive Cup makers of access to sales channels for Competitive Cups to be sold to end customers.  Competitive Cup makers, such as TreeHouse and Rogers, have been told repeatedly by KADs that KADs want to purchase Competitive Cups, but are scared to do so for fear of retribution from KGM.  Indeed, companies have even been forced by KGM to cancel orders that have already been placed for TreeHouse Competitive Cups.  *See supra* at ¶¶ 359, 367.

386. The purpose and effect of tying K-Cup purchases to sales of K-Cup Brewers has been to artificially maintain KGM's supracompetitive K-Cup prices, which prices are ultimately passed onto end customers and consumers, and to deprive such end customers and consumers of beverage choices without any procompetitive justification whatsoever. KGM has accomplished this not because K-Cups are better products than Competitive Cups, but because of KGM's power and leverage in the Single-Serve Brewer Market.

> **2. KGM Leverages Its Monopoly In The Compatible Cup Market And Ties The Sale of Single-Serve Brewers To Compatible Cup Sales By Prohibiting Distributors And Roasters From Selling Competitive Brewers**

387. KGM's exclusionary agreements and coercive tactics unlawfully tie purchases of its K-Cup Brewers to purchases of its K-Cups because KGM agrees to manufacture and sell K-Cups only on the condition that the buyers also purchase K-Cup Brewers or at least agree that they will not purchase or support Competitive Brewers from any other supplier. By leveraging its monopoly power in the Compatible Cup Market by prohibiting K-Cup licensees from making, selling, or supporting Competitive Brewers, KGM has abused its market power and restrained the output of Competitive Brewers that could otherwise increase demand for Competitive Cups.

388. As discussed above, KGM requires that licensed roasters and brands enter into "Non-Competition" agreements with KGM prohibiting these companies from ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *See supra* at ¶ 291.

389. KGM also requires that licensees entering into contracts for the manufacture and distribution of K-Cups sell K-Cup Brewers if they have retail stores that are capable of doing so. *See, e.g., supra* ¶ 315.

## VI. KGM Has Leveraged Its Monopoly In The Single-Serve Brewer Market To Coerce Consumers To Purchase K-Cups Instead Of Competitive Cups

### A. KGM Has Coerced Consumers By Threatening Not To Honor Consumers' Warranties If They Use Competitive Cups

390. KGM coerces consumers to purchase K-Cups instead of Competitive Cups by unlawfully tying consumer purchases of K-Cups to K-Cup Brewer purchases. The warranty printed in the product manual for 1.0 K-Cup Brewers states, "Only the use of Keurig Brewed K-Cup brand packs and accessories will guarantee the proper functioning and lifetime of your Keurig Brewer. Any damage to or malfunction of your Brewer resulting from the use of non-Keurig Brewed K-Cup brand packs and accessories *may not be covered by this warranty or may result in a service fee if the damage or malfunction is determined to be caused by such use.*" (Emphasis added.) Later, the warranty states, "*Nor does this warranty cover damages caused by use of non Keurig Brewed K-Cup brand packs or accessories.*" (Emphasis added.)

391. Similarly, the warranty printed in the product manual for 2.0 K-Cup Brewers states, "The Keurig 2.0 brewer is designed to only work with Keurig brand packs. Any damage to or malfunction of your brewer resulting from the use of non-Keurig brand packs and accessories *may not be covered by this warranty or may result in a service fee if the damage or malfunction is determined to be caused by such use.*" (Emphasis added.) Again, this warranty later states, "*Nor does this warranty cover damages caused by use of non-Keurig brand packs or accessories*." (Emphasis added).

392. Thus, these warranties are yet another way in which KGM leverages its brewer monopoly and coerces consumers to use its K-Cups. On their face, these warranties are in direct violation of the tie-in provision of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2302(c) (providing that "[n]o warrantor of a consumer product may condition his written or implied warranty of such product on the consumer's using, in connection with such product, any article

or service … which is identified by brand, trade, or corporate name"), because the warranties tie consumers' exclusive use of K-Cups to the use of the brewer. These representations are all the more pernicious and deceitful because, in spite of the wording of these warranties, KGM has admitted that it will ████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████████ Thus, the written warranties (and similar descriptions provided by KGM representatives on customer service lines) serve as pretexts to scare consumers into only using K-Cups.

### B. KGM Has Coerced Consumers By Disparaging Competitive Cups

393.    As discussed below, KGM has also coerced consumers to purchase K-Cups instead of Competitive Cups by making statements or otherwise suggesting that Competitive Cups: (1) do not work in 2.0 K-Cup Brewers; (2) are of inferior quality; (3) may damage K-Cup Brewers more than K-Cups and/or are unsafe to use; and (4) are "unauthorized" by Keurig such that consumers do not have the right to use them in K-Cup Brewers. *See infra* ¶¶ 463-99. KGM leverages its monopoly in the Single-Serve Brewer Market by taking advantage of the relationship it has with consumers by virtue of their brewer ownership in order to disparage Competitive Cups. For example, KGM representatives are trained to ask what Compatible Cups consumers are using when they call with questions or complaints concerning their brewers. If the consumer uses Competitive Cups, the representatives are trained to disparage Competitive Cups. As Competitive Cup makers are not privy to such communications, they are not able to identify or respond to the consumer to correct the disparaging and misleading statements made by KGM.

### C. KGM Has Coerced Consumers To Use K-Cups By Restraining Access to Competitive Cups

394. As discussed above and below, KGM has leveraged its monopoly in the Single-Serve Brewer Market to reduce consumer access to Competitive Cups. As a result, KGM has also coerced consumers to purchase K-Cups instead of Competitive Cups by reducing the availability of Competitive Cups in consumers' preferred shopping locations.

395. The vast majority of consumers are unlikely to understand that Competitive Cups that are no longer stocked on retail shelves were not discontinued or sold out or that these Competitive Cups may be available in a different retail chain.

396. It is also unlikely that consumers — many of whom purchase Compatible Cups for their convenience — would make the additional effort and incur the added inconvenience and expense of hunting down alternative locations where their preferred Competitive Cups may be sold. This is particularly true considering that many consumers who purchase Competitive Cups do so in the first instance because of the cost savings associated with purchasing Competitive Cups over K-Cups.

397. Finally, as discussed below, KGM has coerced consumers who purchased 2.0 K-Cup Brewers to use K-Cups by locking out all Competitive Cups for the time period leading up to TreeHouse's introduction of Competitive Cups that work in 2.0 K-Cup Brewers.

### VII. KGM Has Successfully Implemented Its Plan, "Project ▮▮▮," To Unlawfully Recapture Market Share Lost To Unlicensed Competitive Cup Makers By Removing Competitive Cups From Retail Shelves

398. The 2.0 K-Cup Brewer represented the culmination of long and substantial efforts by KGM to lock out competition. As a former KGM Process Development Technician and member of KGM's Research & Development Department acknowledged under penalty of perjury, the 2.0 K-Cup Brewer was not developed for any purported consumer benefit; rather

██████████████████████████████████████████████████████████

██████████████████████ Ex. 12 at ¶ 8 (Declaration of Andrew Gross in Support of Roger's Motion for a Preliminary Injunction (Aug. 11, 2014)) ("Gross Decl."). This individual also acknowledged that KGM employees ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████ *Id.* at ¶ 4. He further stated that KGM held internal meetings in which personnel discussed ███████████████████████ how the lock-out technology could be developed in such a way that it ███████████████████████████████████████

████████ and █████████████████████████████████████████████

*Id.* at ¶¶ 5-6.

### A. KGM Implemented Project ████ To Create A Barrier To Entry For Competitors To Give KGM A Sufficient Market Lead

399. As discussed above, KGM faced its first real threat to its market share in 2012. KGM's attempt to persuade consumers to willingly give up access to Competitive Cups by purchasing Vue brewers was not proving effective, and the K-Cup Filter Patents were set to expire that year. Thus KGM had to act fast and deceptively to achieve through an abuse of its dominance and conspiratorial conduct what it had failed to do on the merits of its purported "innovation." This subsequent plan, Project ████, proved to be a highly effective means of unlawfully recapturing and maintaining KGM's market share.

400. To launch Project ████, Kevin Sullivan, KGM's Chief Technology Officer, and ████ met to discuss methods for preventing Competitive Cups from being used in 2.0 K-Cup Brewers. In a day-long workshop on July 24, 2012, KGM and ████ agreed upon the minimum requirements for any lock-out mechanism including that the lock-out mechanism must at least: (1) ████████████████████████████████████ (2) ████████████████████

██████████████████████ (3) ████████████████████████████████████████████ and

(4) be ████████████████████ among other things. Ex. 1 at 1-2.████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ What was

important was that KGM could create barriers to entry, engender fear and uncertainty, and raise

its rivals' costs in order to buy itself some time to lock up retail customers with anticompetitive

contracts. As KGM informed ██████████████████████████████████████████

████████████████████████████████████████ *Id.* at 2. KGM and

██████████ also agreed that the lock-out would be ██████████ instead of ██████████ so that KGM could

use the ████████████████████████████ *Id.* This would mitigate the risk that

████████████████████████████████████████ *Id.*

401.    In the July meeting with ██████████, KGM also discussed how KGM could apply its

████████████████████████████████████████████████████████ It

was important that the supplier of the ink used to lock out Competitive Cups was exclusively

available to KGM and that Competitive Cup makers ████████████████████████████

████████████████████████████ Ex. 2 at 4. As KGM told ██████████ during the meeting, ██████████

████████████████████████████████████████████████████████

██████████████ *See* Ex. 1 at 3; *see also* Ex. 2 at 3-4. KGM ████████████████████████

████████████████████

402.    KGM's lock-out of Competitive Cups is yet another attempted "end-run" around

the patent and competition laws. While KGM could have lowered K-Cup prices and its 50% K-

Cup profit margins to compete on the merits, KGM instead developed a technology to lock out

what its CEO has described as the "many strong [Competitive Cup] brands that are unlicensed" from 2.0 K-Cup Brewers.

403. Rather than a true technological innovation, KGM's "new" technology reduced competition from Competitive Cups for 2.0 K-Cup Brewers, as well as consumer and retail customer choice, by technologically tying the purchase of K-Cups to the purchase of K-Cup Brewers for the anticompetitive purpose of locking out Competitive Cups for long enough to give KGM a market lead.

**B. The 2.0 K-Cup Brewer's Lock-Out Mechanism Has No Legitimate Consumer Benefit**

404. To this day, KGM has failed plausibly to substantiate its claim that locking Competitive Cups out of 2.0 K-Cup Brewers would benefit consumers. In truth, there is no consumer benefit to be gained by locking Competitive Cups out of the market, and in fact, the lock-out does nothing but harm consumers.

**1. The Lock-Out Mechanism Cannot Read Recipes And Does Not Adjust The Way The Brewer Brews One K-Cup Over Any Other K-Cup**

405. KGM asserted in its 2013 Investor Day slides that its "interactive technology" recognizing only "licensed portion packs" would allow 2.0 K-Cup Brewers to "deliver the perfect beverage." Mr. Kelley has claimed that this function provides "game-changing performance," allowing the brewers to "provide consumers with the perfect brew settings for each beverage by recognizing the 'recipes' of licensed portion packs."

406. However, these vague claims lack any real substance, are without merit, and are pretextual sham justifications for KGM's anticompetitive and exclusionary conduct. As Mr. Kelley has admitted, even with the 2.0 K-Cup Brewers, "a K-Cup will be a K-Cup." KGM

has also openly acknowledged that "very much of the [2.0 K-Cup Brewer] technology … is technology [it is] very familiar with."

407. As analysts at Stifel noted, the much-hyped features of the 2.0 K-Cup Brewer at best represent an "underwhelming innovation."

408. The so-called "breakthrough innovation" is in fact old news. Even if the 2.0 K-Cup Brewer could recognize recipes (which it does not), this is not a KGM innovation. For example, Bosch has for some time been selling its Tassimo brewer with "Intellibrew™" barcode technology that is advertised as allowing the bar code on each T-disc to tell the brewer the exact temperature, cup size, and brewing time in order to purportedly make the "perfect cup." Despite this "interactive technology," consumers remained unconvinced and, as of January 2014, Tassimo had only captured a 2.9% share of the market of consumers who own a brewer at home (as opposed to 93% for KGM).

409. KGM's claim that its lock-out technology benefits consumers by providing "game-changing" performance by recognizing the "recipes" on K-Cups is also belied by KGM's own experience with its Vue Brewer, which also touted the same feature, but was largely rejected by consumers.

410. As the Vue V1200 product brochure stated, "[e]ach commercial Vue pack contains an identification tag that is read by the Vue Brewer so it can apply the optimum recipe for your beverage." Just as KGM now claims with respect to 2.0 K-Cup Brewers, this identification tag on Vue portion packs was touted by KGM as promising the "perfect brew."

411. Nonetheless, Vue's lock-out technology was recognized as a failure. One analyst notes the "Vue platform was a poorly planned, researched and designed platform."

412.     A January 2014 market report showed that the overwhelming majority of Keurig users did not own a Vue and were either unlikely or very unlikely to purchase a Vue.

413.     Even Mr. Kelley has acknowledged that the Vue Brewer lock-out technology was poorly received by consumers, noting in a May 2013 call with investors that Vue Portion Packs offer only about 25% of the variety of K-Cups.  Referring to the Vue Brewer's limited success, Mr. Kelley admitted that consumers "want the ability to have more choice.  They want to have all of the brands available to them.  …  And the most important thing they tell us about Vue is, give us more choice."

414.     Mr. Kelley further stated in a November 2013 investor call that KGM "learned from prior product introductions, in particular the Vue, and we'll do things differently with our new Keurig 2.0."

415.     KGM says it "learned" from its prior Vue introduction, and indeed it did learn that consumers wanted more choice across Compatible Cups.  But instead of responding to consumer demand, KGM decided it simply did not go far enough in order to force consumers and commercial customers to use K-Cups exclusively.  Accordingly, to get the full benefit of its market lead while competitors scrambled to reverse engineer Competitive Cups compatible with 2.0 K-Cup Brewers, KGM set out to deceive customers and consumers in order to coerce them to buy K-Cups exclusively *before* they had the opportunity to see for themselves that KGM was using the lock-out as a deceptive tool to exclude competition and raise prices, without any corresponding benefit to consumers.

416.     KGM repackaged the marketing language it used in connection with its first attempt to exclude competition through purportedly interactive technology — the Vue — to better deceive customers and consumers by claiming that 2.0 K-Cup Brewers would be capable

of reading and reacting to different recipes for beverages in the K-Cups, rather than merely locking out Competitive Cups and triggering default settings.  As KGM advertised, the Vue's "innovative My Brew™ technology was engineered by Keurig to guide users who might not be familiar with the Keurig® single cup brewing system to get it right the first time *by enabling the brewer to default to optimum settings* for the chosen beverage based on a 'recipe' tag." (Emphasis added.)

417.    Recognizing that the mere triggering of default settings would not persuade anyone that the lock-out technology provided anything but a sham consumer benefit, KGM omitted the admission as to default settings for 2.0 K-Cup Brewers and instead told key holders of large accounts that forthcoming 2.0 K-Cup Brewers "would provide consumers with the perfect brew setting for each beverage *by recognizing the 'recipes' of licensed portion packs*." (Emphasis added.)  KGM reiterated these statements publicly to the press stating that "[b]ecause Keurig 2.0 machines are designed to optimize the beverage with specific recipes, 'it is critical for beverage quality that the system only brews Keurig brand packs.'"[6]  KGM likewise told a consumer complaining about the forthcoming lock-out on Keurig's Facebook page that "[t]he Keurig 2.0 Brewing Technology *allows the brewer and the pack to communicate* in order to enable the brewer to recognize the inserted Keurig pack and optimize to the recommended, customized setting *for that particular beverage*."  (Emphasis added.)[7]

418.    Although KGM was more careful this time to avoid the embarrassing public admission that the lock-out technology merely triggers default settings in addition to being designed to lock out Competitive Cups, KGM was forced to admit ███████████████

---

[6] Bloomberg Businessweek - With Keurig 2.0, Green Mountain Wants Its Monopoly Back (Mar. 11, 2014) (quoting Suzanne DuLong).
[7] Keurig's Facebook Page, *available at* https://www.facebook.com/keurig?directed_target_id=0&filter=2 (July 3, 2014).

██████ KGM has now been forced to admit that ████████████████████████████

████████████████████████████████████████████████████████████████ It

merely █████████████████████████████████, and does not itself ██████

█████████████████████████████ For example, KGM was ultimately

forced to admit under oath that █████████████████████████████████

████████████████████████████████████████████████████████████████

██████ Pressing "brew" after inserting any type of K-Cup made or licensed by KGM or any other

2.0-compatible Competitive Cup will result in the ██████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████ Nevertheless, KGM's

consumer hotline representatives have been telling consumers precisely the opposite – that 2.0

K-Cup Brewers brew K-Cups differently depending on the type of beverage inserted.

419. Thus, the purported consumer benefit of an "optimized" brew that is adjusted

based on the technology's ability to recognize the "recipe" for the inserted beverage is a

pretextual sham intended to conceal KGM's true intention of excluding competition that

threatens its ability to extract monopoly profits from the Compatible Cup Market.

420. KGM further admitted that there ██████████████████████████████

█████████████████████████████████ or K-Cup. KGM stated that this separate

████████████████████████████████████████████████████████████████

█████████████████████ in case ████████████████████ As KGM has

admitted, this is a █████████████████ to the 2.0 K-Cup Brewer.

421. Accordingly, even if distinguishing between a Vue or a K-Cup provided any

cognizable consumer benefit, the lock-out technology, as KGM admits, is not necessary to

achieve any such purported benefit. Nor would any such benefit outweigh the anticompetitive effects of the lock-out technology. Consumers often prefer the price, taste, and/or quality of Competitive Cups to K-Cups, but consumers who purchased 2.0 K-Cup Brewers have been deprived of that choice for the months that Competitive Cups were locked out.

### 2. KGM's Brewer Redesign Sacrificed Consumer Safety, Brewer Performance, And Beverage Quality For Profits

422. While KGM claims the lock-out was necessary for safety reasons because a consumer could otherwise use the brewer to ███████████████████████████ ███████ the lock-out technology does not disable the brewer's hot water dispenser and thus does not prevent the brewer from being used for such purposes.

423. Moreover, if KGM really believed that the lack of lock-out technology truly posed a threat to public safety, KGM surely would have recalled the 1.0 K-Cup Brewers it has sold without this technology or, at a minimum, would stop selling the commercial brewers for office use and 1.0 K-Cup Brewers for home use that it currently sells without the lock-out technology. Indeed, KGM has made a point to note that it may keep the Keurig Mini Brewer, marketed to college students and hotels, on the market for an extended period even though it does not contain the lock-out technology. If the lock-out technology were legitimately necessary to protect the safety of consumers or performance of the brewer, KGM would seek to protect commercial customers, college students, and other owners of 1.0 Brewers, just as it purportedly seeks to protect consumers at home with the 2.0 Brewer.

424. The pretextual nature of KGM's claim that the lock-out is critical for consumer safety is demonstrated by the two memoranda that document the initial Project ███ discussions. *See* Exs. 1, 2. These memoranda do not reflect ████████████████████████ ██████████████████████████████████████ They do not reference any ███████

██████████████████████████████████████████████████

████████████████████████ There is only one reference to █████████████

██████ KGM and ████████ agreed that they would *use* █████████████ as its ████████

██████████████████████████████████ *See* Ex. 1 at 2 █████████████

██████████████████████████████████████████████████

████████████████ These two documents are otherwise entirely dedicated to determining how to

██████████████████████████████████████ *See* Exs. 1, 2.

425.    Although KGM now claims that it redesigned its brewer to enhance consumer safety, in fact, the redesign made the brewers *less safe* and made at least some of KGM's K-Cups brew poorly, resulting in beverages that tasted worse than when the same K-Cups were brewed in 1.0 K-Cup Brewers.

426.    Unlike 1.0 K-Cup Brewers in which a K-Cup is placed straight down into the K-Cup holder, the K-Cup holder in 2.0 K-Cup Brewers is set at a 45 degree angle.  This new angled orientation of the K-Cup holder caused substantial quality problems for KGM when brewing teas, cocoas, and fruit drinks because water cannot flow as well through the K-Cups and thus the beverage powders were not dissolving properly.

427.    Because the beverage powders in the K-Cups were not dissolving all the way, many teas tasted bitter and cocoas clumped.

428.    In fact, KGM's cocoa clumping problem was so severe that it caused 2.0 K-Cup Brewer prototypes to "explode" when using Keurig-brand K-Cups (though not when using TreeHouse Competitive Cups), thus necessitating KGM to add a locking mechanism to prevent the head of the brewer from blowing open.

429.    In order to try to solve this safety and quality problem caused by brewing KGM cocoa K-Cups in 2.0 K-Cup Brewer prototypes, KGM ran tests on Sturm's Competitive Cups as part of a project named "Project Earthquake."  The basis for these tests, as reported by a former KGM employee, was that KGM could not figure out why KGM's cocoas were clumping and making the 2.0 K-Cup Brewer prototypes explode, but Sturm's cocoa cups worked beautifully in 2.0 K-Cup Brewer prototypes.  Ultimately, the official results of these tests were memorialized in a report recording that Sturm's Competitive Cups performed ██████████ in 2.0 K-Cup Brewer prototypes as compared to KGM K-Cups.

430.    KGM reportedly was unable to determine why its cocoas were clumping but Sturm's were not.  Thus, although KGM added a locking mechanism to lock the head of the brewer so that it would not blow open, the 2.0 K-Cup Brewer has a greater propensity for causing cocoas to clump and produce "short brews" than 1.0 K-Cup Brewers.

431.    Even KGM's employees were frustrated that KGM had sacrificed brewer safety and beverage quality by redesigning the brewer first and then trying to make KGM's K-Cups work in the brewer later, rather than designing a brewer that would enhance the brewer's ability to brew beverages properly and consistently.  In short, the story that the 2.0 K-Cup Brewer was designed with consumer safety in mind is pure fiction:  the brewer was less safe and brewed a lower-quality product because of its design and necessitated makeshift measures to prevent those problems from injuring consumers in normal use.  The 2.0 K-Cup Brewer was designed with one goal in mind:  excluding competition.

### C.    KGM Used The Impending Lock-Out To Coerce Retailers To Stop Selling Competitive Cups

432.    Rather than letting the market decide which Compatible Cups were best on the merits, KGM leveraged its control over the Single-Serve Brewer market by lying to retailers

about 2.0 K-Cup Brewers, their capabilities, and Competitive Cups before KGM could be proved wrong. KGM systematically confronted all or nearly all of the large U.S. retailers and threatened that if retailers did not stop selling Competitive Cups, then they would only be left with angry consumers whose cups did not work in the monopoly share of brewers being sold. Having previously failed with the Vue to persuade retailers and consumers of the benefit of lock-out technology that merely triggers default settings, KGM claimed falsely that the lock-out mechanism allowed the brewers to read beverage recipes and adjust the brewing process. KGM also claimed falsely that the lock-out was "critical" for the brewer's performance and for consumer safety — just as KGM had planned would be its ███████ justifying the lock-out.

433.    KGM's anticompetitive deception worked and retailers dropped Competitive Cups months before 2.0 K-Cup Brewers even hit the shelves. Although the brewer itself has been largely viewed as a step backwards that limits consumer choice and Competitive Cup makers have reverse engineered a workaround to the lock-out, KGM has already recaptured and tied up the majority of what market share KGM had previously lost to Competitive Cup makers.

### D. KGM Cannot Justify Tying K-Cup Purchases To Brewer Purchases On The Basis That They Create A "System"

434.    KGM deceptively claims that it must tie its K-Cup Brewers and K-Cups together because they are one purportedly unified "system," but this is false. Indeed, KGM has admitted that it could turn on or off this lock-out technology after a certain number of uses, such that any purported claim that the K-Cup Brewers and the K-Cups necessarily constitute a system is pretextual.

435.    As of October 2013, Mr. Kelley admitted it was "fair to say [KGM] [was] still deciding on exactly how [it would] handle the unlicensed pod" in that "it could range from not

brewing them at all to brewing them a few times before they no longer work," as reported by USA Today. *See* Dan D'Ambrosio, With K-Cup Patent Expired, Others Try To Cash In, USA Today (October 29, 2013). KGM therefore cannot plausibly assert that this lock-out technology, which could be programmed to be switched on or off or to work only a limited number of times, is in any way integral to any purported consumer benefit or a necessary aspect of any unified "system."

436.    Moreover, K-Cup Brewers and Compatible Cups have been sold as separate products for many years, and consumers have purchased and demand to purchase Compatible Cups and their K-Cup Brewer separately, from different types of suppliers, from different stores or internet retailers, in different locations, at different times, and under different promotions.

437.    K-Cup Brewers are generally sold through an entirely different sales channel from Compatible Cups. K-Cup Brewers are typically sold to consumers with other appliances, but Compatible Cups are typically sold to consumers through the grocery channel.

438.    While KGM may choose to bundle K-Cups with K-Cup Brewers at the time the brewer is sold, the vast majority of K-Cups are sold without a K-Cup Brewer.

439.    Consumers typically purchase Compatible Cups at separate times from the time at which they purchase a K-Cup Brewer.

440.    Some retailers only sell K-Cups or Competitive Cups but not the corresponding K-Cup Brewers.

441.    As such, a diverse group of entities typically sell K-Cups and/or K-Cup Brewers alone and/or separately.

442.    Further, KGM has successfully raised K-Cup prices above supracompetitive levels for extended periods of time without losing market share of its K-Cup Brewers, thereby

demonstrating that the K-Cup Brewer and the K-Cup do not constitute a system.  *See supra* ¶¶ 35-36.

443.    Indeed, KGM's sales of K-Cup Brewers have experienced a high rate of growth, year after year, every year since KGM increased its K-Cup prices in 2010 and 2011.  KGM's internal documents further show that KGM forecasts this trend of increased brewer sales to continue for many years to come despite KGM's most recent K-Cup price increase taking effect November 2014.  *See supra* ¶ 86.

> **E.    KGM Cannot Justify Tying K-Cup Purchases To Brewer Purchases On The Basis That Closing The Purported "System" Provides Economic Benefits To Consumers**

444.    Nor can KGM justify locking out competitors and tying K-Cup sales to brewer sales on the basis that closing any purported "system" has benefitted consumers.  KGM cannot credibly claim that it closed its "system" in order to lower brewer prices, thereby allowing more consumers to purchase brewers and "metering" K-Cup sales, because KGM has used closing its purported "system" as an excuse to *raise — not lower* — brewer prices as well as K-Cup prices.

445.    Consumers have also come to rely on their ability to brew low-priced Competitive Cups in KGM K-Cup Brewers and have continued to purchase 2.0 K-Cup Brewers based on the expectation that Competitive Cups will work in 2.0 K-Cup Brewers.

446.    As one consumer posted on Amazon.com, "I just got this [2.0 K-Cup Brewer] model to replace one that broke … and found out half of my coffee I had bought for the old machine won't work in this! I put a Grover [sic] Square cup in and it said it wasn't genuine and wouldn't brew it.  This is a dirty trick and am very disgusted keurig would do that to customers given how much the machine costs.  It is obvious they are trying to block out compettion [sic] so they can charge their customers whatever they want to use their expensive machine."

447.    As demonstrated by this consumer's comment, consumers feel locked in once they have purchased or received a K-Cup Brewer.  Consumers perceive KGM's K-Cup Brewers to be "expensive machine[s]," and thus likewise believe that the cost of switching to a new brewer is high, which prevents them from changing to an alternative brewer even if they are dissatisfied after their purchase.

**VIII.    The Introduction Of 2.0 K-Cup Brewers Allowed KGM To Exercise Its Monopoly Power By Excluding Competition, Reducing Consumer Choice, And Raising Prices**

448.    By using the threat of an impending lock-out to coerce retailers to stop selling Competitive Cups, KGM further exercised its monopoly power to exclude competition and to maintain supracompetitive K-Cup prices by forcing consumers to give up the Competitive Cups they prefer to use.

449.    Brokerage and investment firm Stifel agrees that KGM's "re-closing … is primarily driven by share gains from unlicensed brands … since patent expiration," rather than an interest in benefitting consumers.

450.    Bank of America has similarly observed that "the new Keurig platform [] not brew[ing] unlicensed portion packs … is the strongest action management has taken to strengthen the moat around its profit pool," noting further that their "impression was that management felt a sense of urgency to [] protect its market share (and profits) from the incursion of unlicensed portion pack competitors."

451.    As industry commentator Keith Nunes explained, "Keurig 2.0 is the company's answer" to the question of "how would it protect its market share."

452.    Accordingly, as of February 5, 2014, Mr. Kelley "expect[ed] [the] unlicensed [Competitive Cup] share of the system to … begin to decline in the second half [of fiscal 2014] and thereafter," corresponding roughly to the introduction of the 2.0 K-Cup Brewer.   And

indeed, Mr. Kelley was correct. As the anticompetitive effects began to show from KGM's unlawful scheme to lock competitors out of the market — with both the 2.0 K-Cup Brewers lock-out technology and KGM's systematic deception and coercion of retailers and the market as a whole — KGM "successfully recaptured ~ 10 points of the 15 points of market share it had lost over the last couple of years to private-label and non-licensed brands," which largely came "at the expense of [TreeHouse]." *See supra* ¶ 130.

453.    Just as KGM had done before Competitive Cup makers entered the market, as soon as KGM excluded Competitive Cup makers from the market, it again exerted its monopoly power by raising K-Cup prices. On August 14, 2014, KGM announced a price increase of up to 9% on all K-Cups, to become effective on November 3, 2014 — soon after the introduction of the 2.0 K-Cup Brewer.

454.    Market analysts predict that the price hike will not decrease KGM's market share given the large installed user base of K-Cup Brewer owners. As one analyst put it, "A K-Cup sells for about $0.50, so a 9% increase translates to about 4.5 cents extra, hardly big enough to keep a coffee lover away. The rise will, nevertheless, provide a nice cushion for the company's margins."

455.    KGM's anticompetitive product redesign was not legitimately intended to benefit consumers; it was just KGM's latest of many anticompetitive acts designed to maintain its monopoly over the Compatible Cup Market by excluding competition and the lower-priced Competitive Cups that consumers demand.

456.    As one financial analyst recently observed, "the introduction of a new closed system, dubbed Keurig 2.0, which will only use licensed K-Cups … will effectively hold consumers, who can currently shop for the lowest-priced (albeit likely unlicensed K-Cup)

hostage to higher prices. With the new machines, Green Mountain is effectively cutting off competition. I know, I know — a monopoly is good, but marketplace/consumer confusion isn't."

### IX. The Introduction Of 2.0 K-Cup Brewers Injured TreeHouse's Ability To Compete For Sales Of Competitive Cups

457. Although TreeHouse has since reverse engineered Competitive Cups that can be used with the 2.0 K-Cup Brewer, TreeHouse was required to expend considerable resources in order to do so. Moreover, TreeHouse was locked out of 2.0 K-Cup Brewers for several months, forcing consumers who would have otherwise purchased TreeHouse Competitive Cups to purchase Keurig-branded K-Cups. Thus, consumers were coerced to pay more money for a product that was not their first choice in price, quality, and personal taste preference. TreeHouse likewise was injured because it was deprived of sales to consumers who used 2.0 K-Cup Brewers over the period during which it was locked out. Further, despite TreeHouse's reverse engineering success, the lock-out continues to injure TreeHouse because KGM was able to coerce retailers to stop purchasing Competitive Cups for periods extending beyond the time for which TreeHouse was locked out. *See supra* ¶¶ 432-33.

458. As discussed above, KGM systematically confronted retailers with false and misleading statements about 2.0 K-Cup Brewers and its ability to lock out Competitive Cups, attempting to coerce those retailers not to do business with TreeHouse, and then, on information and belief, seeking to foreclose future competition by entering into unduly restrictive, long-term exclusionary agreements with such retail customers. *See supra* ¶¶ 363-72, 432-33.

### X. KGM Has Misled Consumers And Retailers Regarding Material Qualities And Characteristics Of Its K-Cup Brewers, K-Cups, And Competitive Cups Made By TreeHouse And Others, Depriving Plaintiffs Of Sales And Eroding Their Goodwill

459. As part and parcel of its unlawful strategy to increase its own Compatible Cup market share at the expense of Plaintiffs and other competitors, KGM has engaged in false,

deceptive, and/or misleading advertising and promotional efforts directed at consumers and retail customers alike, regarding the key qualities and characteristics of its K-Cup Brewers, its K-Cups, and Competitive Cups made by TreeHouse and others. On information and belief, these efforts were intended to and did drive up KGM's own sales while eliminating or diminishing competition from Competitive Cup makers, including TreeHouse, by sullying their reputations.

460.    The key themes communicated by KGM to consumers — that unlicensed Competitive Cups (such as those made by TreeHouse) are incompatible with the 2.0 K-Cup Brewer, that they are inferior to K-Cups in terms of quality, performance, and safety, and that use of unlicensed Competitive Cups may affect or void the warranties of consumers' 1.0 and 2.0 K-Cup Brewers — have been disseminated by KGM over the course of many months in a wide variety of ways intended to penetrate the public consciousness and have featured prominently in the company's vast nationwide, multimedia marketing campaign to promote the K-Cup Brewers and K-Cups. On information and belief, the purpose and effect of these misrepresentations was not only to deter a substantial number of consumers from purchasing Competitive Cups, but also to decrease retailer demand for Competitive Cups (given that retailers will not stock Portion Packs that do not sell) and to damage the reputations of Competitive Cup makers, including TreeHouse, by communicating that their products were inferior to KGM's.

461.    KGM has made similar misrepresentations about its K-Cup Brewers, K-Cups, and Competitive Cups directly to retailers who collectively purchase and sell no less than hundreds of millions of dollars' worth of K-Cups and unlicensed Competitive Cups annually nationwide, including TreeHouse's actual and potential retail customers. These misrepresentations were made in the course of advertising and/or promotional efforts by KGM intended to generate and increase sales of K-Cup Brewers and K-Cups to retailers. On information and belief, the purpose

and effect of these misrepresentations was to substantially decrease retail demand for Competitive Cups and to tarnish the reputations of Competitive Cup makers, including TreeHouse, with retailers so as to further harm their ability to compete in the future.

462. KGM made these misrepresentations in order to perpetuate its unlawful monopolies in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets to suppress competition, and to inhibit potential competitors from entering those markets. Collectively and individually, these misrepresentations were literally false and/or misleading, relate to material characteristics of K-Cup Brewers, K-Cups, and Competitive Cups, were likely to and did induce reliance by retailers and consumers who were unaware of KGM's misrepresentations, continued over a prolonged period of time, and could not be neutralized or offset by TreeHouse, owing to the vast resources expended by KGM in disseminating these messages and the innumerable ways in which those messages have been spread. Many of KGM's misrepresentative advertisements were communicated to retailers and consumers directly, for example in telephone calls or in meetings. Thus, TreeHouse was not privy to such communications and could not identify the recipients of the communications nor the contents of the false and misleading advertisements, much less respond to or neutralize KGM's misrepresentations. Moreover, as many of the communications related to new 2.0 K-Cup Brewers and 2.0 K-Cups, retailers and consumers lack experience with these products and thus were not knowledgeable about the subject matter of the communications.

## A. KGM's Misrepresentations To Consumers

### 1. KGM Has Misled Consumers Regarding The Compatibility Of Unlicensed Competitive Cups With The 2.0 K-Cup Brewer

463. One of the central messages in KGM's advertising and promotion of the 2.0 K-Cup Brewer and 2.0 K-Cups has been that all unlicensed Competitive Cups (including Plaintiffs'

Competitive Cups) are incompatible with the 2.0 K-Cup Brewer and, therefore, consumers should not purchase any unlicensed Competitive Cups for use in the 2.0 K-Cup Brewer. KGM began disseminating this message through public announcements and other means in 2013, prior to the release of the 2.0 K-Cup Brewer, and has continued making this representation in innumerable ways in the months since its release.

464. This claim is patently false and misleading, as KGM well knows. As an initial matter, KGM's documents suggest that KGM anticipated that ████████████████████████ ████████████████████████████ to the lock-out. Nevertheless, KGM misled consumers and retailers to believe that Competitive Cup makers would be locked out for the long-term in order to pressure retailers and end customers to stop buying Competitive Cups. KGM admitted that Mr. Kelley, who supervised development of the lock-out technology, told KGM's Chief Technology Officer Kevin Sullivan, ████████████████████████████████████ ████████████████████████████████

465. On August 7, 2014 — weeks before the 2.0 K-Cup Brewer hit retail shelves on or around August 25, 2014 — TreeHouse publicly announced in an earnings call that it had successfully developed a Competitive Cup that was compatible with the 2.0 K-Cup Brewer. TreeHouse also made this announcement via a press release of that date, and the announcement was also reported by the media.

466. By letter dated August 11, 2014, TreeHouse notified KGM of this development, attaching TreeHouse's August 7, 2014 press release. This letter also notified KGM that its misrepresentations that the 2.0 K-Cup Brewer would only brew 2.0 K-Cups or licensed Compatible Cups were false and misleading, as were its additional misrepresentations, discussed further below, that the 2.0 K-Cup Brewer's lock-out technology was necessary for quality,

performance, and safety reasons. TreeHouse offered to demonstrate the working of its 2.0 compatible Competitive Cups on the 2.0 K-Cup Brewer to KGM but KGM did not take TreeHouse up on its offer.

467. Indeed, the fact that TreeHouse developed a workaround even before the 2.0 K-Cup Brewer was released shows that KGM had no reasonable basis for believing that the claim would be true when 2.0 K-Cup Brewers became available to the public and strongly suggests that KGM's claims that Competitive Cups would not and could not work with the 2.0 K-Cup Brewer were intended to scare consumers and retailers away from purchasing Competitive Cups.

468. On or around August 21, 2014, several days before the release of the 2.0 K-Cup Brewer, Competitive Cup maker Mother Parkers Tea & Coffees publicly announced that it too had developed an unlicensed Competitive Cup that was compatible with the 2.0 K-Cup Brewer.

469. As TreeHouse announced in a November 6, 2014 investor call and corresponding press release, TreeHouse began shipping 2.0-compatible Competitive Cups to retail customers in October 2014. TreeHouse's 2.0-compatible Competitive Cups were available for limited sale the week of November 3, 2014 at Sam's Club and were available for sale with full distribution in Sam's Club beginning the following week of November 10, 2014.

470. TreeHouse notified KGM that TreeHouse was already actively manufacturing, shipping, and selling 2.0-compatible Competitive Cups by letter dated November 23, 2014. Once again, TreeHouse requested that KGM cease its false, misleading, and disparaging misrepresentations regarding TreeHouse's Competitive Cups.

471. Despite its knowledge that some Competitive Cups do work in 2.0 K-Cup Brewers, KGM has continued to falsely claim that all Competitive Cups are incompatible with 2.0 K-Cup Brewers. For example, this message is conveyed to purchasers of those brewers via

the brewers' packaging and the promotional materials contained therein. The outside of the brewers' packaging clearly states, "Works only with Keurig Brand Packs." Similarly, the user manual enclosed with 2.0 K-Cup Brewers prominently warns consumers that "[y]our Keurig 2.0 brewer will not work with packs that don't have the Keurig logo," among other misrepresentations, and goes on to advertise 2.0-compatible K-Cups for use with the brewer (including a promotional offer for free 2.0 K-Cups if consumers register their brewers online). On information and belief, KGM has also developed retail signage and displays that convey this message and that have been set up at retail outlets following the release of the 2.0 K-Cup Brewer.

472.    2.0 K-Cup Brewers themselves are also instrumental in communicating this message. In the event that a 2.0 K-Cup Brewer fails to detect an ink signal from a Portion Pack inserted into the brewer for whatever reason — including a malfunction by the brewer itself, which has nothing to do with the Portion Pack inserted into the brewer — the brewer will display an electronic "Oops!" screen stating that the inserted Portion Pack "wasn't designed for this brewer." The brewer then lists an address for a specific page of the Keurig.com website, where consumers may view a video in which the narrator says that the "Keurig 2.0 brewer works only with Keurig-brand packs" and that the brewer will not be able to read the lids of non-Keurig branded Portion Packs, among other statements.

473.    KGM also disseminates this message online, through its websites (Keurig.com and keuriggreenmountain.com) and social media (including its Facebook page). For example, in response to a hypothetical question from consumers, "Do I need to buy special packs for the Keurig 2.0 brewer," KGM posted on the Keurig.com website that the "Keurig 2.0 brewer will

only function with Keurig brand packs."[8]  Moreover, the Keurig.com website sells various models of 2.0 K-Cup Brewers and the pages devoted to those models have informed consumers that they only work with Keurig-branded packs.  Similar representations have been made by KGM on its keuriggreenmountain.com website (where, among other materials, consumers can access a September 4, 2014 presentation in which KGM discusses promotional signage to be set up at retail stores notifying consumers that the 2.0 K-Cup Brewer was "designed exclusively for K-Cup & K-Carafe packs") and on its Facebook page (where KGM has stated, "Keurig 2.0 brewer only functions with Keurig Brewed/licensed packs," among other representations). These sites are key tools in advertising KGM's products to consumers — on information and belief, KGM's websites are visited no less than thousands of times per day by consumers, and perhaps far more times, while KGM's Facebook page had over 2.7 million "likes" as of November 18, 2014 and has doubtless been seen by many more consumers.

474.  KGM has also spread this message through websites run by its partner retailers. For example, consumers have been able to purchase 2.0 K-Cup Brewers through the website for the QVC at-home shopping channel.  Pages on that website devoted to the 2.0 K-Cup Brewers have contained links to KGM's 2.0 K-Cup Brewer instruction manuals (which, as noted above, assert that Competitive Cups are not compatible with the 2.0 K-Cup Brewer), as well as to "frequently asked question" documents that, on information and belief, were created by KGM and also claim that the 2.0 K-Cup Brewer will not work with unlicensed Competitive Cups.

475.  KGM actively spreads this message through other promotional efforts as well. For example, on or around October 17, 2014, KGM sponsored a public "event" in New York City where, on information and belief, KGM representatives stated that Competitive Cups cannot be made to work in the 2.0 K-Cup Brewer.

---

[8] *See* http://www.keurig.com/support/K2.0-brewers.

476.     To drive this point home even further, KGM's customer service representatives are expected to follow scripts drafted by the company that promote K-Cups to customers who contact them and express an interest in using unlicensed Competitive Cups in connection with their 2.0 K-Cup Brewers.  Among other things, the customer service representatives are expected to steer those consumers away from buying Competitive Cups in the future (and regardless of whether the consumer called to discuss a concern regarding TreeHouse's Competitive Cups specifically or a concern regarding other Competitive Cups) by telling them, ██████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████  The customer service representatives are also supposed to ████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████

477.     On information and belief, the messages conveyed by KGM's customer service representatives, as reflected by their scripts, are yet another facet of KGM's marketing campaign to promote its own products by disparaging Competitive Cup makers.  Furthermore, these scripts reflect a policy on the part of KGM to mislead and misinform consumers who contact its customer service representatives not only about the compatibility of unlicensed Competitive Cups with the 2.0 K-Cup Brewer, but also about the quality, performance and safety of unlicensed Competitive Cups and the effect that using such unlicensed Competitive Cups has on brewer warranties, as discussed in more detail below, so that consumers cease buying all types of Competitive Cups going forward.  On further information and belief, KGM's customer service

representatives have and continue to make use of scripts promoting all of these messages, and have disseminated them to a wide swath of TreeHouse's actual and potential customers, resulting in and contributing to substantial lost sales and decreased goodwill towards TreeHouse.

478. KGM's claim that all Competitive Cups are incompatible with 2.0 K-Cup Brewers has and is likely to cause consumers to mistakenly to believe that only 2.0 K-Cups have the capability of being used in 2.0 K-Cup Brewers, that no TreeHouse Competitive Cups are able to be used in 2.0 K-Cup Brewers, and, therefore, that they had to purchase the higher priced 2.0 K-Cups, rather than the TreeHouse's Competitive Cups.

### 2. KGM Has Misled Consumers Regarding The Quality, Performance, And Safety Of Unlicensed Competitive Cups

479. Other of KGM's core themes in marketing and promoting its products are that it is necessary for quality, performance, and safety reasons for consumers to exclusively use K-Cups with their K-Cup Brewers. The clear implications of this messaging are that unlicensed Competitive Cups are of inferior quality, perform worse than K-Cups, and are also unsafe and potentially harmful to K-Cup Brewers.

480. KGM expresses these themes in a variety of ways. With respect to quality, KGM has claimed that the 2.0 K-Cup Brewers read information stored on 2.0 K-Cup lids to identify the specific beverages inserted into the brewers and then tailor the brewing process based on that information in order to deliver the "perfect brew," "perfect beverage," or words to similar effect. With respect to performance and safety, KGM has represented in a wide variety of contexts that use of K-Cups is necessary to maintain the proper functioning of both 1.0 and 2.0 K-Cup Brewers and that use of Competitive Cups may pose unspecified safety problems.

481. As with its misrepresentations that unlicensed Competitive Cups are incompatible with the 2.0 K-Cup Brewer, these claims are false, deceptive, and/or misleading. KGM has no

objective basis whatsoever to claim that Competitive Cups in general, or TreeHouse's Competitive Cups specifically, are of lower quality, do not perform as well, or are less safe than K-Cups, or are potentially harmful to K-Cup Brewers.

482.    To the extent that KGM has admitted ████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████ of the same beverage in terms of quality and performance.  KGM's internal documents reveal that in or around March 2014, it performed a series of tests on ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ On information and belief, these tests were performed on 2.0 K-Cup Brewers or prototypes thereof.

483.    As for the issue of safety, KGM has publicly represented on the Keurig.com website, as well as in other contexts, that it does not "make or test … other brands." Additionally, KGM has admitted that it has ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████

484.    Finally, and in connection with the 2.0 K-Cup Brewer specifically, there is no magic to the 2.0 K-Cup Brewer's lock-out technology that somehow enhances the quality,

performance, or safety of 2.0 K-Cups over and above that of unlicensed Competitive Cups. KGM has admitted that the 2.0 K-Cup Brewer's ink reader ████████████████████████ ████████████████████████████████████████████████ In other words, the ink reader only ████████████████████████████████ ████████████████████████████████████████ If the ink reader identifies a 2.0 K-Cup, the consumer will then be presented with the opportunity to *manually* select brew options for the beverage that was inserted into the brewer.

485.    On the other hand, if the reader does not detect any ink, then the Portion Pack will not brew, regardless of the relative quality, performance, or safety of the Portion Pack at issue. Indeed, the 2.0 K-Cup Brewer will not even brew K-Cups made for use with the 1.0 K-Cup Brewer, which are physically identical to 2.0 K-Cups except for the lack of ink on their lids. And, while KGM touts the lock-out technology — and the exclusive use of 2.0-compatible K-Cups with the 2.0 K-Cup Brewer — as a necessary safety feature, KGM ████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████ Similarly, as noted at ¶435, *supra*, KGM's CEO admitted prior to the 2.0 K-Cup Brewer's launch that KGM was "still deciding" how the 2.0 K-Cup Brewer would treat unlicensed Competitive Cups, and that options under consideration included "brewing them a few times before they no longer work." Thus, as with its misrepresentations regarding quality

and performance, KGM's purported safety concerns merely serve as a pretext to justify excluding Competitive Cups from the 2.0 K-Cup Brewer.

486. In spite of all this, KGM has and continues to disseminate these misrepresentations regarding quality, performance, and safety in its promotional and advertising efforts.

487. For example, the user manual for the 2.0 K-Cup Brewer contains multiple pages advertising 2.0-compliant K-Cups for use with the brewer. One such page informs customers that "[t]he Keurig 2.0 brewer reads the lid of the Keurig brand pack to provide the perfect beverage setting." Additionally, the section of the manual entitled "Important Safeguards" provides an extensive list of precautions regarding performance and use of the 2.0 K-Cup Brewer, including a warning, set forth in bold, that "[y]our Keurig 2.0 brewer will not work with packs that do not have the Keurig logo on them," not only emphasizing that Competitive Cups are incompatible with 2.0 K-Cup Brewers, but suggesting that their use could cause harm to the brewers themselves.

488. This theme is also echoed on the page of the Keurig.com website to which consumers are directed after receiving an "Oops!" screen when using the 2.0 K-Cup Brewer. Besides telling consumers that the 2.0 K-Cup Brewer will only work with Keurig-branded Portion Packs, the video also states that the 2.0 K-Cup Brewer reads the lids of 2.0-compatible K-Cups in order "to provide the perfect beverage." The page on which the video is located further states that the "Keurig 2.0 Brewing Technology reads each lid to deliver on the promise of excellent quality beverages."

489.     KGM has also stated on other pages of the Keurig.com website, as well as on its Facebook page, that "[i]t's critical for performance and safety reasons that the [2.0] system only brews Keurig brand license packs."

490.     Similar sentiments have been expressed publicly by KGM in investor presentations (for example, a June 11, 2014 investor presentation accessible through the keuriggreenmountain.com website, in which Mr. Kelley stated that it was necessary for the 2.0 K-Cup Brewer to read inserted cups in order to "deliver the consumer benefit in a safe way"), as well as to the media.  Among other contexts, and in connection with a report by CNN dated March 7, 2014, KGM's Senior Public Relations Specialist, Kate Binette, stated that "[i]t is critical for performance and safety reasons that the system only brews Keurig brand packs."  In talking points intended for a press event held on or around June 24, 2014 ████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████  And, in a statement to the media on October 5, 2014, KGM's Vice President of Corporate Communications, Suzanne DeLong, stated that "[w]e remain confident that only Keurig-designed and produced and/or licensed beverage-optimized packs with the Keurig Brewed seal will allow the Keurig 2.0 brewer to perform consistently at its optimum level."

491.     Additionally, on information and belief, these themes have been widely disseminated by KGM through public events and other promotional efforts stemming from

KGM's marketing campaign for the 2.0 K-Cup Brewer. On information and belief, during a promotional event held in New York City on or around October 17, 2014, KGM representatives falsely stated that the ink on the lids of 2.0 K-Cups informs the 2.0 K-Cup Brewer of the beverages contained in those 2.0 K-Cups and further instructs the 2.0 K-Cup Brewer how to brew those specific beverages. These same representations were made by KGM representatives during promotional segments that, on information and belief, were broadcast on the QVC network on or around November 16, 2014 promoting the 2.0 K-Cup Brewer and 2.0 K-Cups. These segments were also made available for viewing on QVC's website, where consumers can purchase 2.0 K-Cup Brewers.

492. KGM's customer service representatives also spread these claims. According to a script for use with respect to the 1.0 K-Cup Brewer and which, according to Mr. Sullivan, ███



███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████ The customer service representatives are also supposed to warn consumers that ██████████████████████████████████████████████

█████████████████████████ Similarly, a script that was drafted specifically for the 2.0 K-Cup Brewer, and which upon information and belief has been used since the release of that brewer, instructs KGM's customer service representatives to stress that the █████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████ among other representations. If asked why the 2.0 K-Cup Brewer is ███████

███████████████████████████ they are instructed to respond that █████████████

███████████████████████████████████ Likewise, a third customer service script, which was developed by KGM to help troubleshoot the 2.0 K-Cup Brewer, and which upon information and belief has been used since the release of that brewer, instructs customer service representatives to inform customers using unlicensed Competitive Cups that the brewer ██████████████ ████████████████████████████████████ and that they should therefore only purchase K-Cups in the future. Indeed, on information and belief, customer service representatives have further misled a substantial number of consumers by asserting that the 2.0 K-Cup Brewer recognizes the type of 2.0 K-Cup inserted into the brewer and "brews differently" depending on the type of beverage inserted. As set forth at ¶¶ 405-21, *supra*, this is simply untrue.

> 3. **KGM Has Confused And Misled Consumers Regarding How The Use Of Unlicensed Competitive Cups Affects Their Brewer Warranties**

493. Finally, KGM has actively disseminated the message that consumers' use of unlicensed Competitive Cups may somehow affect the warranties on their brewers. In fact, this veiled threat is illusory. It is KGM's policy with respect to both the 1.0 and 2.0 K-Cup Brewers to ██████████████████████████████████████████████████████████████ ███████████████████████

494. Nevertheless, KGM communicates this threat in a variety of ways. This threat is not only false, but, on information and belief, has created confusion among a substantial number of consumers about whether they are "allowed" to use unlicensed Competitive Cups with their brewers and have resulted in and contributed to TreeHouse's loss of sales and goodwill.

495. As set forth in ¶¶ 390-92, *supra*, the written warranties contained in the product manuals sold with 1.0 and 2.0 K-Cup Brewers assert that use of Competitive Cups will void those warranties, in blatant violation of the prohibition on tie-in sales set forth in the Magnuson-

Moss Warranty Act. The 1.0 Brewer warranty states, "Any damage to or malfunction of your Brewer resulting from the use of non-Keurig Brewed K-Cup brand packs and accessories *may not be covered by this warranty or may result in a service fee if the damage or malfunction is determined to be caused by such use . . . . Nor does this warranty cover damages caused by use of non Keurig Brewed K-Cup brand packs or accessories*" (emphasis added). Similarly, the 2.0 warranty states, "The Keurig 2.0 brewer is designed to only work with Keurig brand packs. Any damage to or malfunction of your brewer resulting from the use of non-Keurig brand packs and accessories *may not be covered by this warranty or may result in a service fee if the damage or malfunction is determined to be caused by such use . . . . Nor does this warranty cover damages caused by use of non-Keurig brand packs or accessories*" (emphasis added).

496. This message is also fostered and reinforced by KGM's online statements. For example, a June 29, 2014 post by KGM on Keurig's Facebook page reads as follows: "We do not endorse using any product in or with our brewers other than those that carry the Keurig or Keurig Brewed logos …. We also want to note that using unapproved portion packs may decrease your brewer's performance, overall life and may affect its warranty." KGM also states on Keurig's Facebook page that "[w]e recommend you only use products with the Keurig Brewed seal with the Keurig Brewer as these meet the standards for taste, quality and safety and are tested to perform in the Keurig Brewer …. Also, using unapproved portion packs or accessories may decrease your brewer's performance, overall life, and may affect its warranty."

497. Online customer reviews for Competitor Cups also reflect KGM's messaging. In reviewing Rogers brand San Francisco Bay Coffee OneCups, an Amazon.com reviewer wrote, "When I called Keurig for assistance I was informed that this coffee was not a licensed manufacturer of 'K' cups and that by using them I would in essence void the warranty on the

machine. They did replace the machine but told me that using non-licensed coffee cups would result in voiding the warranty."[9]  Another reviewer wrote, "Not only can they not guaranty the unauthorized K-Cups, they can also void your warranty."

498.   Similarly, one Amazon.com reviewer of Treehouse brand Grove Square Cappuccino Single Serve Cups wrote, "First of all, tasted pretty good.  BUT, contacted a few Keurig-Cup authorized on-line sellers and was told by all that Grove Square are NOT approved by Keurig and using them will void the warranty on your brewer.  Was told they are a "pirated" product."[10]

499.   This theme is further emphasized in the scripts prepared for use by KGM's customer service representatives.  As reflected by those scripts, consumers are to be told that

███████████████████████████████████████████████████  On information and belief, customers are in fact told by KGM's customer service representatives statements to the effect that "they do not authorize [TreeHouse Competitive Cups] to use in their coffee makers," that if they are used, "the warranty would not apply," and that if consumers "use any other brands of the coffee other than Green Mountain, then the machine would not be covered under warranty."  In this way as well, KGM creates the impression through these representations that consumers must cease buying all Competitive Cups (including those made by TreeHouse and others) and only use K-Cups going forward.

---

[9] Customer review, Amazon.com, San Francisco Bay Coffee, Breakfast Blend, 80 OneCup Single Serve Cups, http://www.amazon.com/review/RHR7BKT16FM6A/.
[10] Customer review, Amazon.com, Grove Square Cappuccino Variety Pack, 72-Count Single Serve Cup for Keurig K-Cup Brewers, http://www.amazon.com/review/R155AT1NBWJ62/.

### 4. KGM's Misrepresentations To Consumers Have Harmed TreeHouse

500. On information and belief, these misrepresentations, collectively and individually, have misled and deceived a substantial number of consumers regarding material qualities and characteristics of K-Cup Brewers, K-Cups, and Competitive Cups, have caused them to cease or avoid buying TreeHouse's Competitive Cups, and have also eroded TreeHouse's goodwill. On further information and belief, decreased consumer demand resulting from KGM's smear campaign has in turn decreased demand from Plaintiffs' actual and potential retail customers for Plaintiffs' Competitive Cups.

### B. KGM's Misrepresentations To Retailers

### 1. KGM Has Misled Retailers Regarding The Current And Future Compatibility Of Unlicensed Competitive Cups With The 2.0 K-Cup Brewer And Future K-Cup Brewers

501. KGM has made much the same misrepresentations to retailers. Among other contexts, these misrepresentations were made by KGM's management and personnel in sales presentations to major retailers prior to the launch of the 2.0 K-Cup Brewer. On information and belief, the retailers to whom these presentations were directed — including ███████████ ████████████████████████████████████████████████████████████ █████████████████ — collectively buy and sell no less than hundreds of millions of dollars in K-Cups and Competitive Cups annually and include actual and potential retail customers of Plaintiffs.[11] The presentations were intended to promote future sales of KGM's brewers and K-Cups in general, as well as 2.0 K-Cup Brewers and 2.0 K-Cups in particular. The sales presentations also served as platforms for KGM to disparage the qualities and

---

[11] Indeed, according to KGM's securities filings, Wal-Mart and Costco alone have each recently accounted for over 10% of KGM's net consolidated annual sales.

characteristics of unlicensed Competitive Cups, including the Competitive Cups made by Plaintiffs.

502. As reflected by slides from these sales presentations, one of KGM's key themes was that Competitive Cups would not and could not be made to work with the 2.0 K-Cup Brewer.

503. For example, and as discussed at ¶ 540, *supra*, a presentation given to retail giant ████████ on or around October 29, 2013 emphasized the ██████████████████ of ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████████ Additionally, KGM asserted in this presentation that the 2.0 K-Cup lids contained ████████████████ ██████████████████████████████████████████████████████████ ██████████ which on information and belief created the misimpression that KGM had unspecified intellectual property rights with respect to the ink on the 2.0 K-Cup lids that would bar competitors from developing their own 2.0-compatible Competitive Cups in the future. Indeed, on information and belief (and as set forth at ¶¶ 54, 143, *supra*). ██████████████ ██████████████████████████████████████████████████████████ ██████████████████████████████████ As if that were not enough, KGM represented to ██████████████████████████████████████████████████ ████████████ reinforcing the claim that KGM's competitors could not develop Competitive Cups that were compatible with the 2.0 K-Cup Brewer lock-out technology and implying that their Competitive Cups were ████████████

504. Similar representations were made as part of sales presentations to numerous retailers in the lead-up to the launch of the 2.0 K-Cup Brewer.





██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

518.     Additionally, on information and belief, KGM represented in the course of these sales presentations, and/or in separate presentations or other promotional outreach efforts to these and/or other retailers, that even if the makers of Competitive Cups could develop workarounds to the 2.0 K-Cup Brewer's lock-out technology, those Competitive Cups would not be compatible with future iterations of the K-Cup Brewer.

519.     On further information and belief, KGM has continued to make these representations in sales presentations and promotional efforts to these and other retailers even though TreeHouse has developed and is now selling 2.0-compatible Competitive Cups.

### 2.     KGM Has Misled Retailers Regarding The Quality, Performance, And Safety Of Unlicensed Competitive Cups

520.     On information and belief, KGM has also disparaged the quality, performance, and safety of unlicensed Competitive Cups (including Plaintiffs' Competitive Cups) as part of its promotional efforts to the above-referenced and/or other retailers.

521.     Although KGM has no objective basis for casting such aspersions, as detailed at ¶¶ 480-85, *supra*, it nonetheless did so in its sales presentations to retailers, emphasizing  to each of the above retailers ████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

[REDACTED]

522.     Further, upon information and belief, KGM used the above-referenced sales presentations and/or other promotional outreach efforts to these and other retailers to spread false and misleading information regarding the safety of unlicensed Competitive Cups, including Plaintiffs' Competitive Cups. *See*, *e.g.*, ¶ 370, *supra*.

### 3.     KGM's Misrepresentations Regarding Its Discontinuance Of 1.0 K-Cup Brewers

523.     KGM also represented to numerous retail customers that it planned to stop selling 1.0 K-Cup Brewers altogether by the spring of 2015 and, accordingly, it would be critical for retailers to stock only 2.0 K-Cups following the launch of the 2.0 K-Cup Brewer.

524.     For example, in its above-referenced presentation to [REDACTED]

[REDACTED]

527.    KGM's statements to retailers were further echoed in public statements,  For example, during a November 2013 financial analyst call, KGM CEO Brian Kelley stated that KGM "will replace [its] current lineup of both K-Cup and Vue brewers" with 2.0 K-Cup Brewers and "will be transitioning [its] lineup of Keurig brewers over fiscal 2014 and early 2015." KGM continued this message throughout late 2013 and early 2014.

528.    On information and belief, these misrepresentations had the purpose and effect of pressuring retailers to cease their business relationships with makers of Competitive Cups and

enter into exclusionary agreements with KGM prior to the launch of the 2.0 K-Cup Brewer, before Competitive Cup makers ever had the opportunity to develop a workaround to the brewer's lock-out technology.

### 4. KGM's Misrepresentations To Retailers Have Harmed TreeHouse

529. On information and belief, these misrepresentations, collectively and individually, are false and/or misleading, and have in fact misled, confused, and deceived a substantial number of retailers, responsible for hundreds of millions of dollars' worth of annual Compatible Cup purchases and sales, regarding material qualities and characteristics of K-Cup Brewers, K-Cups, and Competitive Cups (including TreeHouse's products). These misrepresentations have deprived TreeHouse of substantial sales to such retailers and have also eroded TreeHouse's goodwill, jeopardizing its ability to compete for future sales to retailers.

530. Specifically, on information and belief, KGM's false, misleading, and disparaging statements have caused TreeHouse to lose millions of dollars' worth of business, including but not limited to business with ███████ (as discussed further at ¶¶ 531-48, *infra*), have harmed TreeHouse's reputation, and have impaired its ability to win future retail business from the above-referenced retailers and others.

### 5. KGM's Misrepresentations Have Interfered With TreeHouse's Business Relations, Including Those With ████████

531. KGM's misrepresentations have interfered with TreeHouse's business relations.

532. For example, ████████████████████████████████████████████ ███████████████████ after KGM misrepresented that its lock-out technology would benefit consumers and would also prevent TreeHouse's Competitive Cups from working in 2.0 K-Cup Brewers.



534.     ████ private label program was extremely successful.  Consumers rated the quality of ████ Competitive Cups highly, with 86% of ████ Competitive Cup consumers stating that these products performed at or better than expected.

535.     Sales of ████ Competitive Cups were expanding rapidly, with over 500% growth since 2012.

536.     In fact, ████ had been so impressed by TreeHouse's private label programs that earlier this year it named TreeHouse subsidiary Bay Valley as "████ Private Label Supplier of the Year" for Dry Grocery, which includes Competitive Cups.  According to ████ senior leadership, Bay Valley was awarded the Private Label Supplier of the Year award for a number of positive reasons, including "continually driving sales through product innovation; industry leading product development; and pioneering supply chain transformation."

537.     Despite this success, in May 2014, ████ informed TreeHouse that it was suddenly switching to KGM and would no longer use TreeHouse for its private label coffee.  This switch occurred even though ████ and Grove Square sales were growing quickly across all ████ divisions.  With TreeHouse's proven track record, quality, pricing, and private label success, switching to a new private label program represents a severe downside risk.

538.     Upon information and belief, ████ switched to KGM because of KGM's misrepresentation that the lock-out technology would prevent unlicensed Competitive Cups from working in the 2.0 K-Cup Brewer, its assertion that ████ would lose customer confidence if

its private label product did not work in the 2.0 K-Cup Brewer, and/or misrepresentations regarding quality, performance, and/or safety of TreeHouse's Competitive Portion Packs. On information and belief, these misrepresentations were made during the sales presentation that KGM gave to ███████ on or around October 29, 2013 and October 30, 2013, and/or in the course of additional promotional efforts by KGM that were directed at ███████

539. ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████ By stating that unlicensed Competitive Cups were ███████████ that would not work in its new brewers because of interactive technology was ████████████████ KGM was both disparaging Competitive Cups, which the Federal Circuit has held may legally be sold to consumers for use in KGM brewers, and was falsely claiming that Competitive Cups would not work in 2.0 K-Cup Brewers.

540. In a second day of meetings between KGM and ████████████████████ KGM reiterated that because of the ████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████ KGM's ██████████████████ communicated in this meeting set June 2014 as the date to ████████████████████████████████████ ██████████████ In KGM's ████████████████ KGM also set June 2014 for the date to ████████████████████████████████████████ KGM also

set ███████████████████████ including the objective to ███████████

███████████████████████████████████████████████████

including that ████████████████████████ The advertising displayed in

the PowerPoint presentation repeatedly shows messaging stating: ████████

████████████████████████████

541. Shortly after the ████████████████ meeting, buyers for ████████ began

expressing concerns to TreeHouse that its Competitive Cups would not work in 2.0 K-Cup

Brewers and that ████████ was suddenly █████████████████ of ███████

Competitive Cups.

542. In May 2014, ██████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

543. Notably, at least one prior ██████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████ This is consistent with other threats KGM has

made to retailers, KADs, and Away-From-Home operators that if the customer permitted

consumers to use Competitive Cups, KGM would take away their brewers. By using its brewers

to exclude competition for the sale of Compatible Cups, both through purportedly "proprietary"

anti-counterfeiting technology and through such strong-arm tactics, KGM has leveraged is

dominance in the brewer market to restrain competition in the Portion Pack and Compatible Cup

Markets.

544.     KGM's ███████████████ presentation also demonstrated that KGM believed that its 2.0 K-Cup Brewer strategy ████████████████████████████ ██████████████████████████████████████████

545.     ██████ transition to KGM for its private label Competitive Cups was unlike other times at ██████ when a private label product line was in jeopardy of being lost to a competitor.  Ordinarily, ██████ provided the incumbent private label producer the opportunity to meet or beat a competitive offer before switching private label suppliers.   In this case, however, ██████ did not afford TreeHouse such an opportunity.

546.     The rapid growth of ██████████████ products during the time they were produced by TreeHouse indicates that these products had become many consumers' preferred Compatible Cups.  As these consumers' preferred Compatible Cups have now been removed from the shelves due to KGM's exclusionary and deceptive conduct, the switch from TreeHouse to KGM has harmed not only TreeHouse, but also all of the consumers who made the ████ ████ cups produced by TreeHouse into the enormous success that they were.  Those consumers, however, will be disappointed to discover that even though the brand appears to be the same, the products will no longer have the same taste and aroma.

547.     As a result of ██████ switching from TreeHouse to KGM for private label Compatible Cups, TreeHouse has lost business with ████████████████████████████ TreeHouse was projected to sell over ██████ in sales of ██████ coffee products in 2015 alone.

548.     Even though TreeHouse has already reverse engineered Competitive Cups that work in 2.0 K-Cup Brewers, the buyer for ██████ has indicated that ██████ is not at liberty to discuss future private label sales with TreeHouse.  On information and belief, ██████ is

now prohibited from using TreeHouse and other Competitive Cup manufacturers for █████████ private label business under a restrictive agreement with KGM.

**XI.     KGM Has Harmed Competition, Competitive Cup Makers, Suppliers, Retailers, Distributors, Commercial Customers, And Consumers**

549.     KGM's anticompetitive acts, including requiring its K-Cup machinery and component suppliers, brands and roasters, and K-Cup distributors and retailers to enter into exclusive agreements, have had serious anticompetitive effects on TreeHouse and on competition in the Portion Pack and Compatible Cup Markets overall, including on other Competitive Cup manufacturers, potential market entrants, distributors, retailers, commercial customers, and consumers.

**A.     Restraints On Price Competition Have Caused Supracompetitive Prices Harming Consumers, Commercial Customers, Retailers, And Distributors**

550.     With little to no competition, depending on the line of business, KGM and its owned or licensed coffee brands have been able to charge supracompetitive prices for K-Cups. As a result, consumers and commercial customers in both the Away-From-Home and At-Home Market Segments have been forced to pay at least 15% to 25% more for KGM-owned and licensed K-Cups than they would have for Competitive Cups.  Indeed, a consumer or commercial customer pays on average $0.60 for a KGM K-Cup, as opposed to $0.45 for a Competitive Cup. *See* Rabobank, In Pod We Trust, NCA 2013 Coffee Summit Presentation at 28 (October 4, 2013).

551.     The average K-Cup Brewer owner, moreover, uses more than 1,000 K-Cups per year, according to estimates.  At an estimated 60 cents per K-Cup, that translates into an expense of over $600 per year for the average K-Cup user.

552. Competitive Cups are substantially less expensive, which can save consumers over $150 a year (assuming the same 1,000-cup per year consumption rate).

553. Consumers and commercial customers do not willingly choose to pay supracompetitive prices for KGM-owned and licensed K-Cups. On the contrary, market studies show that "Keurig users remain highly price sensitive and willing to try new K-Cup brands if they are less expensive." In fact, "90.9% of Keurig users replied that they would try a new K-Cup brand if it were less expensive. This is more supportive evidence that K-Cup users would not necessarily be loyal to a particular brand if they found a more inexpensive option."

554. By restraining price competition and the availability of Competitive Cups, KGM has also harmed retailers, grocers, and distributors, which seek to reduce prices in order to increase sales and win business away from competitors with higher prices or less brands.

### B. Restraints On Competition Have Reduced Output And Availability Of Preferred Brands, Thereby Harming Suppliers, Competitive Cup Makers, Retailers, Distributors, Commercial Customers, And Consumers

555. KGM's conduct has also limited the number and variety of Competitive Cup beverages available to consumers and commercial customers. By foreclosing access to markets, inputs, suppliers, distributors, and brands, KGM has limited the output, distribution, and availability of Competitive Cups. As a result, consumers and commercial customers have been impeded or entirely prevented from accessing the types and flavors of beverages offered by Competitive Cup manufacturers.

556. Restricted access to Competitive Cups has been especially harmful to consumers who prefer the taste, flavor, and/or quality of Competitive Cups over KGM-owned or licensed K-Cups. Indeed, as one market study observed, "[w]hile there are more licensed K-Cups in the top

100 on Amazon, unlicensed [Competitive Cups] actually had a better average ranking and had far more consumers who rated each flavor."

557. Consumer choice has been further limited because competitors disadvantaged by KGM's anticompetitive acts have suffered a diminished capacity to invest in research and resources needed to develop new products and to improve the quality of their existing Competitive Cups.

558. KGM has further constrained Competitive Cup output and diversity by foreclosing access to lucrative licensing and manufacturing arrangements with most well-known coffee brands, such as Starbucks and Dunkin' Donuts.

559. KGM's agreements with ███████ and other roasters and licensees also restrain competition and limit Competitive Cup output by prohibiting companies from making their own K-Cup Brewers or supporting the development of new K-Cup Brewers by third parties.

**C.  KGM Has Substantially Foreclosed Access To The Office Coffee Services Market Segment**

560. Because KGM is currently the only significant provider of K-Cup Brewers in the Office Coffee Services Market Segment and has prohibited distributors from selling Competitive Cups, competition in this market has been substantially foreclosed.  TreeHouse, other Competitive Cup manufacturers, and other potential entrants have been substantially foreclosed from competing for this business.

561. Distributors serving the Office Coffee Services Market Segment have also been deprived of competition for their services and the opportunity to bargain for their preferred sales terms, despite their expressed interest in doing business with multiple Compatible Cup manufacturers.

562. Instead, distributors have been forced to do business with KGM alone on a take-it-or-leave-it basis, and distributors and commercial customers have had to accept KGM's unfavorable delivery and packaging terms.

563. By eliminating the freedom to do business with Competitive Cup manufacturers, distributors have also been harmed because they cannot compete based on the brands that they carry, which also harms consumers who are deprived of their preferred Compatible Cup selections.

564. KGM's Office Coffee Services customers have expressed that they would prefer to purchase Competitive Cups from TreeHouse, but are precluded from doing so because KGM has locked in all distributors and has substantially foreclosed access to Competitive Cups.

### D. Harm Specific To The TreeHouse Companies

565. The TreeHouse companies have suffered millions of dollars of damages as a result of delayed market entry, substantially foreclosed access to markets and customers, months of being locked out from 2.0 K-Cup Brewers, increased costs due to reverse engineering and restricted inputs, attorneys' fees and costs associated with the defense of a sham litigation and appeal, and the loss of substantial sales.

566. As a direct and proximate result of KGM's anticompetitive conduct, TreeHouse has lost profits due to higher costs of doing business and the fact that it has been substantially foreclosed from competing with KGM in the Compatible Cup Market.

567. As a direct and proximate result of KGM's scheme to foreclose Plaintiffs from the Compatible Cup Market, Bay Valley has been financially injured by a decreased ability to compete for Competitive Portion Pack supply arrangements.

568. As a direct and proximate result of KGM's scheme to restrain competition for Compatible Cups, Sturm's ability to manufacture Compatible Cups has been substantially

restrained and therefore Sturm has been financially injured. In addition, Sturm's reputation was substantially harmed as a result of KGM's baseless litigation regarding Sturm's Grove Square Compatible Cups.

## CAUSES OF ACTION

### COUNT ONE

**Monopolization**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

569. Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 568 as if fully set forth herein.

570. As detailed above, KGM has monopoly power in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

571. As alleged herein, KGM has willfully and intentionally engaged in anticompetitive conduct in order to unlawfully maintain its monopoly in these markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

572. KGM has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Cup Markets by:

a.     coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements that restrain market entry, unreasonably restrain competition, exclude competitors, limit output, and raise competitors' costs;

b.     conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to exclude competitors, unreasonably restrain competition, allocate markets, and limit output;

c.　　coercing distributors and retailers to enter into anticompetitive agreements that restrain market entry, exclude competitors, unreasonably restrain competition, and limit output;

d.　　filing an objectively and subjectively baseless litigation and appeal against TreeHouse subsidiary Sturm for the purpose of interfering with TreeHouse's ability to compete in the Compatible Cup Market;

e.　　interfering with TreeHouse's business relationships by attempting to dissuade retailers from working with TreeHouse on the basis that TreeHouse's Competitive Cups would not be authorized or compatible with 2.0 K-Cup Brewers;

f.　　tying the purchase of K-Cups to the purchase of K-Cup Brewers in order to unreasonably restrain competition from Competitive Cup makers;

g.　　unreasonably restraining competition by implementing lock-out technology that cannot be justified based on any legitimate, non-pretextual consumer benefit, which was coupled with the elimination of most if not all K-Cup Brewers that are compatible with Competitive Cups;

h.　　raising rivals' costs above those that would exist under competitive conditions by coercing Competitive Cup makers to enter purported "licenses" that restrict output and raise rivals' costs by requiring the payment of improper "royalty" payments; and

i.　　making material misrepresentations and omissions to retailers, distributors, and end customers, including but not limited to, misrepresentations and omissions regarding the compatibility, performance, safety, and quality of Competitive Cups as compared to K-Cups in order to perpetuate its Portion Pack and Compatible Cup Market monopolies by deterring customers from doing business with Competitive Cup makers (including

TreeHouse) and thereby also dissuading other potential competitors from entering the market. As set forth in great detail above, KGM's misrepresentations were (1) clearly false, (2) clearly material, (3) clearly likely to induce reasonable reliance, (4) made to buyers without knowledge of the subject matter, (5) continued for prolonged periods, and (6) not readily susceptible of neutralization or other offset by TreeHouse. *See supra*, at ¶¶ 459-548.

573. KGM has effectively restrained, and further threatens to restrain, competition in the Single-Serve Brewer Market by entering into anticompetitive agreements with competitors and suppliers prohibiting them from making or supporting Competitive Brewers.

574. While many of these anticompetitive acts themselves constitute individual antitrust violations on a stand-alone basis, together they support a broader monopolization claim.

575. As a direct, foreseeable, and proximate result of KGM's anticompetitive and monopolistic conduct, TreeHouse has been injured in its business, all with resultant damages in amounts to be proven at trial, in at least the following ways: (1) TreeHouse's costs of doing business have been increased as a direct result of KGM tying up the inputs and machinery necessary to make Competitive Cups; (2) TreeHouse has been substantially foreclosed from competing in the Portion Pack and Compatible Cup Markets; (3) TreeHouse has had to pay attorneys' fees and costs to defend against a baseless litigation and appeal; and (4) TreeHouse has lost business as a result of KGM's anticompetitive conduct, interference with its relationships with retailers, and its claims that Competitive Cups would be locked out of 2.0 K-Cup Brewers and other deceptive and disparaging conduct.

576. As a direct, foreseeable, and proximate result of KGM's anticompetitive and monopolistic conduct, competition, suppliers, retailers, distributors, commercial customers, and

consumers in the Portion Pack and Compatible Cup Markets have been harmed by, among other things: (1) KGM's ability to charge supracompetitive prices for K-Cups; and (2) the reduced output and availability of consumers' preferred Compatible Cups.

## COUNT TWO

**Exclusive Dealing**
**Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2**
**and Section 3 of the Clayton Act, 15 U.S.C. § 14**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(1)-(4)**
**Wisconsin Antitrust Act, Wis. Stat. §§ 133.03(1)-(2)**
**Donnelly Act, N.Y. Gen. Bus. Law § 340**

577. Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 576 as if fully set forth herein.

578. As detailed above, KGM has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

579. KGM has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified agreements with machine suppliers, component suppliers, competitor roasters, competitor coffee brands, distributors, and retailers.

580. These exclusive dealing agreements are unreasonably restrictive in terms of breadth, duration, and market coverage.

581. This web of exclusive dealing agreements cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because KGM does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers. Thus, KGM's exclusive dealing agreements are not only unduly restrictive and unreasonable in length, but also serve the anticompetitive purpose of cutting competitors off from resources they need to compete with KGM.

582.     This conduct has substantially foreclosed competition in the Portion Pack and Compatible Cup Markets.

583.     This conduct has also substantially foreclosed access to machinery used to manufacture non-filtered Compatible Cups and competition for sales of Compatible Cups to the Office Coffee Services Market Segment.

584.     Because this conduct involves exclusionary agreements between two or more unaffiliated entities, this conduct violates Section 1 of the Sherman Act, 15 U.S.C. § 1, and similar state laws.  These exclusionary agreements also violate Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws because these agreements constitute anticompetitive acts intended to maintain KGM's monopolies in the Portion Pack and Compatible Cup Markets.

### COUNT THREE

**Monopoly Leveraging**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

585.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 584 as if fully set forth herein.

586.     As detailed above, KGM has monopoly power in the Single-Serve Brewer Market, including the power to control prices and exclude competition.

587.     KGM has willfully and intentionally used its monopoly power in the Single-Serve Brewer Market to unlawfully maintain or attempt to maintain monopoly power in the Portion Pack and Compatible Cup Markets, specifically, by selling K-Cup Brewers at or below cost in order to lock consumers into the K-Cup-format as opposed to any other single-serve formats, then coercing companies, whose business depends on access to K-Cup Brewers, to sign

anticompetitive agreements prohibiting them from dealing with KGM's competitors in the Compatible Cup Market.

588.    KGM has continued to leverage its monopoly power in the Single-Serve Brewer Market to unlawfully maintain monopoly power in the Portion Pack and Compatible Cup Markets by tying 2.0 K-Cup purchases to purchases of its 2.0 K-Cup Brewers.

589.    KGM has also leveraged its monopoly in the Single-Serve Brewer Market by threatening not to sell brewers to customers and threatening to take brewers back from customers unless they agree not to sell Competitive Cups.

590.    KGM has further leveraged its monopoly in the Single-Serve Brewer Market by threatening consumers that their warranties will be void if consumers use Competitive Cups, by disparaging Competitive Cups when consumers call KGM about their brewers, and by restraining consumers access to Competitive Cups as a result of KGM's unlawful tactics with retailers and distributors.

591.    KGM has also leveraged its monopoly power in the Compatible Cup and Portion Pack Markets by entering into unlawful tying and anticompetitive contracts restraining competitors from entering into the Single-Server Brewer Market in order to unlawfully maintain its monopoly in that market as well.

592.    Not only does KGM have a dangerous probability of success of monopolizing the Single-Serve Brewer, Compatible Cup, and Portion Pack Markets, but it has actually *succeeded* in doing so by unlawfully maintaining and augmenting its monopolies in these markets through its leveraging tactics.

593.    KGM willfully acquired monopoly power by the exclusionary conduct detailed above, rather than through efficiency or innovation.

# COUNT FOUR

**Sham Litigation**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

594.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 593 as if fully set forth herein.

595.     Just weeks after TreeHouse subsidiary Sturm entered the Compatible Cup Market, Keurig willfully and intentionally sued Sturm, alleging in bad faith, with no objective or subjective basis, that Sturm's Competitive Cups infringed Keurig's patents directed at brewers and methods of using brewers and that Sturm induced consumers to infringe these brewer patents by using Competitive Cups.     Keurig's non-patent claims were likewise objectively and subjectively baseless.

596.     In September 2012, the United States District Court for District of Delaware granted summary judgment in favor of Sturm on Keurig's patent claims, and Keurig, in turn, reasserted its baseless patent claims by appealing that decision to the United States Court of Appeals for the Federal Circuit, thereby further requiring TreeHouse to expend additional resources that could have otherwise been spent competing against KGM.

597.     After Sturm incurred three years of litigation costs based on Keurig's frivolous argument that Sturm's Competitive Cups infringed Defendants' K-Cup Brewer patents, the Federal Circuit affirmed the district court's ruling and held, on October 17, 2013, that Keurig was not seeking the proper enforcement of any patent rights, but was rather trying to make an "end-run" around the patent laws with "a tactic that the Supreme Court has explicitly admonished." *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013).

598. The Federal Circuit expressly concluded that rather than pursuing any legitimate purpose, "Keurig [was] attempting to impermissibly restrict purchasers of Keurig brewers from using non-Keurig [Competitive Cups] by invoking patent law." *Id.*

599. No reasonable litigant could have realistically expected to succeed on the merits of Keurig's claims, and thus Keurig's litigation and appeal were objectively baseless.

600. On information and belief, and as supported by the allegations in the *Keurig v. Sturm* complaint and the meritless legal claims, Keurig's litigation and appeal were also subjectively baseless.

601. On information and belief, Keurig instituted this lawsuit and appeal in an attempt to interfere with TreeHouse's ability to compete in the Compatible Cup Market, to intimidate market entrants, to raise a rival's costs, to harm TreeHouse's reputation and interfere with its business relations, and to deprive TreeHouse and consumers of resources that would have otherwise been spent on bringing more Competitive Cups to consumers at favorable prices.

602. As a result of this sham litigation and appeal, Plaintiffs were forced to incur three years' worth of litigation fees and costs, rather than use those resources to compete against KGM. Competition in the market for Compatible Cups has thus been harmed.

## COUNT FIVE

### Patent Misuse

603. Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 602 as if fully set forth herein.

604. The *Keurig v. Sturm* litigation alleged that KGM's patents directed at brewers and methods of using brewers were infringed by Sturm and KGM's consumers using Sturm's Competitive Cups in K-Cup Brewers.

605. As noted above, the United States Court of Appeals for the Federal Circuit affirmed the district court's grant of summary judgment in Sturm's favor on Keurig's patent claims, holding that rather than seeking the proper enforcement of any patent rights, Keurig was rather trying to make an "end-run" around the patent laws. *Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1374 (Fed. Cir. 2013). This constituted patent misuse.

606. KGM has engaged in two types of unlawful patent misuse: (1) by seeking to extend the scope of its patents; and (2) by tying unpatented products to patented products.

607. First, by having sought to "impermissibly restrict" purchasers of K-Cup Brewers from using Competitive Cups on the basis of its brewer and brewing method patents, (and similarly having sought to restrict suppliers of those Competitive Cups, like TreeHouse) KGM has willfully, intentionally, and unlawfully broadened the scope of its patents and threatens to do so again in the future. KGM's efforts to "convert" "unlicensed" competitors, such as TreeHouse, to "licensed" or "authorized" Keurig manufacturers have only increased in the lead up to and following the release of 2.0 K-Cup Brewers. Accordingly, the Federal Circuit's decision in the *Sturm* litigation holding that KGM's assertion of brewer patents was an impermissible attempt to restrict consumers' use of Competitive Cups in 1.0 K-Cup Brewers did not adequately resolve this controversy. Indeed, that litigation did not involve any patents on K-Cups or their components themselves, nor did it involve 2.0 K-Cup Brewers. Indeed, when KGM sought to convert TreeHouse to an "authorized" licensee, KGM did not base its demand for royalties or KGM's "authorization" to make Competitive Cups on the patents at issue in the litigation with Sturm, but rather on the impending introduction of 2.0 K-Cup Brewers.

608.    Second, by conditioning consumers' use of the patented K-Cup Brewers on the use of its unpatented K-Cups, KGM engaged in, and threatens to continue to engage in, an unlawful tying arrangement, constituting patent misuse.

609.    As a result of KGM's patent misuse, competition has been harmed because, among other things, KGM's patent misuse has substantially foreclosed its competitors from the Compatible Cup Market, TreeHouse has been forced to pay attorneys' fees and costs that otherwise would have been spent bringing more Competitive Cups to the market, and consumers have had reduced access to Competitive Cups.

610.    A declaration that KGM may not lawfully exclude TreeHouse from making Competitive Cups for use in KGM brewers based on any patent rights is necessary to refute KGM's statements to suppliers, distributors, and customers that KGM has a lawful right to exclude competitors and demand that they only deal with companies that are "licensed" or "authorized" by KGM.

## COUNT SIX

**Tying**
**Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2**
**and Section 3 of the Clayton Act, 15 U.S.C. § 14**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(4)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)**

611.    Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 610 as if fully set forth herein.

612.    KGM's contractual agreements, which force distributors, suppliers, and retailers to purchase K-Cups from KGM, or at least not to purchase Competitive Cups, if they wish to purchase K-Cup Brewers, constitute unlawful tying arrangements.

613.    K-Cup Brewers and K-Cups are separate and distinct products.

614.    KGM has sufficient economic power in the Single-Serve Brewer market to coerce distributors, suppliers, and retailers to also purchase K-Cups even if they would prefer not to do so.

615.    KGM's tying arrangements affect a significant volume of interstate commerce, and have the effect of substantially foreclosing competition in the Compatible Cup Market by virtue of reducing the number of potential distributors, suppliers, and retail customers for whom Competitive Cup makers can compete.    Moreover, these tying arrangements allow KGM to maintain supracompetitive prices for K-Cups that are ultimately passed on to end customers, who are also harmed by virtue of having fewer beverage options available at lower price points because of KGM's conduct.

616.    KGM's tying arrangements have caused TreeHouse substantial damages as a direct and proximate cause of this unlawful conduct because KGM has foreclosed Plaintiffs from competing for potential distributors, suppliers, and retail customers and deprived TreeHouse of sales channels to end customers, for reasons having nothing to do with the merits of KGM's or TreeHouse's products.

617.    KGM's agreements requiring that companies purchasing K-Cups not purchase Competitive Brewers also constitute an unlawful tie that exploits KGM's market power in the Compatible Cup Market.    This tie injures TreeHouse, other Competitive Cup makers, and consumers because it reduces the ability for companies to produce or support new Competitive Cup makers that could open up competition between K-Cups and Competitive Cups.

618.    KGM also restrained competition and caused TreeHouse substantial damages by technologically tying the purchase of K-Cups to 2.0 K-Cup Brewers by installing a lock-out mechanism in 2.0 K-Cup Brewers that locked TreeHouse Competitive Cups out of 2.0 K-Cup

Brewers for several months. Even after TreeHouse has reverse engineered a workaround to the lock-out mechanism, the technological tie continues to harm TreeHouse by having prevented TreeHouse from being able to compete for ongoing sales orders with retailers and others, raising TreeHouse's costs of production, and forcing TreeHouse to incur substantial and unnecessary reverse engineering costs.

**COUNT SEVEN**

**Attempted Monopolization In The Alternative**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(2)**

619.   Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 618 as if fully set forth herein.

620.   As detailed above, KGM has monopoly power, or at a minimum, a dangerous probability of acquiring monopoly power, in the Portion Pack and Compatible Cup Markets, including the power to control prices and exclude competition.

621.   KGM has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Portion Pack and Compatible Cup Markets, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and similar state laws.

622.   KGM's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Portion Pack and Compatible Cup Markets. KGM's anticompetitive conduct presents a dangerous probability that KGM will succeed, to the extent it has not already, in its attempt to monopolize the Portion Pack and Compatible Cup Markets.

623.   As a direct, foreseeable, and proximate result of KGM's anticompetitive and monopolistic conduct, TreeHouse has been injured in its business, all with resultant damages in

amounts to be proven at trial, in at least the following ways: (i) TreeHouse's costs of doing business have been increased as a direct result of KGM tying up the inputs and machinery necessary to make Competitive Cups; (ii) TreeHouse has been substantially foreclosed from competing in the Portion Pack and Compatible Cup Markets; (iii) TreeHouse has had to pay attorneys' fees and costs to defend against a baseless litigation and appeal; and (iv) TreeHouse has lost business as a result of KGM's interference with its relationships with retailers and its claims that Competitive Cups would be locked out of 2.0 K-Cup Brewers.

624. As a direct, foreseeable, and proximate result of KGM's anticompetitive and monopolistic conduct, competitors, suppliers, distributors, retailers, commercial customers, and consumers in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets have been harmed by, among other things: (i) KGM's ability to restrain competition with Competitive Cup makers; and (ii) the reduced output and availability of consumers' preferred Compatible Cups.

## COUNT EIGHT

**Conspiracy to Monopolize**
**Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2**
**Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(1)-(3)**
**Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2)**
**Donnelly Act, N.Y. Gen. Bus. Law § 340**

625. Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 624 as if fully set forth herein.

626. As detailed above, KGM has monopoly power in the Single-Serve Brewer, Portion Pack Market, and Compatible Cup Market, including the power to control prices and exclude competition.

627. KGM willfully and intentionally conspired with competitor roasters and coffee brands to monopolize the Portion Pack and Compatible Cup Markets.

628. KGM and its licensees accomplished this by entering into multi-year, exclusionary agreements which prevent competitor roasters or coffee brands from licensing trademarks or entering into agreements with KGM's competitors.

629. Co-conspirators entered into these agreements with the knowledge and agreement that distributors and other resellers will be required to enter into, or already have entered into, agreements that limit their freedom to do business outside of specified authorized locations, thereby restraining the ability of Competitive Cup makers to enter into contracts with distributors or other resellers.

630. These restrictions regarding where and how K-Cups can be sold also allow KGM to maintain supracompetitive prices across licensed brands by controlling output, which reduces the competitor roaster or coffee brands' incentives to enter into deals with Competitive Cup makers and creates an economic incentive for these co-conspirators to restrain competition from Competitive Cup makers and to induce Competitive Cup makers to enter into "license" agreements with KGM that would require the Competitive Cup maker to permit KGM to allocate the markets for Competitive Cups and to raise rivals' costs through the payment of an illegitimate "royalty."

631. KGM and its licensees' anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of restraining competition from Competitive Cup makers in order to restrain price competition in the Portion Pack and Compatible Cup Markets.

## COUNT NINE

**Conspiracy, Concerted Refusals to Deal & Group Boycott
Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1
Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10(1)-(2)
Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)
Donnelly Act, N.Y. Gen. Bus. Law § 340**

632.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 631 as if fully set forth herein.

633.     As detailed above, KGM has monopoly power in the Single-Serve Brewer, Portion Pack, and Compatible Cup Markets, including the power to control prices and exclude competition.

634.     KGM has willfully and intentionally entered into anticompetitive, exclusionary, and unjustified concerted refusal to deal agreements with machine suppliers, component suppliers, competitor roasters, competitor beverage brands, distributors, and retailers.

635.     Specifically, KGM has effectively restrained, and further threatens to restrain, competition in the Portion Pack and Compatible Cup Markets by:

a.     coercing manufacturers of the machinery and components necessary to make Compatible Cups to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers;

b.     conspiring with competitor roasters and coffee brands to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers; and

c.     coercing distributors and retailers to enter into anticompetitive agreements to refuse to deal with Competitive Cup makers.

636.     These agreements constitute unlawful concerted refusals to deal because two or more unaffiliated companies have unreasonably agreed not to deal with Competitive Cup makers.  These agreements also constitute unlawful group boycotts because they are designed to

induce Competitive Cup makers to become "licensed" or "authorized" by KGM. Indeed, KGM has repeatedly made public statements that its business objective is to "convert" unlicensed suppliers to licensed entities.

637. This web of agreements refusing to deal with Competitive Cup makers cannot be justified by any purportedly procompetitive purpose, such as to ensure a reliable supply of materials used in K-Cups, because KGM does not restrict the ability to sell the same products for purposes other than for use in K-Cup Brewers. Thus, KGM's refusals to deal serve the anticompetitive purpose of cutting competitors off from resources they need to compete with KGM.

638. These concerted refusals to deal have unreasonably restrained trade and have permitted KGM to maintain its monopoly power over the Portion Pack and Compatible Cup Markets.

## COUNT TEN

**False, Deceptive, and Misleading Promotion/Advertising**
**Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)**
**Illinois Consumer Fraud and Deceptive Business Practices Act,**
**815 Ill. Comp. Stat. 505/1, *et seq.***
**Illinois Uniform Deceptive Trade Practices Act,**
**815 Ill. Comp. Stat. 510/1, *et seq.***
**New York Consumer Protection Act, N.Y. Gen. Bus. Law §§ 349-50**

639. Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 638 as if fully set forth herein.

640. KGM has willfully misrepresented and/or omitted material facts, features, qualities, and characteristics of K-Cup Brewers, K-Cups, and Competitive Cups in advertising and promotional activity that took place in interstate commerce and, on information and belief, have been widely disseminated to substantial numbers of consumers and retailers who are actual

and potential customers of Plaintiffs (including actual and potential customers in Illinois and New York). Each of the uses by KGM of false and misleading representations and omissions of material fact set forth above, including but not limited to the aforesaid claims and suggestions (direct or implied) that Competitive Cups are incompatible with the 2.0 K-Cup Brewer (as well as future iterations of the K-Cup Brewer), that Competitive Cups are inferior in quality, performance, and safety to K-Cups and could potentially harm K-Cup Brewers, that use of Competitive Cups may affect consumers' warranties for their K-Cup Brewers, that 2.0 K-Cups ████████████████████████████████████████████ and that KGM planned to discontinue selling all 1.0 K-Cup Brewers within a few months of the 2.0 K-Cup Brewers' release (collectively, the "KGM Claims"), constitute, individually and in combination, a misleading use of a word, term, and name that tends to deceive or mislead consumers and the trade in violation of Section 43(a) of the United States Trademark Act, 15 U.S.C. § 1125(a). KGM has willfully continued making these claims in spite of its awareness of their falsity and/or potential to mislead.

641. On further information and belief, these misrepresentations, collectively and individually, have in fact confused, misled, and deceived consumers and retailers alike (including those in Illinois and New York), have deprived Plaintiffs of substantial sales to consumers and retailers, threaten the loss of substantial future sales, and have also caused significant harm to Plaintiffs' goodwill and reputation, further hurting Plaintiffs' ability to compete for future sales.

642. Each of the aforesaid uses by KGM of false and misleading representations and omissions of material facts, including the KGM Claims, individually and in combination, constitute deceptive trade practice that tend to deceive or mislead consumers and the trade in

violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill.Comp.Stat. 505/1, *et. seq.* and the Illinois Uniform Deceptive Trade Practices Act 815 Ill.Comp.Stat. 510/1, *et. seq.*

643.     Each of the aforesaid uses by KGM of false and misleading representations and omissions of material facts, including the KGM Claims, individually and in combination, also constitute deceptive trade practice that tend to deceive or mislead consumers and the trade in violation of the New York Consumer Protection Act, New York General Business Law §§ 349-50.

## COUNT ELEVEN

### Violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340, *et seq.*

644.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 643 as if fully set forth herein.

645.     The violations of Sections 1 and 2 of the Sherman Act set forth above also constitute violations of the Donnelly Act, N.Y. Gen. Bus. Law §§ 340-47.

## COUNT TWELVE

### Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. 510/1, *et seq.*

646.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 645 as if fully set forth herein.

647.     KGM's conduct alleged herein has injured TreeHouse Foods and Bay Valley, companies with a principal place of business in Illinois.

648.     The anticompetitive conduct alleged herein also constitutes a violation of the IUDTPA, 815 Ill Comp. Stat. 510/1, *et seq.*, which makes it unlawful to engage in unfair

methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

649.     KGM's anticompetitive conduct was willful and intentional and has resulted in substantial injury to consumers and competition that is not outweighed by any benefit to consumers, and which could not have been reasonably avoided by consumers.

## COUNT THIRTEEN

### Violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/1, *et seq.*

650.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 649 as if fully set forth herein.

651.     KGM's conduct alleged herein has injured TreeHouse Foods and Bay Valley, companies with a principal place of business in Illinois.

652.     The anticompetitive conduct alleged herein also constitutes a violation of the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(1), which makes it unlawful for a person to "make any contract with, or engage in any combination or conspiracy with, any other person who is, or but for a prior agreement would be, a competitor of such person;" 740 Ill. Comp. Stat. § 10/3(2), which prohibits unreasonable restraints of trade or commerce "[b]y contract, combination or conspiracy;" 740 Ill. Comp. Stat § 10/3(3), which makes it unlawful to "[e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce;" and 740 Ill. Comp. Stat. § 10/3(4), which prohibits unlawful tying and exclusive dealing arrangements.

653.     KGM has willfully and intentionally monopolized trade or commerce in Illinois by restraining competition with TreeHouse Foods and Bay Valley, which have their principal place of business in Illinois.

## COUNT FOURTEEN

### Violation of the Wisconsin Antitrust Act, Wis. Stat. §§ 133.01, *et seq.*

654.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 653 as if fully set forth herein.

655.     KGM intentionally entered into an agreement with R.A. Jones, a Wisconsin-based supplier of machinery necessary to make non-filtered Compatible Cups, to refuse to sell such machinery to KGM's competitors, such as TreeHouse.

656.     The anticompetitive conduct alleged herein also constitutes a violation of the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1) which prohibits "contract[s], combination[s] in the form of trust or otherwise, or conspirac[ies], in restraint of trade or commerce" as well as Wis. Stat. § 133.03(2), which makes unlawful monopolization, attempts to monopolize, and combinations or conspiracies to monopolize trade or commerce.

657.     A portion of the conduct alleged herein occurred within the state of Wisconsin. Furthermore, the conduct alleged herein as a whole substantially affects consumers in the state of Wisconsin and Bay Valley's subsidiary, Strum, located in Wisconsin, as well as interstate commerce.

## COUNT FIFTEEN

### Wisconsin Common Law Unfair Competition

658.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 657 as if fully set forth herein.

659.     KGM entered into an agreement with R.A. Jones, a Wisconsin-based supplier of machinery necessary to make non-filtered Compatible Cups, to refuse to sell such machinery to KGM's competitors, such as TreeHouse.

660. On information and belief, KGM has also entered into additional unlawful contracts with Wisconsin suppliers of components used to make Compatible Cups.

661. The anticompetitive conduct alleged herein also constitutes a violation of the common law of Wisconsin, which prohibits unfair competition between competitors or would-be competitors.

## COUNT SIXTEEN

### Negligent and Intentional Interference with Business Relations Under New York Law

662. Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 661 as if fully set forth herein.

663. TreeHouse had, or has, a reasonable expectation of, economically advantageous business relations with its past, current, and prospective Competitive Cup customers.

664. A special relationship existed between KGM and TreeHouse because KGM intended to harm TreeHouse, such harm was foreseeable, TreeHouse's injury was directly linked to KGM's conduct, and KGM's conduct was morally blameworthy.

665. KGM knew of TreeHouse's business relations and was aware or should have been aware that if it did not act with due care, its actions would interfere with and cause injury, in whole or in part, to these relations.

666. KGM interfered with and continues to interfere with these relations by confronting TreeHouse's Competitive Cup customers with its plan to lock out Competitive Cups through its introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those retailers from doing business with TreeHouse.

667. KGM made and continues to make these statements intentionally, maliciously, without justification, and through the use of wrongful means as set forth above.

668. But for KGM's interference, TreeHouse would have received or would receive the expected economic advantage from its business relations with its Competitive Cup customers.

669. As a result of KGM's interference, TreeHouse is likely to suffer, has suffered, and will continue to suffer damage to its relations with past, current, and/or prospective Competitive Cup customers, as set forth above.

670. By reason of the foregoing, KGM has engaged in negligent and intentional interference with business relations in violation of New York law.

## COUNT SEVENTEEN

### Tortious Interference with Contract Under New York Law

671. Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 670 as if fully set forth herein.

672. TreeHouse had contracts with roasters, beverage brands, retail customers, and/or others to manufacture, co-pack, supply, and/or sell Competitive Cups.

673. KGM knew of TreeHouse's contracts with these customers and intentionally interfered in order to persuade the customers to breach or end their contracts with TreeHouse and to sign restrictive agreements with KGM instead.

674. KGM interfered with and continues to interfere with these contracts by confronting TreeHouse's customers with misrepresentations that the lock-out technology would prevent unlicensed Competitive Cups from working in the 2.0 K-Cup Brewer, assertions that the customers would lose consumer confidence if its private label product did not work in the 2.0 K-Cup Brewer, and/or misrepresentations regarding quality, performance, and/or safety of TreeHouse's Competitive Cups.

675.     But for KGM's interference, TreeHouse would have continued to profit from sales associated with its relationships with these customers.

676.     As a result of KGM's interference, TreeHouse is likely to suffer, has suffered, and will continue to suffer damage by virtue of its customers breaching or ending their contracts with TreeHouse, as set forth above.

677.     By reason of the foregoing, KGM has engaged in tortious interference with contract in violation of New York law.

## COUNT EIGHTEEN

### Tortious Interference with Contract Under Wisconsin Law

678.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 677 as if fully set forth herein.

679.     KGM has interfered with TreeHouse's business relations by confronting confronting roasters, beverage brands, distributors, retail customers, and/or others with its plan to lock out Competitive Cups through its introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those customers from doing business with TreeHouse.

680.     KGM, aware of TreeHouse's reasonable expectation of entering into a valid business relationship with these customers, intentionally interfered without justification or privilege with that prospective business relationship by making the statements described above, causing injury to TreeHouse.

## COUNT NINETEEN

### Tortious Interference with Prospective Business Expectancy Under Illinois Law

681.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 680 as if fully set forth herein.

682.     KGM has interfered with TreeHouse's business relations by confronting roasters, beverage brands, distributors, retail customers, and/or others with its plan to lock out Competitive Cups through its introduction of the 2.0 K-Cup Brewers and by attempting to dissuade those customers from doing business with TreeHouse.

683.     KGM, aware of TreeHouse's reasonable expectation of entering into a valid business relationship with these customers, intentionally interfered with that prospective business relationship by making the statements described above, causing injury to TreeHouse.

684.     KGM's conduct also constitutes common law unfair competition under Illinois law.

## COUNT TWENTY

### Tortious Interference with Contract Under Illinois Law

685.     Plaintiffs repeat and reassert each of the allegations contained in paragraphs 1 through 684 as if fully set forth herein.

686.     TreeHouse had contracts with roasters, beverage brands, retail customers, and/or others to manufacture, co-pack, supply, and/or sell Competitive Cups.

687.     KGM knew of TreeHouse's contracts with these customers and intentionally interfered in order to persuade the customers to breach or end their contracts with TreeHouse and to sign restrictive agreements with KGM instead.

688.     KGM interfered with and continues to interfere with these contracts by confronting TreeHouse's customers with misrepresentations that the lock-out technology would prevent unlicensed Competitive Cups from working in the 2.0 K-Cup Brewer, assertions that the customers would lose consumer confidence if its private label product did not work in the 2.0 K-Cup Brewer, and/or misrepresentations regarding quality, performance, and/or safety of TreeHouse's Competitive Cups.

689.     But for KGM's interference, TreeHouse would have continued to profit from sales associated with its relationships with these customers.

690.     As a result of KGM's interference, TreeHouse is likely to suffer, has suffered, and will continue to suffer damage by virtue of its customers breaching or ending their contracts with TreeHouse, as set forth above.

691.     By reason of the foregoing, KGM has engaged in tortious interference with contract in violation of New York law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand a trial by jury and hereby respectfully request:

A.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM has monopolized, or in the alternative, attempted to monopolize, the Compatible Cup Market and the Portion Pack Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(2);

B.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM has conspired with its licensees to monopolize the Compatible Cup Market and the Portion Pack Market in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(1)-(3), the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

C.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM's exclusive dealing agreements are unreasonable and unenforceable restraints of trade that violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the Illinois Antitrust Act, 740 Ill. Comp. Stat. §§ 10/3(1)-(4), the Wisconsin Antitrust Act, Wis. Stat. §§ 133.03(1)-(2), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

D.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM has unlawfully leveraged its monopoly power in the Single-Serve Brewer Market to monopolize the Compatible Cup Market and the Portion Pack Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(2);

E.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM has unlawfully tied the sale of K-Cups to the sale of K-Cup Brewers by virtue of its exclusionary agreements with distributors, suppliers, and retailers, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2,

Section 3 of the Clayton Act, 15 U.S.C. § 14, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)-(4), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2);

F.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM has unlawfully tied the sale of K-Cup Brewers to K-Cups, in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, Section 3 of the Clayton Act, 15 U.S.C. § 14, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10/3(3)-(4), and the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1)-(2);

G.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM's unlawful agreements are null and void and that their anticompetitive provisions cannot be enforced against suppliers, roasters, licensees, distributors, retailers, or other parties to the contracts;

H.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM has engaged in concerted refusals to deal and group boycotts in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, the Illinois Antitrust Act, 740 Ill. Comp. Stat. § 10(1)-(2), the Wisconsin Antitrust Act, Wis. Stat. § 133.03(1), and the Donnelly Act, N.Y. Gen. Bus. Law § 340;

I.      Pursuant to 28 U.S.C. § 2201, a declaration that KGM has engaged in false and/or misleading advertising and promotional activity in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill Comp. Stat. § 510/1, *et seq.*;

J.      Pursuant to 15 U.S.C. § 15, compensatory and trebled damages resulting from KGM's violations of the Sherman Act;

K.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing KGM from continuing the unlawful acts in violation the Sherman Act;

L.      Pursuant to 15 U.S.C. § 26, permanent injunctive relief requiring KGM to disable the lock-out feature of the 2.0 K-Cup Brewer, which unnecessarily increases costs, and preventing

and restraining KGM from installing other lock-out features in the future that are not reasonably necessary to confer a consumer benefit that outweighs the anticompetitive nature of the lock-out;

M.     Pursuant to 15 U.S.C. § 26, permanent injunctive relief preventing and restraining KGM from tying the sale of K-Cups to K-Cup Brewers;

N.     Pursuant to 15 U.S.C. §§ 1116-17, permanent injunctive relief preventing and restraining KGM from continuing its unlawful acts in violation of the Lanham Act, 15 U.S.C. § 1125(a), recovery of KGM's profits and Plaintiffs' trebled damages resulting from KGM's violations of the Lanham Act, recovery of the costs of this action, and attorneys' fees;

O.     Pursuant to N.Y. Gen. Bus. Law §§ 349-50, permanent injunctive relief preventing and restraining KGM from continuing its unlawful acts, recovery of Plaintiffs' damages resulting from KGM's violations of law, and recovery of attorneys' fees;

P.     Pursuant to N.Y. Gen. Bus. Law § 340(5), trebled damages resulting from KGM's violations of the Donnelly Act and permanent injunctive relief preventing KGM from continuing the unlawful acts in violation of the Donnelly Act;

Q.     Pursuant to Wis. Stat. § 133.18, trebled damages resulting from KGM's violations of the Wisconsin Antitrust Act;

R.     Pursuant to Wis. Stat. § 133.14, permanent injunctive relief voiding KGM's unlawful contracts with its conspirators that violate the Wisconsin Antitrust Act and preventing KGM from entering into new unlawful contracts;

S.     Pursuant to 740 Ill. Comp. Stat. § 10/7(2), maximum compensatory and trebled damages resulting from KGM's intentional and willful violations of the Illinois Antitrust Act and permanent injunctive relief preventing KGM from continuing the unlawful acts in violation of the Illinois Antitrust Act;

T.      Pursuant to 815 Ill Comp. Stat. § 505/10a, recovery of Plaintiffs' actual and punitive damages resulting from KGM's violations of law;

U.      Pursuant to 815 Ill Comp. Stat. § 510/3, permanent injunctive relief preventing KGM from continuing the unlawful acts in violation of the Illinois Uniform Deceptive Trade Practices Act;

V.      Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon this Court's declaratory judgments;

W.      Pre-judgment and post-judgment interest at the maximum legal rate;

X.      TreeHouse's costs, expenses, and reasonable attorneys' fees in bringing this action;

Y.      An award of punitive damages; and

Z.      Such other relief as this Court may deem just and proper.

## <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury on all issues triable by jury.

Dated:  New York, New York       WINSTON & STRAWN LLP
        November 25, 2014        Attorneys for Plaintiffs


                                By: ___/s/ Aldo A. Badini_____
                                    Aldo A. Badini
                                    abadini@winston.com
                                    Susannah P. Torpey
                                    storpey@winston.com
                                    WINSTON & STRAWN LLP
                                    200 Park Avenue
                                    New York, New York 10166
                                    (212) 294-6700

                                    Dan K. Webb (admitted *pro hac vice*)
                                    dwebb@winston.com
                                    James F. Herbison (admitted *pro hac vice*)
                                    jherbison@winston.com
                                    WINSTON & STRAWN LLP
                                    35 West Wacker Drive
                                    Chicago, IL 60601-9703
                                    (312)  558-5600

                                    Diana L. Hughes (admitted *pro hac vice*)
                                    dhughes@winston.com
                                    WINSTON & STRAWN LLP
                                    333 South Grand Avenue
                                    Los Angeles, CA 90071
                                    (213) 615-1700